

1  COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2  SHAWN A. WILLIAMS (213113)
   100 Pine Street, Suite 2600
3  San Francisco, CA 94111
   Telephone: 415/288-4545
4  415/288-4534 (fax)
   shawnw@csgrr.com
5       – and –
   DARREN J. ROBBINS (168593)
6  DAVID C. WALTON (167268)
   655 West Broadway, Suite 1900
7  San Diego, CA 92101
   Telephone: 619/231-1058
8  619/231-7423 (fax)
   darrenr@csgrr.com
9  davew@csgrr.com

10 LAW OFFICES BERNARD M.
      GROSS, P.C.
11 DEBORAH R. GROSS
   ROBERT P. FRUTKIN
12 Wanamaker Bldg., Suite 450
   100 Penn Square East
13 Philadelphia, PA 19107
   Telephone: 215/561-3600
14 215/561-3000 (fax)
   deborahg@bernardmgross.com
15 robertf@bernardmgross.com

16 Attorneys for Plaintiff

17 [Additional counsel appear on signature page.]

18          UNITED STATES DISTRICT COURT

19          NORTHERN DISTRICT OF CALIFORNIA

20 SAMMY ESSES, Individually and On Behalf   )  No.
   of All Others Similarly Situated,          )  CV 08 0856
21                                             )  CLASS ACTION
                          Plaintiff,           )
22                                             )  COMPLAINT FOR VIOLATION OF THE
        vs.                                    )  FEDERAL SECURITIES LAWS
23                                             )
   SiRF TECHNOLOGY HOLDINGS, INC.,             )
24 MICHAEL L. CANNING, DIOSDADO P.             )
   BANATAO, GEOFFREY RIBAR and                 )
25 KANWAR CHADHA,                              )
                                               )
26                        Defendants.          )  DEMAND FOR JURY TRIAL
                                               )
27

28

**INTRODUCTION**

1.       This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of SiRF Technology Holdings, Inc. (SiRF" or the "Company") between October 30, 2007 and February 4, 2008 (the "Class Period"), against SiRF and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.       SiRF, through its subsidiaries, engages in the development and marketing of semiconductor and software products that are designed to enable location-awareness utilizing global positioning system ("GPS") and other location technologies worldwide. SiRF is headquartered in San Jose, California.

3.       During the Class Period, defendants issued materially false and misleading statements regarding the Company's business and financial results. As a result of defendants' false statements, SiRF stock traded at artificially inflated prices during the Class Period. This permitted one of the defendants to sell $9.6 million worth of his SiRF stock at $24.18-$24.29 per share.

4.       On February 4, 2008, after the market closed, the Company issued a press release entitled "SiRF Technology Holdings Inc. Announces Financial Results for Fourth Quarter and Fiscal 2007," which stated in part:

> Net revenue in the fourth quarter of 2007 was $100.4 million, an increase of 35.3 percent from $74.2 million reported in the fourth quarter of 2006. Net revenue in fiscal 2007 was $329.4 million, an increase of 33.0 percent from $247.7 million reported in fiscal 2006. Gross margin in the fourth quarter of 2007 was 48.1 percent, as compared to 54.7 percent in the fourth quarter of 2006. Gross margin in fiscal 2007 was 50.9 percent, as compared to 54.8 percent in fiscal 2006.
>
> Net income for the fourth quarter of 2007 was $0.7 million, or $0.01 per diluted share, based on 64.3 million diluted weighted average shares outstanding. This compares with net income of $9.1 million, or $0.16 per diluted share, based on 56.1 million diluted weighted average shares outstanding in the fourth quarter of 2006.
>
> Net loss for fiscal 2007 was $(10.4) million, or $(0.19) per diluted share, based on 55.5 million diluted weighted average shares outstanding. This compares with net income of $2.4 million, or $0.04 per diluted share, based on 56.0 million diluted weighted average shares outstanding in fiscal 2006.

1    5.    On February 5, 2008, SiRF's stock collapsed $8.91 per share to close at $7.36 per

2  share, a one-day decline of 54% on volume of 63 million shares, 30 times the average three-month

3  volume.

4    6.    The true facts, which were known by the defendants but concealed from the investing

5  public during the Class Period, were as follows:

6         (a)    SiRF's acquisition of Centrality Communications, Inc. ("Centrality") was

7  having an adverse impact on SiRF's results due to the similar products sold by Centrality which

8  were cannibalizing SiRF's sales;

9         (b)    SiRF's major customers were not placing orders at sufficient quantities for

10  SiRF to meet the aggressive targets set by and for the Company;

11         (c)    Centrality's System-on-Chip ("SoC") product line had lower gross margins

12  than SiRF's products and defendants knew that although the Centrality acquisition would increase

13  revenues in Q4 (as it did), it would also significantly lower SiRF's gross margins (as it also did);

14  therefore, defendants had no basis for their statements on the Q3 conference call that EPS would be

15  up in the $0.31-$0.33 range, or that the gross margins of 54% to 55% experienced in Q3 would be

16  maintained in Q4;

17         (d)    Competitive pressures were having much more of an adverse impact on the

18  Company than acknowledged by defendants, as SiRF's customers were moving to cellular-enabled

19  products which SiRF could not adequately compete with;

20         (e)    As of October 30, 2007, which is also one month into Q4, Q4 gross margins

21  would be down significantly because of the lower SoC product line margins, which products were

22  accounting for much of the increased revenues in Q4; and

23         (f)    Downward pricing pressures were accelerating and would lead to lower

24  margins and earnings in future quarters.

25    7.    As a result of defendants' false statements, SiRF's stock traded at inflated levels

26  during the Class Period.  However, after the above revelations seeped into the market, the

27  Company's shares were hammered by massive sales, sending them down more than 75% from their

28  Class Period high.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 2 -

1

**JURISDICTION AND VENUE**

2    8.    Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise

3    under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

4    9.    (a)    Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the

5    false and misleading statements were made in or issued from this District.

6        (b)    SiRF's principal executive offices are located at 217 Devcon Drive, San Jose,

7    California.

8

**PARTIES**

9    10.    Plaintiff Sammy Esses purchased SiRF publicly traded securities as described in the

10    attached certification and was damaged thereby.

11    11.    Defendant SiRF develops and markets semiconductor and software products that are

12    designed to enable location-awareness utilizing GPS and other location technologies worldwide.

13    SiRF offers a range of GPS chip set and software products. The Company's chip set product line

14    consists of two integrated circuits, a radio frequency integrated circuit and a digital signal processing

15    circuit, and standard embedded GPS software.

16    12.    Defendant Michael L. Canning ("Canning") is, and at all relevant times was,

17    President and Chief Executive Officer ("CEO") of the Company. During the Class Period, Canning

18    was responsible for the Company's public statements.

19    13.    Defendant Diosdado P. Banatao ("Banatao") is, and at all relevant times was,

20    Chairman of the Board of SiRF. Banatao was also a co-founder of the Company. During the Class

21    Period, while SiRF's stock was artificially inflated by defendants' false statements, Banatao sold

22    400,000 shares of his SiRF stock for proceeds of $9.6 million.

23    14.    Defendant Geoffrey Ribar ("Ribar") is, and at all relevant times was, Chief Financial

24    Officer ("CFO") and Senior Vice President of Finance of the Company. During the Class Period,

25    Ribar was responsible for the Company's public statements.

26    15.    Defendant Kanwar Chadha ("Chadha") is co-founder of the Company. At all relevant

27    times Chadha was Vice President of Marketing and a director of the Company. During the Class

28    Period, Chadha was responsible for the Company's public statements.

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 3 -

16.    Defendants Canning, Banatao, Ribar and Chadha (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of SiRF's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein at ¶¶20-21.

### FRAUDULENT SCHEME AND COURSE OF BUSINESS

17.    Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about SiRF. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of SiRF publicly traded securities was a success, as it: (i) deceived the investing public regarding SiRF's prospects and business; (ii) artificially inflated the price of SiRF's publicly traded securities; (iii) allowed defendant Banatao to reap $9.6 million in insider trading proceeds; and (iv) caused plaintiff and other members of the Class to purchase SiRF publicly traded securities at inflated prices.

### BACKGROUND

18.    SiRF develops and markets semiconductor and software products that are designed to enable location-awareness utilizing GPS and other location technologies worldwide. SiRF offers a range of GPS chip set and software products. The Company's chip set product line consists of two integrated circuits, a radio frequency integrated circuit and a digital signal processing circuit, and standard embedded GPS software. SiRF's software products include SiRFLoc for wireless devices that provides location information for multimode GPS; SiRFXTrac to provide high-sensitivity satellite tracking in autonomous GPS applications; SiRFDRive for automotive applications that enhances positioning by using sensors found in automobiles, such as odometers; SiRFNav for

1    automotive navigation systems that shares resources with the host processor; SiRFInstantFix, which

2    provides quick position fix and high-sensitivity satellite acquisition in occasionally connected GPS

3    applications; and SiRFSoft, which enables application processors to perform the functions of a GPS

4    baseband processor. The Company also offers utility software to its customers to assist them in

5    high-volume manufacturing and testing. SiRF markets and sells its products through direct sales,

6    independent sales representatives, and distributors. It serves wireless handheld devices, automotive,

7    and consumer and computer devices markets.

8         19.    On August 6, 2007, the Company acquired Centrality for 2.1 million shares of SiRF

9    stock. Defendants wanted to demonstrate that the acquisition, which required the issuance of 2.1

10   million shares, was beneficial to the Company. Unfortunately, the acquisition occurred just as

11   SiRF's own business was peaking and certain of Centrality's products overlapped with SiRF's.

12   Defendants sought to conceal these problems for as long as possible, hoping the market would

13   improve prior to these problems being revealed.

14                    **DEFENDANTS' FALSE AND MISLEADING**
                   **STATEMENTS ISSUED DURING THE CLASS PERIOD**
15
16        20.    On October 30, 2007, the Company issued a press release entitled "SiRF Technology

17   Holdings Inc. Announces Financial Results for Third Quarter 2007," which stated in part:

18        SiRF reports record revenue and strong Non-GAAP operating profits

19            . . . SiRF Technology Holdings, Inc., a leading provider of GPS-enabled
         silicon and premium software location platforms, today reported unaudited financial
         results for its third quarter ended September 30, 2007.
20
            Net revenue in the third quarter of 2007 was $91.2 million, an increase of 43
21       percent from $63.7 million reported in the third quarter of 2006. Net revenue in the
         first nine months of 2007 was $229.0 million, an increase of 32 percent from $173.5
22       million reported in the first nine months of 2006. Gross margin in the third quarter
         of 2007 was 52.2 percent, as compared to 55.6 percent in the third quarter of 2006.
23       Gross margin in the first nine months of 2007 was 53.7 percent, as compared to 55.7
         percent in the first nine months of 2006.
24
            Net loss for the third quarter of 2007 was $16.1 million, or $(0.28) per diluted
25       share, based on 57.0 million diluted weighted average shares outstanding. This
         compares with net income of $2.6 million, or $0.05 per diluted share, based on 55.6
26       million diluted weighted average shares outstanding in the third quarter of 2006.

27            Net loss for the first nine months of 2007 was $11.1 million, or $(0.21) per
         diluted share, based on 54.0 million diluted weighted average shares outstanding.
28       This compares with net loss of $6.7 million, or $(0.13) per diluted share, based on

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    - 5 -

1    50.9 million diluted weighted average shares outstanding in the first nine months of
2    2006.

                              *       *       *

3
     "We believe our Q3 performance has been exceptional. We have once again
4    posted record revenues on record shipment volumes with excellent profitability and
     strong bookings momentum. *Our acquisition of Centrality and broadening of our*
5    *product portfolio with the System-on-Chip (SoC) products has been*
     *enthusiastically welcomed by customers, and the SoC products are also breaking*
6    *revenue and shipment volume records*," said Dr. Michael Canning, President and
     CEO.
7
             The assets acquired and liabilities assumed as part of the acquisition of
8    Centrality in August 2007 are reflected in SiRF's consolidated financial statements.
     As SiRF finalizes certain valuation assumptions, adjustments may be recorded in the
9    related purchase price allocations.

10   Q3'2007 Highlights and Business Outlook:

11   •    We have successfully closed the merger with Centrality Communications and
          are integrating our products, platforms and personnel. The resulting
12        combination has exceeded our expectations and has been very well received
          by customers, vendors and employees alike. We are seeing significant design
13        win momentum at major PND customers for our SoC platforms. We are now
          working on synergistic extensions of our combined fundamental technology.
14
     •    Growth in our Automotive business, and particularly in Portable Navigation
15        Devices (PNDs), continues to be very strong and to mirror overall market
          growth. In Q3, we made record volume shipments to a number of major
16        customers. In addition, many of our customers, including ASUS, Garmin,
          HP, Magellan, Mio, Siemens VDO and TomTom, launched new platforms
17        using SiRfstarIII or SiRF SoC based products this quarter.

18   •    Interest in and demand for our products continues to accelerate in our
          Wireless business. One of our key tier one customers launched their first new
19        GPS enabled handset which has been qualified at two operators this quarter;
          and RIMM continues to launch new GPS-enabled products and expand the
20        number of operators using their platform. Multiple handsets based on the
          SiRFstarIII platforms have also been announced or moved into volume
21        production by customers such as Mio ASUS and Amoi, one of the leading
          local handset manufacturer in China. In July, Chung-Hwa Telecom launched
22        LBS services based on a SiRF SUPL 1.0 AGPS server and our SiRFstudio
          development platform for LBS applications is getting good reception at some
23        of the leading operators.

24   •    In the consumer and mobile computing market, SiRFstarIII architecture is
          gaining more momentum. Garmin launched a new generation of their
25        SiRFstarIII based Edge platforms for cyclists and Magellan launched a new
          family of SiRFstarIII based TRITON™ handhelds featuring National
26        Geographic's award winning full color topographic maps. One of the leading
          mobile gaming customers launched a GPS accessory with gaming and
27        navigation software for their mobile gaming platform and we are also starting
          to see increasing interest from digital camera industry.
28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1       21.    Following the release of its Q3 2007 results, SiRF hosted a conference call for

2 analysts, investors and media representatives, during which defendants stated the following:

3       [CANNING]: Customer interest in our Atlas type and SoC platforms has been very
strong, especially in the tier one PND market, and we expect them to be significant

4       contributors to our revenue growth in 2008 and beyond as these and other design
wins move into high volume production.

5

                *     *     *

6

7       Interest in and demand for our products continues to accelerate in our
wireless business. One of our key tier one customers has launched their first new
GPS-enabled hand set, which has been qualified at two operators. And one of our

8 leading wireless customers, Research in Motion, continues to launch new GPS-
enabled products and expand a number of operators supporting their platform.

9 Multiple handsets based on SiRFstarIII platforms have also been announced or
moved into volume production by customers such as Mio (inaudible), Asus and

10 Amoi, one of the leading local handset manufacturers in China. *In addition, our
diverse customer base continues to introduce mobile products based on our award*

11 *winning GPS technology. Of particular note this quarter, many of the tier one
handset manufacturers have launched GPS Bluetooth accessory modules based on*

12 *SiRFstarIII and compatible with a variety of existing handsets which can provide
GPS navigation, mapping and other traffic data to the appropriate Bluetooth-*

13 *enabled phones.*

14       Our end-to-end location platform continues to gain momentum. For example,
LBS services based on a SiRF secure user plain 1.0 AGPS server were launched by

15 Chung-Hwa Telecom in July, and our SiRF studio development platform for LBS
applications is getting good reception at some of the leading operators worldwide. In

16 our consumer markets segment Garmin launched a new generation of their
SiRFstarIII based edge platforms for cyclists and Magellan launched a new family of

17 SiRFstarIII based TRITON handhelds featuring National Geographic's award
winning, full color, topographic maps. We're also experiencing good growth and

18 substantial sustained interest from Asian consumer electronics and computing
companies in some of the more mobile applications of GPS into media players,

19 cameras and gaming systems. Already a leading manufacturer has introduced a
SiRFstarIII based GPS accessory to a portable gaming system, which is expected to

20 be deployed globally at an attractive price point early in 2008.

21       With our newly extended product portfolio and a major new operational base
in China, *we believe there will be substantial growth in this market segment in the*

22 *next year or so as the use of GPS-based location technology becomes a standard
feature in consumer electronics, and we believe that we are extremely well*

23 *positioned to enjoy that growth.* Earlier this quarter, we signed a major agreement
with Intel to jointly develop a series of innovative products designed to bring our

24 GPS technology to mainstream mobile computing platforms. And we continue to
receive positive feedback from our customers on this.

25

                *     *     *

26

27       Demand for our products is robust across all market segments and we expect to see
Q4 revenues in the range of $99 to $102 million with at least 10% of this revenue
coming from SoC products. This will bring revenue for the year into the range $328

28

1   million to $331 million. Assuming a tax rate of 5% to 10%, we are modeling EPS
    for Q4 in the range $0.31 to $0.33.

2                              *        *        *

3
        [ANALYST]: So let's say a full quarter of Centrality in Q4. Will than then
4   depress margin or would the higher revenue level, do you expect gross margin to go
    up sequentially a little bit?

5
        [CANNING]: We expect to maintain our gross margins. We have done for
6   the last five years, we expect it to continue.

7       [RIBAR]: In the 54% to 55% range.

8                              *        *        *

9       [CHADHA]: Okay so on the wireless side we do expect more handsets from
    tier one customers in '08. We expect '08 to be quite a strong year for our wireless
10  based on all the feedback we are getting from handset partners as well as in
    operators. We just held a Location 2.0 Summit where we brought together key
11  leaders in the handset industry as well as operators, global operators and all the
    feedback during the Summit as well as in our private conversation is that 2008 will
12  be a strong year with multiple handsets from tier one customers.

13                             *        *        *

14  Yes, I think 2008, clearly there is a significant ramp up in the wireless market. A lot
    will depend on how quickly can these handsets be qualified by operators and
15  deployed into the marketplace. Let's say that you can talk to the front operators, you
    can talk to the front handset vendors. All indications are that the growth is very high.
16  The key question is, is the growth 100%, 200%, or even higher than those numbers?
    So we expect that most of the 3G handsets, especially in the U.S. market, will be
17  GPS-enabled. We expect significant deployment of 3G handset with the location
    capability in both Europe as well as in Asian markets. So that market clearly will
18  have high penetration of GPS. So based on that, you can model what kind of
    numbers will be there in terms of unit models.

19
                               *        *        *
20
        [ANALYST]: Well then as a follow-up. Did you feel like you've really
21  taken a big brunt of the ASP decline in Q3 so we'll see more modest declines going
    forward or will we see more of the same?
22
        [CANNING]: Well there's always competition in the marketplace, and that's
23  something we have expected and forecast for sometime. So it's not surprising that
    competitors are there. It's not surprising that if they want to try to win business from
24  us, they try to offer lower prices. But we plan to be just as competitive going
    forward as we have been in the past. And we expect to win more sockets than we
25  lose and to improve the value of the sockets that we win.

26      [RIBAR]: So I think the other point is clearly, right, we've been able to
    sustain our market share, sustain our margin, sustain our business model in this
27  pricing environment. So I think we've done an outstanding job over an extended
    period of time of maintaining our business.
28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    - 8 -

1    22.    Following the release of the Company's Q3 earnings and the Q3 conference call,

2  SiRF's stock shot up in one day from $23.30 to $29.81 per share on volume of 11.9 million shares.

3  This was particularly noteworthy given the downward direction of the stock market during this time.

4    23.    On November 29-30, 2007, defendant Banatao sold 400,000 shares of his SiRF stock

5  for proceeds of $9,694,000.

6    24.    In January 2008, SiRF's stock declined as the market began to doubt the market for

7  SiRF's products.  However, defendants did not reveal how much of SiRF's growth was disappearing

8  and the stock continued to be artificially inflated.

9    25.    On February 4, 2008, SiRF's stock closed at $16.27 per share.

10    26.    Then, after the market closed on February 4, 2008, the Company issued a press

11  release entitled "SiRF Technology Holdings, Inc. Announces Financial Results for Fourth Quarter

12  and Fiscal 2007," which shocked the market with a decrease in fourth quarter profits and which

13  stated in part:

14    SiRF reports record revenue

15    . . . SiRF Technology Holdings, Inc., a leading provider of GPS-enabled
      silicon and premium software location platforms, today reported unaudited financial
16    results for its fourth quarter and year-ended December 31, 2007.

17    Net revenue in the fourth quarter of 2007 was $100.4 million, an increase of
      35.3 percent from $74.2 million reported in the fourth quarter of 2006.  Net revenue
18    in fiscal 2007 was $329.4 million, an increase of 33.0 percent from $247.7 million
      reported in fiscal 2006.  Gross margin in the fourth quarter of 2007 was 48.1 percent,
19    as compared to 54.7 percent in the fourth quarter of 2006.  Gross margin in fiscal
      2007 was 50.9 percent, as compared to 54.8 percent in fiscal 2006.
20
      Net income for the fourth quarter of 2007 was $0.7 million, or $0.01 per
21    diluted share, based on 64.3 million diluted weighted average shares outstanding.
      This compares with net income of $9.1 million, or $0.16 per diluted share, based on
22    56.1 million diluted weighted average shares outstanding in the fourth quarter of
      2006.
23
      Net loss for fiscal 2007 was $(10.4) million, or $(0.19) per diluted share,
24    based on 55.5 million diluted weighted average shares outstanding.  This compares
      with net income of $2.4 million, or $0.04 per diluted share, based on 56.0 million
25    diluted weighted average shares outstanding in fiscal 2006.

26                      *       *       *

27    The assets acquired and liabilities assumed as part of the acquisition of
      Centrality in August 2007 are reflected in SiRF's consolidated financial statements.
28    The results of Centrality's operations have been included in SiRF's consolidated

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                              - 9 -

1    results of operations since the August 6, 2007 acquisition close date. As SiRF
2    finalizes certain valuation assumptions, adjustments may be recorded in the related
     purchase price allocations.

3        27.     On the conference call following the earnings release, Canning admitted that
4    defendants had expected gross margins to decline:

5        We had always expected that gross margins would start to shift down as ramping of
         certain products occurred and as competitive influences came into the market. So for
6        the moment, I think, it's probably best to assume that we'll be around 50% gross
         margin.
7
         28.     On February 5, 2008, SiRF's stock collapsed $8.91 per share to close at $7.36 per
8
     share, a one-day decline of 54% on volume of 63 million shares, 30 times the average three-month
9
     volume.
10
         29.     As *Forbes.com* noted on February 5, 2008, in an article entitled "SiRF Shares Wiped-
11
     Out":
12
         Shares of SiRF Technologies drowned on Tuesday.
13
         The firm closed trading down 54.8%, or $8.91, to $7.36 after announcing
14       fourth-quarter earnings below analyst estimates.

15       SiRF Technologies, makes parts for GPS devices. The firm saw its shares fall
         after it reported an 89% decrease in fourth-quarter profits to $0.7 million from $9.1
16       million the year before. The company also gave a miserable outlook for the first-
         quarter, predicting a loss of 4 cents per share on revenue of $71 million to $77
17       million. Analysts polled by Thomson Financial expected, on average, profit of 24
         cents per share on revenue of $92.4 million.
18
         SiRF is the leading supplier of global positioning system chips, supplying
19       industry-leading brands like TomTom and Garmin. Despite demand for the GPS
         units, pricing has gone down significantly over the last year putting strain on SiRF to
20       lower prices as well.

21       "The guidance was the big bugaboo," said Jefferies analyst Adam Benjamin.
         "We've been concerned about Portable Navigation Devices pricing pressure, but
22       thought the wireless would offset that. Handsets are a billion-unit market; as that
         takes off that could dwarf the PND market."
23
         Benjamin downgraded the stock to "hold" from "buy" and lowered his price
24       target to $9 from $32.

25       "I think over time you will see GPS in all handsets," added Benjamin, "but
         the question is 'who is going to benefit from that?'"
26
         SiRF purchased Centrality Communications, another GPS chip-maker, June
27       of last year, giving it the potential to be a bigger player in the wireless market.
         Mobile phone currently incorporate GPS technology, but it is not widely used. The
28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

1    industry is making a shift over to 3G, or W-CDMA standards, opening up the market
2    for next-gen mobile devices.

3        30.    The true facts, which were known by the defendants but concealed from the investing
4    public during the Class Period, were as follows:

5        (a)    SiRF's acquisition of Centrality was having an adverse impact on SiRF's
6    results due to the similar products sold by Centrality which were cannibalizing SiRF's sales;

7        (b)    SiRF's major customers were not placing orders at sufficient quantities for
8    SiRF to meet the aggressive targets set by and for the Company;

9        (c)    Centrality's SoC product line had lower gross margins than SiRF's products
10    and defendants knew that although the Centrality acquisition would increase revenues in Q4 (as it
11    did), it would also significantly lower SiRF's gross margins (as it also did); therefore, defendants had
12    no basis for their statements on the Q3 conference call that EPS would be up in the $0.31-$0.33
13    range, or that the gross margins of 54% to 55% experienced in Q3 would be maintained in Q4;

14        (d)    Competitive pressures were having much more of an adverse impact on the
15    Company than acknowledged by defendants, as SiRF's customers were moving to cellular-enabled
16    products which SiRF could not adequately compete with;

17        (e)    As of October 30, 2007, which is also one month into Q4, Q4 gross margins
18    would be down significantly because of the lower SoC product line margins, which products were
19    accounting for much of the increased revenues in Q4; and

20        (f)    Downward pricing pressures were accelerating and would lead to lower
21    margins and earnings in future quarters.

22        31.    As a result of defendants' false statements, SiRF's stock traded at inflated levels
23    during the Class Period.   However, after the above revelations seeped into the market, the
24    Company's shares were hammered by massive sales, sending them down more than 75% from their
25    Class Period high.

## LOSS CAUSATION/ECONOMIC LOSS

26        32.    By misrepresenting demand for its products, the defendants presented a misleading
27    picture of SiRF's business and prospects.   Thus, instead of truthfully disclosing during the Class
28

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS    - 11 -

1   Period that SiRF's business was not as healthy as represented, defendants misrepresented the

2   benefits of the Centrality acquisition.

3       33.    These claims of profitability caused and maintained the artificial inflation in SiRF's

4   stock price throughout the Class Period and until the truth was revealed to the market.

5       34.    Defendants' false and misleading statements had the intended effect and caused SiRF

6   stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $30 per

7   share.

8       35.    As a direct result of defendants' admissions and the public revelations regarding the

9   truth about demand for SiRF's products and its actual business prospects going forward, SiRF's

10  stock price plummeted 54% on February 5, 2008, to $7.36 per share, a one-day decline of $8.91 per

11  share.  This drop removed the inflation from SiRF's stock price, causing real economic loss to

12  investors who had purchased the stock during the Class Period.

13                            **COUNT I**

14          **For Violation of §10(b) of the 1934 Act and Rule 10b-5**
                            **Against All Defendants**
15

16      36.    Plaintiff incorporates ¶¶1-35 by reference.

17      37.    During the Class Period, defendants disseminated or approved the false statements

18  specified above, which they knew or deliberately disregarded were misleading in that they contained

19  misrepresentations and failed to disclose material facts necessary in order to make the statements

20  made, in light of the circumstances under which they were made, not misleading.

21      38.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

22          (a)    employed devices, schemes and artifices to defraud;

23          (b)    made untrue statements of material facts or omitted to state material facts

24  necessary in order to make the statements made, in light of the circumstances under which they were

25  made, not misleading; or

26          (c)    engaged in acts, practices and a course of business that operated as a fraud or

27  deceit upon plaintiff and others similarly situated in connection with their purchases of SiRF

28  publicly traded securities during the Class Period.

39.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for SiRF publicly traded securities. Plaintiff and the Class would not have purchased SiRF publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

### COUNT II

**For Violation of §20(a) of the 1934 Act**
**Against All Defendants**

40.     Plaintiff incorporates ¶¶1-39 by reference.

41.     The Individual Defendants acted as controlling persons of SiRF within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of SiRF stock, the Individual Defendants had the power and authority to cause SiRF to engage in the wrongful conduct complained of herein. SiRF controlled the Individual Defendants and all of its employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired SiRF publicly traded securities during the Class Period (the "Class"). Excluded from the Class are defendants.

43.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. SiRF has over 60 million shares of stock outstanding, owned by hundreds if not thousands of persons.

44.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     whether the 1934 Act was violated by defendants;

(b)     whether defendants omitted and/or misrepresented material facts;

1           (c)     whether defendants' statements omitted material facts necessary to make the

2  statements made, in light of the circumstances under which they were made, not misleading;

3           (d)     whether defendants knew or deliberately disregarded that their statements

4  were false and misleading;

5           (e)     whether the prices of SiRF's publicly traded securities were artificially

6  inflated; and

7           (f)     the extent of damage sustained by Class members and the appropriate measure

8  of damages.

9      45.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class

10  sustained damages from defendants' wrongful conduct.

11      46.     Plaintiff will adequately protect the interests of the Class and has retained counsel

12  who are experienced in class action securities litigation.  Plaintiff has no interests which conflict

13  with those of the Class.

14      47.     A class action is superior to other available methods for the fair and efficient

15  adjudication of this controversy.

16                           **PRAYER FOR RELIEF**

17     WHEREFORE, plaintiff prays for judgment as follows:

18     A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

19     B.     Awarding plaintiff and the members of the Class damages, including interest;

20     C.     Awarding plaintiff reasonable costs and attorneys' fees; and

21     D.     Awarding such equitable/injunctive or other relief as the Court may deem just and

22  proper.

23

24

25

26

27

28

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: February 8, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SHAWN A. WILLIAMS

_____
        SHAWN A. WILLIAMS

100 Pine Street, Suite 2600
San Francisco, CA 94111
Telephone: 415/288-4545
415/288-4534 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

LAW OFFICES BERNARD M. GROSS, P.C.
DEBORAH R. GROSS
ROBERT P. FRUTKIN
Wanamaker Bldg., Suite 450
100 Penn Square East
Philadelphia, PA 19107
Telephone: 215/561-3600
215/561-3000 (fax)

LAW OFFICES OF KENNETH A. ELAN
KENNETH A. ELAN
217 Broadway, Suite 605
New York, NY 10007
Telephone: 212/619-0261
212/385-2707 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Sirf Technologies.doc

COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                - 15 -

1

## CERTIFICATION OF INTERESTED ENTITIES OR PERSONS

2      Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

3   named parties, there is no such interest to report.

4
_____
5                                   ATTORNEY OF RECORD FOR PLAINTIFF
                                    SAMMY ESSES
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES BERNARD M. GROSS, P.C.

## AFFIDAVIT OF SAMMY ESSES

1.    I, Sammy Esses, have reviewed the Complaint and have authorized the filing of same;

2.    I did not purchase the common stock or calls of SIRF TECHNOLOGY HOLDINGS INC. ("SIRF") at the direction of my counsel or in order to participate in any private action arising under this title;

3.    I am willing to serve as a class representative and provide testimony at a deposition and trial if necessary;

4.    My transactions in SIRF common stock and calls during the time period October 30, 2007 through February 4, 2008 are as follows:

| DATE | PURCHASE/SALE | AMOUNT | PRICE |
|------|---------------|--------|-------|

SEE ATTACHED EXHIBIT A

5.    During the previous three years, I have not been or moved to be a lead plaintiff in any securities fraud class action.

6.    I will not accept any payment for serving as a class representative beyond my *pro rata* share of any recovery, except as ordered or approved by the Court with respect to an award for reasonable costs and expenses (including lost wages).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8 day of   February, 2008, at Brooklyn, New York,

SAMMY ESSES

SCHEDULE A

SECURITIES TRANSACTIONS

**Common Stock**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 12/26/2007 | 800 | $25.74 |

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 01/08/2008 | 500 | $18.75 |

**Options**

| Date Acquired | Type of Option | Contract Amount | Price |
|---|---|---|---|
| 12/18/2007 | C 27.5 JAN '08 | 30 | $0.65 |
| 12/31/2007 | C 27.5 JAN '08 | 35 | $0.30 |
| 01/07/2008 | C 22.5 JAN '08 | 10 | $0.65 |
| 01/08/2008 | C 22.5 JAN '08 | 10 | $0.40 |
| 01/08/2008 | C 25 FEB '08 | 20 | $0.65 |
| 01/30/2008 | C 20 MAR '08 | 31 | $0.35 |
| 01/31/2008 | C 17.5 FEB '08 | 10 | $0.50 |
| 01/31/2008 | C 17.5 FEB '08 | 20 | $0.50 |
| 02/01/2008 | C 17.5 FEB '08 | 13 | $0.65 |
| 02/01/2008 | C 20 FEB '08 | 65 | $0.15 |

| Date Sold | Type of Option | Contract Amount | Price |
|---|---|---|---|
| 02/01/2008 | C 20 FEB '08 | 65 | $0.20 |