PETER BINKOW #173848
MICHAEL GOLDBERG #188669
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:info@glancylaw.com

SUSAN G. KUPFER (#141724)
GLANCY BINKOW & GOLDBERG LLP
One Embarcadero Center, Suite 760
San Francisco, California 94111
Telephone:     (415) 972-8160
Facsimile:     (415) 972-8166
Email: skupfer@kmllp.com
*Liaison Attorney for Proposed Lead Plaintiff*

IRA M. PRESS
PETER S. LINDEN
SARAH G. LOPEZ
KIRBY MCINERNEY LLP
830 Third Avenue, 10th Floor
New York, New York 10022
Telephone:     (212) 317-2300
Facsimile:     (212) 751-2540
Email: ipress@kmllp.com
*Attorneys for Proposed Lead Plaintiff*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re SiRF TECHNOLOGY HOLDINGS, INC. SECURITIES LITIGATION | Master File No. C 08 00856 |
| | **SUPPLEMENTAL DECLARATION OF SARAH G. LOPEZ ON BEHALF OF THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT IN RESPONSE TO MATTERS RAISED IMPROPERLY IN MAY 2, 2008 REPLY SUBMISSION OF IRON WORKERS LOCAL NO. 25 PENSION FUND AND KENNETH L. WEISS** |
| This Document Related To: | |
| All Actions | |
| | Date: May 30, 2008 Time: 9:00 a.m. Courtroom 7, 19th Floor |
| | Hon. Maxine M. Chesney |

SUPPLEMENTAL DECLARATION OF SARAH G. LOPEZ ON BEHALF OF THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT IN RESPONSE TO MATTERS RAISED IMPROPERLY IN MAY 2, 2008 REPLY SUBMISSION OF IRON WORKERS LOCAL NO. 25 PENSION FUND AND KENNETH L. WEISS

1    I, Sarah G. Lopez, hereby declare as follows:

2    1.    I am associated with the law firm Kirby McInerney LLP, counsel for the Police & Fire

3    Retirement System of the City of Detroit ("Detroit PFRS").

4    2.    Detroit PFRS seeks appointment as Lead Plaintiff pursuant to Section 21D of the

5    Securities Exchange Act of 1934.

6    3.    I submit this Declaration, together with the attached exhibits, on behalf of Detroit

7    PFRS in response to matters raised improperly in the May 2. 2008 reply submission of Iron Workers

8    Local No. 25 Pension Fund ("Iron Workers") and Kenneth L. Weiss.

9    4.    Attached hereto as the exhibits are true and correct copies of the following:

10

11    Exhibit A:    Slip Opinion of the court in *Brody v. Dot Hill Sys Corp*, 06 cv 228

12        (S.D. Cal June 23, 2006).

13    Exhibit B:    Slip Opinion of the court in *McClain v. WSB Financial Group,*

14        *Inc.*, 07-1747 (W.D. Wash. March 10, 2008).

15    Exhibit C:    List of federal lawsuits filed by Iron Workers Local No. 25 over the

16        past three (3) years, obtained from the PACER system.

17    Exhibit D:    Slip Opinion of the court in *In re Guess?, Inc. Securities Litigation*,

18        No. CV01-00871 LGB (RNBx) (C.D.Cal. Nov. 29, 2001).

19    Exhibit E:    Excerpts from docket in *Miller v. Lazard*, No. 1:05-cv-05630-VM

20        (S.D.N.Y. 2007).

21    Exhibit F:    Excerpts from docket in *In re Vertex Pharmaceuticals, Inc. Securities*

22        *Litigation*, 03-cv-11852-PBS (D. Mass).

23    Exhibit G:    Stipulation of Dismissal and Order in *Weisz v. Calpine Corp.*, No.02-

24        CV-1200 (N.D.Cal.).

25

26

27

28

**SUPPLEMENTAL DECLARATION OF SARAH G. LOPEZ ON BEHALF OF THE POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT IN RESPONSE TO MATTERS RAISED IMPROPERLY IN MAY 2, 2008 REPLY SUBMISSION OF IRON WORKERS LOCAL NO. 25 PENSION FUND AND KENNETH L. WEISS**

1    Exhibit H:    Excerpts from Iron Worker's reply brief, dated November 13, 2007

2    in *In Re Radian Securities Litigation*, No. 2:07-03375-MAM

3    (E.D.Pa.).

4    I declare under penalty of perjury under the laws of the State of California that the foregoing

5    facts are true and correct. Executed this 19th day of May, 2008.

6

7

8    _____
     Sarah G. Lopez

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  K:\Users\SLopez\SiRF Technology\Supplemental Lopez Declaration re lead plaintiff motions.wpd

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

FILED

2006 JUN 23  AM 9: 23

⬚ ⬚ ⬚ ⬚ ⬚ ⬚ ⬚ ⬚ ⬚

⬚ ⬚ ⬚ ⬚ ⬚ ⬚ ⬚

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATT BRODY On Behalf of Himself and All Others Similarly Situated,<br><br>                                    Plaintiffs,<br><br>    v.<br><br>DOT HILL SYSTEMS CORPORATION, et al.,<br><br>                                    Defendants. | CASE NO. 06-CV-0228 W (WMc)<br><br>**ORDER APPOINTING LEAD COUNSEL** |

//

//

On January 31, 2006 Plaintiff Matt Brody, in his individual capacity and on behalf of all others similarly situated ("Plaintiff"), filed a putative class action Complaint alleging that Defendant Dot Hill Systems Corporation, ("Defendant") violated § 10(b) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). 17 C.F.R. §240.10b-5. On April 3, 2006 The Detroit Pension group ("Detroit Group"), the City of Deerfield Beach Non-uniformed

- 1 -

06cv0228

1  Employees Retirement Fund and Matt Brody ("Deerfield Beach and Brody"), and the
2  Brucker Group ("Brucker Group") (collectively "Movants") submitted competing
3  Appointment of Lead Plaintiff motions.  On May 1, 2006 the Detroit Group, and
4  Deerfield Beach and Brody, filed Oppositions. The Brucker Group did not oppose. All
5  parties are represented by counsel.  The Court decides the matter on the papers
6  submitted and without oral argument.  See Civil Local Rule 7.1(d.1).  For the reasons
7  outlined below, the Court **GRANTS** the Detroit Group's motion for appointment of
8  lead counsel.

9

10    I.    BACKGROUND
11         This is a securities class action on behalf of purchasers of Dot Hill Systems
12  Corporation ("Dot Hill") common stock during the period April 23, 2003 through
13  February 3, 2005 ("Class Period"), against Dot Hill and certain of its officers and
14  directors for violations of the Securities and Exchange Act of 1934.

15         Dot Hill is a provider of innovative design and delivery of storage network
16  solutions to channel and original equipment manufacturer (OEM) partners worldwide.
17  These storage solutions can be used to store any type of digital information.
18  Defendant's storage solutions integrate hardware and software products employing a
19  modular system that allows end-users to add capacity as needed. Dot Hill maintains it's
20  principal executive offices at 6305 El Camino Real, Carlsbad, California 92009.

21         On January 31, 2006, Plaintiff Matt Brody commenced case number 05-cv-0228
22  in the Southern District of California alleging that during the Class Period, Defendants
23  issued materially false and misleading financial statements to the investing public due
24  to improper revenue recognition and inadequate internal controls.  As a result of
25  Defendants' false financial statements, Dot Hill stock traded at artificially inflated
26  prices. The Complaint specifically alleges that: (1) Dot Hill's accounting department
27  suffered from material weaknesses and deficiencies and lacked the necessary staff and
28  resources to perform its required functions; (2) Dot Hill's inadequate internal

1   accounting processes and controls enabled Dot Hill management to manipulate Dot
2   Hill's Costs of Goods Sold ("COGS") and routinely and inappropriately mis-classify
3   expenses, causing Dot Hill to issue false financial statements; (3) multiple areas of Dot
4   Hill's internal controls suffered serious deficiencies; (4) Dot Hill lacked effective
5   internal controls in its financial reporting process; and (5) Dot Hill falsely reported it's
6   Q1-Q3 04 financial results by improperly recognizing revenue and by improperly
7   recording expenses.

8       On the same day that Plaintiff filed his Complaint, his counsel published a notice
9   of the pendency of Plaintiff's case on *Business Wire*, a widely circulated national
10   business-oriented wire service. (Declaration of Michael Goldberg at Exhibit A.)
11   Subsequent to the Brody action, four related actions were filed in this District[1]. On
12   April 3, 2006, competing Motions to Appoint Lead Plaintiff and for Consolidation of
13   Related Actions were filed by Norman R. Brucker, Marvin M. Feldman and Timothy
14   J. Ake (collectively "the Brucker Group"); the General Retirement System of the City
15   of Detroit("GRS"), and the Police & Fire Retirement System of the City of Detroit
16   ("DP&F") (collectively "the Detroit Group"); and David S. Wetherall, Deerfield Beach
17   and Matt Brody ("Deerfield Beach and Brody).

18       On May 1, 2006, the Detroit Pension Fund, and Deerfield Beech and Brody, filed
19   Oppositions. On May 8, 2006 David S. Wetherall withdrew his application for
20   appointment of lead plaintiff.[2] [Doc. No. 29.] On May 24, 2006 Deerfield Beach and
21   Brody submitted an additional notice of lead plaintiff filings by the Detroit Group. On
22   June 8, 2006, the Court consolidated these cases with lead case 06cv0228. Also on
23   June 8, 2006, the Detroit Funds submitted a response to the post-return-date filing by
24   Deerfield Beach and Brody.

25

26     [1] The cases filed with this Court are; Brody v. Dot Hill, 06cv0228; Buckner v. Dot Hill
    06cv0268, Naryznai v. Dot Hill, 06cv0341 Jardin v. Dot Hill, 06cv0281, Steinberg v. Dot
27   Hill,06cv0662.

28     [2] In light of David Wetherall's withdrawal, the Court declines to address any arguments for
    or against his participation as lead plaintiff in the current action.

II.    LEGAL STANDARD

Section 21D(a)(3)(B) of the Securities Exchange Act of 1934 ("Exchange Act") sets forth the procedure for selecting lead plaintiffs to oversee class actions brought under the federal securities laws. First, §21D(a)(3)(A)(I) provides that within 20 days after the date on which the class action is filed under the PSLRA:

> [T]he plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class-
>
> (I)    of the pendency of the action, the claims asserted therein, and the purported class period; and
>
> (II)    that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

15 U.S.C. §78u-4(a)(3)(A)(I).

Next, the PSLRA sets forth a detailed procedure for appointment by the court of 'the most adequate plaintiff' as lead plaintiff, who may then, subject to the Court's approval, select and retain lead counsel to represent the class. See 15 U.S.C. §§ 78u-4(a)(3)(B)(ii) and (v). Under the PSLRA there is a rebuttable presumption that:

> the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(I); (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

In making its determination that a lead plaintiff satisfies the requirements of Rule 23, the Court need not raise its inquiry to the level required in ruling on a motion for class certification. Courts limit their inquiry to the typicality and adequacy prongs of Rule 23(a) requiring generally that the lead plaintiff's claims are typical of the claims of the class, and that the representatives will fairly and adequately protect the interests of the class. See In re Enron Corp. Securities Litigation, 206 F.R.D. 427, 441 (S.D. Tex.

1   2002), In re Oxford Health Plans, Inc. Sec. Litig., 182 F.R.D. 42, 49 (S.D.N.Y

2   1998) ("[t]ypicality and adequacy of representation are the only provisions relevant to

3   a determination of lead plaintiff under the PSLRA") (citing Gluck v. Cellstar Corp., 976

4   F.Supp. 542, 546 (N.D. Tex. 1997) and Fischler v. Amsouth Bancorporation, 176

5   F.R.D. 583 (M.D. Fla. 1997); Fed.R.Civ.P. 23.

6           The presumption in favor of appointing a plaintiff who has the largest financial

7   interest in the outcome of the litigation, who otherwise meets Rule 23 typicality and

8   adequacy requirements, can be rebutted only upon proof by a purported member of the

9   plaintiff's class that the presumptively most adequate plaintiff:

10          (aa)    will not fairly and adequately protect the interests of the class; or
            (bb)    is subject to unique defenses that render such plaintiff incapable of
11                  adequately representing the class.

12  15 U.S.C. §78u-4(a)(3)(B)(iii)(II).

13          The PSLRA also contains restrictions against professional plaintiffs, providing

14  that:

15          Except as the court may otherwise permit, consistent with the purposes
            of this section, a person may be a lead plaintiff, or an officer, director, or
16          fiduciary of a lead plaintiff, in no more than 5 securities class actions
17          brought as plaintiff class actions pursuant to the Federal Rules of Civil
            Procedure during any 3-year period.
18

19  15 U.S.C. § 78u-4(a)(3)(B)(vi).

20          The PSLRA further requires that a lead plaintiff movant submit a certification

21  that identifies all other actions filed during the 3-year period preceding the date the

22  certification is signed, in which the plaintiff sought to serve as a representative party on

23  behalf of the class.  15 U.S.C. §78u-4(a)(2)(A)(v).

24

25  III.    DISCUSSION

26          The inquiry before the Court is whether to approve Detroit Pension, Deerfield

27  Beach and Brody, or the Brucker Group, as lead plaintiff in the current class action.

28

1

## A.  NOTICE

2      On January 31, 2006, the law firm Lerach Coughlin Stoia Geller Rudman &

3  Robbins LLP filed the first putative securities class action against Dot Hill stemming

4  from the alleged misstatements and omissions on behalf of Plaintiff Matt Brody.  The

5  firm caused notice to be published on *Business Wire* the same day, within the 20 day

6  period established by the Reform Act..  (McCormick Decl., Ex. 3)  Lerach's notice

7  satisfied the content requirements of the Reform Act by advising of the pendency of the

8  action, the claims asserted therein, the purported class period, and the deadline by

9  which motions to serve as lead plaintiff had to be filed. (Id.)

10

11      ## B.  EACH MOVANT FILED A MOTION WITHIN 60 DAYS

12      The person or group seeking to be lead plaintiff must have "either filed the

13  complaint or made a motion in response to a notice under subparagraph (A)(I)." 15

14  U.S.C. § 78u-4(a)(3)(B)(iii)(I)(aa).  Here, notice was published on January 31, 2006

15  and each of the purported lead plaintiff's filed their respective motions on April 5, 2006,

16  within the 60 day deadline, thereby satisfying this first prong of the Court's analysis.

17

18      ## C.  LARGEST FINANCIAL INTEREST

19      The Court's inquiry next turns to the PSLRA's presumption that the most

20  adequate plaintiff is the "person or group of persons" that in the determination of

21  the Court, has the largest financial interest in the relief sought by the class, and that

22  otherwise satisfies the requirements of Fed.R.Civ.P. 23 ("Rule 23"). 15 U.S.C. §78u-

23  4(a)(3)(B)(iii)

24      The Ninth Circuit in <u>In re Cavanaugh Sec. Litig.</u>, 306 F.3d 726 (9th Cir.

25  2002), established the protocol for deciding competing lead plaintiff motions.  At

26  the outset, the district court must identify the movant or movant group with the

27  largest financial stake.  Once that is done, the Court's inquiry should focus solely on

28  that movant and specifically whether any proof of that movant's inadequacy or

1    atypicality has been submitted.  Absent evidence of atypicality or inadequacy on the

2    part of the presumptively most adequate plaintiff, the Court should not even

3    examine the qualifications of any competing movants.  See <u>Cavanaugh</u>, 306 f.3d

4    729-730.

5        Here, the movants claim losses as follows in descending order: Detroit Group

6    - $876,638.26, with GRS claiming $468,644.64 and DP&F claiming $407,993.62 in

7    losses (Goldberg Decl. Exh. C.); Deerfield Beach and Brody - $699,485.50, with

8    Deerfield Beach claiming $210,903.50 and Matt Brody claiming $488,582.00 in

9    losses; the Brucker Group - $1,983.93.  (Furukawa Dec. Exh. C.)

10   Clearly the Detroit Group claims the largest financial interest in the relief

11   sought by the class with it's losses of $876,638.26.   The Court therefore determines

12   that the Detroit Group is presumptively the most adequate plaintiff, unless proof of

13   its inadequacy or atypicality can be shown, or it is subject to unique defenses which

14   render it incapable of adequately representing the class.

15           D.    <u>TYPICALITY</u>

16       The typicality requirement of Rule 23(a)(3) is satisfied when representative

17   plaintiffs' claims arise out of the same event or course of conduct as do the other

18   class members' claims, and are based on the same legal theories. <u>In re Advanced</u>

19   <u>Tissue Scis. Sec. Litig.</u>, 184 F.R.D. 346 (S.D. Cal. 1998).

20       Here there is a well-defined community of interest in the questions of law and

21   fact.  The Detroit Group, in addition to other movants, allege that Defendants

22   violated the Exchange Act and Securities Commission Rule 10b-5, 17 C.F.R.

23   §240.10b-5, by publicly disseminating materially false and misleading statements, as

24   well as statements which omitted material facts, about Dot Hill during the Class

25   Period.  As a result of Defendants' allegedly fraudulent representations and

26   omissions, Deerfield Beach and Brody, the Detroit Group, and the Brucker Group,

27   purchased Dot Hill securities at artificially affected prices and were damaged

28   thereby.  Because the Detroit Group claims are premised on the same legal and

1    remedial theories as the other putative class members, and are based on the same

2    types of alleged misrepresentations and omissions as other putative class members,

3    typicality is satisfied by the Detroit Group.

4                E.    ADEQUACY

5    The adequacy of representation requirement of Rule 23 is satisfied where it is

6    established that a representative party "will fairly and adequately protect the

7    interests in the class." Fed.R.Civ.P. 23(a).  Accordingly:

8                     The Ninth Circuit has held that representation is
                      "adequate" when counsel for the class is qualified and
9                     competent, the representative's interests are not
                      antagonistic to the interests of absent class members, and
10                    it is unlikely that the action is collusive.
11
12   Takeda v. Turbodyne Technologies, Inc., 67 F.Supp.2d 1129, 1133 (citing In re

13   Northern Dist. Of Cal. Daikon Shield IUD Prod. Lab. Litig., 693 F.2d 847, 855 (9th

14   Cir. 1982).  The class representative must also have "sufficient interest in the

15   outcome of the case to ensure vigorous advocacy." Takeda, 67 F.Supp.2d at 1137

16   (citing Riordan v. Smith Barney, 113 F.R.D. 60, 64 (N.D. Ill. 1986).

17   The Detroit Group argues that it's interests are clearly aligned with the

18   interests of the class and there is no antagonism between it's interests and the class

19   members' interests.  The Detroit Group claims that they have demonstrated their

20   adequacy as lead plaintiff by evincing a strong desire to prosecute this action on

21   behalf of the Class, and have shown that they are willing and able to take an active

22   role and control the litigation to protect the interests of absentees.  Furthermore,

23   the Detroit Group claims the adequacy of its sub-members to serve as lead plaintiff

24   has been confirmed by numerous courts which have appointed these funds to serve

25   as lead plaintiff and/or class representative in other securities class action lawsuits.

26   (Detroit Group Motion at 9.)  The Detroit Group contends they have

27   communicated with Glancy Binkow & Goldberg LLP ("Glancy")concerning the case

28   and have made the motion for appointment of lead plaintiff utilizing Glancy's

1 services.

2     The Court finds that the Detroit Group has demonstrated it's willingness to
3 serve as class representatives by timely filing motions to consolidate the class and for
4 lead plaintiff appointment. Furthermore, the Court notes that the Detroit Group
5 has selected experienced class counsel in Glancy to vigorously pursue the class
6 claims if selected. Glancy has successfully litigated hundreds of class actions,
7 recovering vast sums on behalf of defrauded shareholders. (See Goldberg Decl. Ex.
8 D.)

9     However, the Court must determine whether Deerfield Beach and Brody, or
10 the Brucker Group, has submitted evidence to rebut the presumption that the
11 Detroit Group is the most adequate plaintiff by showing the Detroit Group is
12 inadequate or atypical. See Cavanaugh, 306 F.3d at 729.

13     As a threshold matter, the Court notes that the Brucker Group has not filed
14 any opposition to either the Detroit Group, or Deerfield Beach and Brody's motions
15 for appointment of lead plaintiff. Therefore, the Court limits it's analysis to the
16 competing motions of the Detroit Group, and Deerfield Beach and Brody.

17     Deerfield Beach and Brody argue that, although the Detroit Group claims a
18 larger financial interest than Deerfield Beach and Brody, each member of the
19 Detroit Group suffers from infirmities that prevent their appointment as lead
20 plaintiff. Namely, that the Detroit Group is presumptively barred under the
21 PSLRA's 'professional plaintiff' ban from serving as lead plaintiff because it's
22 individual members are serving, or have served, as lead plaintiff in more than five
23 cases in the past three years. 15 U.S.C. § 78u-4(a)(3)(B)(vi).

24     According to Deerfield Beach and Brody, the Detroit Group's certifications
25 demonstrate that the Detroit Group, and their fiduciary Mr. Zajac, are involved in at
26 least five cases. (See Goldberg Dec. Ex. B.) In addition, Deerfield Beach and Brody
27 assert that the Detroit Group did not disclose additional cases in which it's members

28

1  served as lead plaintiff within the past three years.[3]  Deerfield Beach and Brody

2  further claim that In re King Pharmaceuticals Securities Litigation, should have

3  been included as a case in which the Detroit Group is currently serving as lead

4  plaintiff because it was appointed lead plaintiff within the last three years in the

5  action, despite the case being commenced more than three years ago.

6       Deerfield Beach and Brody argue that the PSLRA requires a movant to

7  include all cases in which they served, or are still serving as lead plaintiff, within a

8  three year period, whether the cases were commenced more than three years ago, or

9  the cases are now closed.  According to Deerfield Beach and Brody, this serves the

10  purpose behind the PSLRA which is to guard against appointment of a lead plaintiff

11  who cannot adequately represent the interests of the class if they are over-extended

12  as litigants.  The Detroit Group is already over-extended, argue Deerfield Beach and

13  Brody, as evidenced by the fact that they couldn't "even recall all the cases in which

14  they have filed for lead plaintiff appointment in the last three years" when they filed

15  their certification.  (Oppo. At 9.)  Therefore, they contend that the Detroit Group

16  must list all open and closed cases in which they have served, or are still serving, as

17  lead plaintiff, and all cases in which they moved to be appointed lead counsel within

18  the last three years regardless of when the cases were originally filed. (Oppo at 6.)

19       In this regard, Deerfield Beach and Brody claim that the Detroit Group failed

20  to include In re Bristol Myers, In re Gemstar, and In re OM Group, in which the

21  Detroit Group served as lead plaintiff within the past three years, despite the cases

22  having been commenced in 2002.  In addition, the Detroit Group should have

23  included Williams Sec. Litig v El Paso Corp, and In re Bisys Sec. Litig because it is a

24  named plaintiff in these actions. Finally, the Detroit Group was remiss in not

25  including Laborers Local 100 and 397 Pension Fund  v. Bausch & Lomb, State

26

27       [3]In re Bristol Myers Squibb Co. Sec. Litig., No 1:02-cv-0225-LAP (S.D.N.Y); In re Gemstar-

28  TV Guide Int'l, Inc., No. 2:02-cv-02775-MRP-PLA (C.D. Cal.); In re OM Group Inc. Sec. Litig.,No.
1:02-cv-2163-DCN (N.D.Ohio)

1  Universities Retirement System of Illinois v. Sonus Networks, Inc., and Maiden v.
2  Merge Techs. Inc. because members of the Detroit Group are currently seeking lead
3  plaintiff status in these cases.

4      Moreover, Deerfield Beach and Brody argue that the Court should not lift the
5  presumptive bar on institutional 'professional plaintiffs' such as the Detroit Group
6  because Deerfield Beach and Brody are an adequate alternative with a significant
7  financial interest.  Deerfield Beach and Brody contend that courts which have lifted
8  the presumptive ban have done so under very limited circumstances such as where
9  there is no other movant, no other institutional investor movant, the other movants
10 have a longer record of participation in securities litigation, and where the other
11 proposed lead plaintiffs were grossly inadequate or foreign. (Deerfield Beach &
12 Brody Oppo at 6-7.)  None of these apply here, therefore Deerfield Beach and Brody
13 claim there is no reason to lift the presumptive ban against the Detroit Group as a
14 'professional plaintiff'.  In addition, Deerfield Beach and Brody argue that Congress
15 did not intend to award a blanket exception to institutions, or their fiduciaries, from
16 the professional plaintiff provision of the PSLRA.  See Gibson v. PS Group Holdings,
17 Inc., Case No. 00-CV-0372 W (RBB), 2000 U.S. Dist., LEXIS 3158 3158, at *14-
18 *16 (S.D. Cal. Mar. 8, 2000).

19     Finally, Deerfield Beach and Brody, argue that all actions in which Mr. Zajac
20 serves as a fiduciary should be combined for purposes of the PSLRA case totals
21 within the past three years, rendering the Detroit Group far in excess of the
22 PSLRA's limit. Deerfield Beach and Brody conclude that because the Detroit
23 Group, and their fiduciary and general counsel Ronald Zajac (who oversees all their
24 securities cases), have already far surpassed the allotted five cases in three years rule,
25 the Detroit Group is presumptively barred from serving as lead plaintiff in this case.

26     The Detroit Group vigorously counter that even if the professional plaintiff
27 limitation applies to them as institutional investors, which they claim it does not,
28 neither fund has surpassed the PSLRA's  limit.  In particular, the Detroit Group

1  notes that DP&F listed it's lead plaintiff appointment status in the <u>King</u>
2  <u>Pharmaceutical</u> action in it's certification, but considered it irrelevant to the
3  calculation under the PSLRA because the action was filed more than three years
4  before the certification date.  Of the other cases which Deerfield Beach and Brody
5  claim were purposefully omitted from the Detroit Group's certification, three were
6  commenced in 2002[4] and are no longer pending, unlike <u>King Pharmaceuticals</u>.  The
7  Detroit Group further claims it did not include <u>In re Bisys Securities Litigation</u>, or
8  <u>Wyatt v. El Paso Corp</u> because it is merely a named plaintiff, but has not moved to
9  serve or has served as a lead plaintiff in these actions, and therefore they are beyond
10  the purvue of the PSLRA's ban.

11        Furthermore, the Detroit Group argues that the separate funds, DP&F and
12  GRS should not be combined for purposes of the 'professional plaintiff' rule simply
13  because Ronald Zajac serves as general counsel for both funds, and oversees their
14  respective participation in class actions as a fiduciary.  The Detroit Group claims
15  that if the Court accepts Deerfield Beach and Brody's argument, Deerfield Beach
16  and Brody will also be disqualified for the same reason, as Lerach Coughlin Stoia
17  Geller Rudman & Robbins have represented them in four prior lead plaintiff
18  appointments for Matt Brody and two prior lead plaintiff appointments for Deerfield
19  Beach.

20        Finally, the Detroit Group argues that even if DP&F and DGRS were serving
21  as lead plaintiff in more than five securities class actions, the PSLRA ban should not
22  bar their appointment because "[t]he majority of courts. . .have determined that the
23  limitation does not apply to institutional investors."  See <u>Smith v. Suprema</u>
24  <u>Specialities, Inc.</u>, 206 F.Supp 2d 627, 641 (D.N.J. 2002); <u>In re Gemstar-TV Guide</u>
25  <u>Int'l Sec. Litig.</u>, 209 F.R.D. 447, 454-55 (C.D. Cal. 2002.)

26

27        [4]<u>In re Bristol Myers Squibb Co. Sec. Litig.</u>, No 1:02-cv-0225-LAP (S.D.N.Y); <u>In re Gemstar-</u>
28  <u>TV Guide Int'l, Inc.</u>, No. 2:02-cv-02775-MRP-PLA (C.D. Cal.);<u>In re OM Group Inc. Sec. Litig.</u>,No.
    1:02-cv-2163-DCN (N.D.Ohio)

1    The Court finds that the Detroit Group has not surpassed the PSLRA's ban

2  on lead plaintiff participation in five or more securities class actions brought as

3  plaintiff class actions during any 3-year period. [5] 15 U.S.C. § 78u-4(a)(3)(B)(vi).

4    In determining whether the Detroit Group members fall within the allowable

5  range under the PSLRA's 'professional plaintiff' ban, the Court will consider DP&F

6  and GRS separately, despite Ronald Zajac's role as fiduciary for both funds' lead

7  plaintiff class actions. The PSLRA does not require the Court to disqualify a

8  movant simply because they have had the same individual fiduciary in multiple

9  securities class actions. See In re Vicuron Pharmaceuticals, Inc. Sec. Litig., 225

10  F.R.D. 508, 512 (E.D. Penn.). While Section 78u-4(a)(2)(A)(v) states that a

11  person may not serve as the fiduciary of a lead plaintiff in more than 5 cases within

12  three years, the courts are also vested with discretion to determine whether it is

13  consistent with the purposes of the Section to allow for a departure from this rule.

14    The PSLRA contemplates that institutional investors are preferred lead

15  plaintiffs because "increasing the role of institutional investors in class actions will

16  ultimately benefit shareholders and assist courts by improving the quality of

17  representation in securities class actions." H.R Conf. Rep. No. 104-369, 1995

18  U.S.C.C.A.C. at 733. It does not comport with the PSLRA's policy to encourage

19  institutional investors to participate as lead plaintiffs, if an institutional investor's

20  participation as a lead plaintiff can be combined with another institutional investor's

21  lead plaintiff experiences simply because they happen to share a common fiduciary

22

23

[5] According to their certifications, GRS has been appointed within the last three years as lead

24  plaintiff in; In re Levi Strauss & Co. Securities Litigation, In re R&G Financial. GRS has commenced

25  and/or moved for appointment as lead plaintiff in In re Royal Dutch/Shell Sec. Litig., and In re Bearing
Point Inc., Sec. Litig. DP&F has been appointed within the last three years as lead plaintiff in In re

26  Levi Strauss & Co. Securities Litigation, Advanced Marketing Services, Inc. Securities Litigation. PFR
is serving as lead plaintiff in In re King Pharmaceuticals Sec. Litig. PFR has moved for appointment

27  of lead plaintiff but was not appointed in In re Royal Dutch/Shell Sec. Litig., In re Bisys Sec. Litig., In

28  re CNL Hotels & Resorts Inc., Sec. Litig., In re Shaw Group Sec. Litig., In re Delphi Sec. Litig., Sonus
Networks Sec. Litig., In re Boston Scientific Corp. Sec. Litig. (Goldberg Dec. Exhibit B.)

06cv0228

1   in more than 5 class actions within three years. Therefore, Ronald Zajac's role as

2   fiduciary for both DP&F and GRS in multiple class actions in which the funds have

3   served as lead plaintiffs is deemed irrelevant for the current motion, and the funds

4   will not be combined for purposes of the 'professional plaintiff' ban.

5        From the Detroit Group's certifications, the Court notes that DP&F has been

6   appointed lead plaintiff within the three years preceding the date of the certification

7   in In re Levi Strauss & Co., Securities Litigation, and Advanced Marketing Services,

8   Inc. Securities Litigation, and GRS is serving as lead plaintiff in In re Levi Strauss &

9   Co., Securities Litigation, and Advanced Marketing Services, Inc. Securities

10  Litigation. If viewed separately, each fund has been appointed in only two securities

11  class actions within the past three years, clearly not surpassing the PSLRA's

12  'professional plaintiff' ban. The Court finds that even if the two funds were

13  considered together due to the fiduciary duties of their general counsel, Ronald

14  Zajac, the Detroit Group's members are only lead plaintiffs in four securities actions

15  commenced within the past three years, again within the PSLRA's allowable range.

16       The Court disagrees with Deerfield Beach and Brody's argument that the King

17  Pharmaceutical case should have been included in the DP&F's total count toward

18  the PSLRA's limit. The Detroit Group accurately stated that they are serving as

19  lead plaintiff in the King Pharmaceutical action, however they did not include it in

20  their calculation for purposes of the PSLRA's 'professional plaintiff' limit because the

21  case was filed on March 12, 2003, and DP&F's certification was signed on March 23,

22  2006. Section 78u expressly states that a movant must include all cases in which

23  they have moved for lead plaintiff that were *filed* within three years. Clearly, King

24  Pharmaceutical does not meet this criteria. 15 U.S.C. 78u-4(a)(2)(A)(v)

25       As with King Pharmaceuticals, DP&F did not disclose their unsuccessful

26  motion to serve as class representative in the 2002 case In re Williams Sec. Litig.,

27  reasoning that they were only required to include actions commenced within the

28  past three years in which they served as lead plaintiff, or in which they moved for

1    and were appointed lead plaintiff. The Court agrees, finding that <u>In re Williams</u> did

2    not need to be included in it's calculation of DP&F's total because the case was not

3    commenced within the three years prior. 15 U.S.C. 78u-4(a)(2)(A)(v).

4        The Court further finds that the additional cases which Deerfield Beach and

5    Brody allege should have been included in the Detroit Group's certifications consist

6    of three cases that were commenced in 2002[6] and therefore are not material in the

7    calculation of the Detroit Group's lead plaintiff application under the PSLRA.

8        Deerfield Beach and Brody's argument that the presumptive ban against

9    'professional plaintiffs' should not be lifted to allow the Detroit Group to serve as

10    lead plaintiff fail because the PSLRA clearly contemplates that an institutional

11    investor may capably serve as lead plaintiff in more than 5 class actions in the prior

12    three years. Furthermore, the PSLRA vests the Court with the discretion to make

13    that determination.

14        The PSLRA does not absolutely prohibit as lead plaintiff an institutional

15    investor who has served more than five times within the prior three years. <u>Vicuron</u>,

16    225 F.R.D. at 511. In fact, the Conference Committee Report on the PSLRA made

17    it clear that the limitation against professional plaintiffs was not designed to be

18    applied mechanically to institutional investors. <u>Id.</u> at 512. The Report states that

19    "Institutional Investors seeking to serve as lead plaintiff may need to exceed this

20    limitation and do not represent the type of professional plaintiff this legislation seeks

21    to restrict." H.R.Conf. Rep. No. 104-369-1995 U.S.C.C.A.N. at 734. The Report

22    further states that the Conference Committee grants courts discretion to avoid

23    disqualifying institutional investors from serving more than five times in three years

24    as an unintended consequence of the strict application of the rule.

25        The Detroit Group is an institutional investor, which consists of two

26

27        [6] <u>In re Bristol Myers Squibb Co. Sec. Litig.</u>, No 1:02-cv-0225-LAP (S.D.N.Y); <u>In re Gemstar-</u>

28    <u>TV Guide Int'l, Inc.</u>, No. 2:02-cv-02775-MRP-PLA (C.D. Cal.); <u>In re OM Group Inc. Sec. Litig.</u>,No.
       1:02-cv-2163-DCN (N.D.Ohio)

1   individual institutional investor funds, DP&F and GRS.  Accordingly, the Detroit

2   Group exactly the type of movant which the PSLRA and Committee considered

3   immune from mechanical disqualification under the 'professional plaintiff' ban.  The

4   Court finds that even if the Detroit Group funds surpassed the PSLRA's lead

5   plaintiff limit within the past three years, which they haven't as of this date, the ban

6   should not apply because appointing the Detroit Group as lead plaintiff in the

7   current action is consistent with the purposes of the PSLRA: the Detroit Group is an

8   institutional investor, has the largest financial interest in the securing relief for the

9   class, has met the requirements of Rule 23, and has secured experienced counsel in

10   Glancy.

11         In light of the Detroit Group's status as an institutional investor, DP&F's

12   failure to disclose their application for lead plaintiff in In re Williams Sec. Litig.,

13   Laborers Local 100 and 397 Pension Fund v. Bausch & Lomb,Inc., and State

14   Universities Retirement System of Illinois v Sonus Networks, Inc., now pending in

15   the Southern District of New York and Massachusetts respectively, does not render

16   them incapable of serving as lead plaintiff in the current action, because assuming

17   they are appointed in each of these cases, in addition to the present action before

18   the Court, it will only bring DP&F's total number of cases in which they are serving

19   as lead plaintiff to six and as addressed above, the PSLRA limit is not to be applied

20   mechanically to institutional investors, and their fiduciaries, such as DP&F.  GRS

21   likewise did not reveal their proposed lead plaintiff status in Maiden v. Merge Techs.

22   Inc., however the same reasoning applies to GRS that if they are appointed in

23   Maiden and this case, it will bring their total to four, well within the PSLRA's

24   presumptive ban.  Here, the Detroit Group has not yet surpassed the PSLRA's

25   professional plaintiff limit, and if they do, it will be by one case.  The Detroit Group

26   has experienced and competent counsel in Glancy to handle these cases, should the

27   funds be appointed lead plaintiff in each of the cases for which they have filed for

28   lead plaintiff status.  Therefore, the Court in its discretion, deems the Detroit Group

1 | the most adequate plaintiff.[7]

2

3 | IV.  **CONCLUSION AND ORDER**

4 | The Court, having considered all documents submitted by the parties and for

5 | good cause appearing, hereby **APPOINTS** the Detroit Group, comprised of the

6 | Detroit Police and Fire Retirement System of the City of Detroit, and the General

7 | Retirement System of the City of Detroit, as lead plaintiff in the above entitled

8 | putative securities class action.

9 | **IT IS SO ORDERED.**

10

11 | DATE: June 21, 2006

12 | Hon. THOMAS J. WHELAN

13 | United States District Court
     Southern District of California

14

15 | CC: ALL PARTIES AND COUNSEL OF RECORD
      HONORABLE WILLIAM MCCURINE, UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28 | [7] In light of the Court's determination, the Detroit Group's Opposition argument against appointment of Deerfield Beach and Brody is not addressed.  See <u>Cavanaugh</u>, 306 f.3d 729-730.

- 17 -

# Exhibit B

1
2
3
4                                              The Honorable Richard A. Jones
5
6
7
8
9                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
10                                      AT SEATTLE
11
      ROBERT MCCLAIN, et al.,
12
                        Plaintiffs,
13
             v.                                   CASE NO. C07-1747RAJ
14
      WSB FINANCIAL GROUP, INC., et al.,          ORDER
15
16                      Defendants.
17
      TURNBERRY ASSET MANAGEMENT,
18    et al.,
19
                        Plaintiffs,
20
             v.                                   CASE NO. C07-1760RAJ
21
      DAVID K. JOHNSON, et al.,                   ORDER
22
23                      Defendants.
24
25
26
27
28

      ORDER – 1

RONALD E. HOUSE, et al.,

               Plaintiffs,

    v.

WSB FINANCIAL GROUP, INC., et al.,

               Defendants.

CASE NO. C07-5618RAJ

ORDER

SANDRA ELTERICH, et al.,

               Plaintiffs,

    v.

DAVID K. JOHNSON, et al.,

               Defendants.

CASE NO. C07-5620RAJ

ORDER

JEFFREY HIGHAM, et al.,

               Plaintiffs,

    v.

WSB FINANCIAL GROUP, INC., et al.,

               Defendants.

CASE NO. C07-2067RAJ

ORDER

## I.    INTRODUCTION

This matter comes before the court on at least fifteen motions seeking to consolidate the above-captioned actions, and seeking to appoint a lead plaintiff for the consolidated action. Most of the pending motions are duplicative. For purposes of this order, it suffices to focus on four motions in Case No. 07-1747 (Dkt. ## 12, 14, 17, 19) and one motion in Case No. 07-5620 (Dkt. # 11). Although two parties have requested oral argument, the court finds these motions appropriate for disposition based on the parties' briefing and supporting documents. For the reasons stated below, the court

ORDER – 2

1  CONSOLIDATES the above-captioned actions, and appoints the Police and Fire

2  Retirement System for the City of Detroit ("Detroit P&F") as the lead plaintiff.

3                              **II.    BACKGROUND**

4         These putative class actions allege securities fraud by WSB Financial Group,

5  Incorporated ("WSB"), many of its officers and directors, and D.A. Davidson and

6  Company, who orchestrated the initial public offering ("IPO") of WSB stock in

7  December 2006.  The complaints in the above-captioned actions describe the same

8  allegedly wrongful conduct.  WSB is a bank holding company engaged in commercial

9  lending.  In connection with its 2006 IPO, WSB issued a registration statement as

10  required by the SEC.  The registration statement allegedly does not reveal that many of

11  WSB's lending practices did not comply with applicable state and federal laws.  After the

12  IPO, WSB shares sold for as much as $21.  In September 2007, WSB announced layoffs

13  and the departure of several executives.  Its stock price dropped.  The price plummeted on

14  October 24, 2007, when WSB announced that state and federal regulators were

15  investigating its lending practices.  On October 25, 2007, WSB shares closed at $4.73.

16  

17  

18         Within a week of WSB's disclosure, shareholders filed the first of the above-

19  captioned actions, Case No. 07-1747, seeking relief under federal securities laws.

20  Turnberry Asset Management ("Turnberry") filed a second action, Case No. 07-1760.

21  On October 31, 2007, following the Private Securities Litigation Reform Act ("PSLRA"),

22  Turnberry's counsel posted a notice in a national business publication announcing this

23  action and the deadline for interested potential class members to file motions to serve as

24  the lead plaintiff.  15 U.S.C. § 78u-4(a)(3)(A)(i).  By January 2, 2008, shareholders had

25  filed three more actions.  Each of the follow-on actions was transferred to this court as

26  related to the first action.

27  

28  

ORDER – 3

1    The motions before the court seek consolidation of the above-captioned actions,

2    and appointment of a lead plaintiff.

3                              **III.    DISCUSSION**

4    **A.    The Court Consolidates the Above-Captioned Actions.**

5

6    At least three WSB shareholders seek to consolidate the five actions captioned

7    above.  No shareholder has opposed consolidation, nor has any Defendant.

8    The PSLRA envisions consolidation of multiple actions targeting the same

9    securities law violations. 15 U.S.C. § 78u-4(a)(3)(B)(ii) (discussing consolidation of

10   "more than one action on behalf of a class asserting substantially the same claim or

11   claims arising under [federal securities laws]").  Fed. R. Civ. P. 42(a) permits

12   consolidation of actions that "involve a common question of law or fact."  The court's

13   decision to consolidate actions under Rule 42(a) is discretionary.  *Investors Research Co.*

14   *v. U.S. Dist. Court for the Central Dist. of Cal.*, 877 F.2d 777, 777 (9th Cir. 1989).

15

16   In this case, consolidation is appropriate.  Review of the complaints in each of the

17   above-captioned actions reveals that they target the same allegations of misconduct by the

18   same parties.  No party opposes consolidation, and the court finds that consolidating the

19   actions is in the interests of the parties and promotes judicial economy.  The court will

20   provide instructions for further pleadings in the consolidated action at the conclusion of

21   this order.

22   **B.    The Court Selects Detroit P&F as Lead Plaintiff.**

23

24   Five shareholders and shareholder groups initially sought to become the lead

25   plaintiff in the above-captioned actions.  The lead plaintiff selection process "is not a

26   beauty contest," *In re Cavanaugh*, 306 F.3d 726, 732 (9th Cir. 2002), it is a three-part

27   pageant.

28   First, the court must ensure that at least one contestant has followed the

ORDER – 4

1  PSLRA's process for notifying potential class members of the pending actions, and

2  offering them the opportunity to seek appointment as lead plaintiff. 15 U.S.C. § 78u-

3  4(a)(3)(A); *Cavanaugh*, 306 F.3d at 729. Once contestants have timely identified

4  themselves, the court must consider their petitions within 90 days of the first class

5  member's notice or "as soon as practicable" after a decision consolidating multiple

6  actions. 15 U.S.C. § 78u-4(a)(3)(B)(i)-(ii).

7

8       Second, the court must determine which of the contestants has the "largest

9  financial interest in the relief sought by the class . . . ." 15 U.S.C. § 78u-

10  4(a)(3)(B)(iii)(I); *Cavanaugh*, 306 F.3d at 729-30. The court must presume that the

11  contestant with the largest financial stake is the lead plaintiff, provided the contestant also

12  meets the requirements of Fed. R. Civ. P. 23(a). 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). The

13  contestant's financial stake is "the *only* basis on which a court may compare plaintiffs

14  competing to serve as the lead" plaintiff. *Cavanaugh*, 306 F.3d at 732 (emphasis in

15  original). In the second step, the court may not consider other factors, even factors that

16  are germane to the representation of the class and the potential class recovery. *See id.* at

17  731-37 (reversing appointment of lead plaintiff based in large part on choice of class

18  counsel). In determining whether the contestant with the largest financial stake meets the

19  Rule 23(a) requirements, the court must rely solely on that contestant's complaint and its

20  PSLRA-mandated certification. *Cavanaugh*, 306 F.3d at 732 ("[T]here is no adversary

21  process to test the substance of [the contestant's] claims" in step two of the process.); 15

22  U.S.C. § 78u-4(a)(2) (setting requirements for plaintiff certification statement).

23

24       Third, the court considers submissions from contestants other than the presumptive

25  lead plaintiff to see if they have rebutted "the presumptive lead plaintiff's showing that it

26  satisfies Rule 23's typicality and adequacy requirements." *Cavanaugh*, 306 F.3d 730.

27

28

ORDER – 5

1   Rebuttal evidence must show that presumptive lead plaintiff "will not fairly and

2   adequately protect the interests of the class" or "is subject to unique defenses that render

3   such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-

4   4(a)(3)(B)(iii)(II)(aa)-(bb). The court cannot reject a presumptive lead plaintiff merely

5   because it finds that "another plaintiff may be 'more typical' or 'more adequate' . . . ."

6   *Id.* at 732 ("So long as the plaintiff with the largest losses satisfies the typicality and

7   adequacy requirements, he is entitled to lead plaintiff status, even if . . . some other

8   plaintiff would do a better job.").

9

10          Turning to the pageant before the court, five contestants initially moved for lead

11  plaintiff status, but two contestants bowed out, conceding that at least one of the

12  remaining three contestants had a larger financial stake. The three remaining contestants

13  are Detroit P&F, Turnberry, and a group of three individual WSB investors (the "Investor

14  Group").

15

16          In part one of the pageant, the court finds that the contestants met the notification

17  requirements of the PSLRA, and that all class members were given an adequate

18  opportunity to seek lead plaintiff status.

19          In part two of the pageant, the court finds that Detroit P&F has the largest

20  financial stake of any contestant. The court need not delve into the details of the

21  contestants' methods of calculating their respective financial stakes.[1] Detroit P&F's

22  calculated stake of approximately $470,000 dwarfs all others. The Investor Group, the

23  closest contestant, has a calculated stake of approximately $280,000. No other contestant

24  has a calculated stake exceeding $100,000. No contestant claims to have a larger

25

26  ───────────────

27          [1]All of the contestants calculated their financial stakes by determining their maximum possible loss under the PSLRA, which caps a plaintiff's damages at the difference between the price the investor paid and the price of the stock after the fraud underlying the lawsuit has been revealed. 15 U.S.C. § 78u-4(e).

28

ORDER – 6

1  financial stake than Detroit P&F, nor does any contestant contend that Detroit P&F erred

2  materially in calculating its financial stake.

3      Moreover, based solely on Detroit P&F's pleadings and certification, *Cavanaugh*,

4  306 F.3d at 730, it meets the Fed. R. Civ. P. 23(a) requirements of typicality and

5  adequacy.  Detroit P&F purchased WSB stock either in the IPO or shortly thereafter, and

6
7  continued to make purchases throughout the class period.  There is no indication that its

8  claims are atypical of claims of other class members, and no indication that it is subject to

9  unique defenses.  *See* Fed. R. Civ. P. 23(a)(3).  Detroit P&F is an institutional investor

10  with substantial experience serving as a class representative in federal securities class

11  actions.  *See* Fed. R. Civ. P 23(a)(4) (stating that "representative parties [must] fairly and

12  adequately protect the interests of the class").  The court finds that Detroit P&F has made

13  a prima facie showing that it satisfies Rule 23(a).

14
15      With Detroit P&F as the presumptive lead plaintiff, the court reaches step three of

16  the pageant, wherein it must determine if other contestants have rebutted the presumption

17  that Detroit P&F can lead the class.  No class member presents any evidence that Detroit

18  P&F's claims are not typical of other class members' claims.  The only challenge to

19  Detroit P&F's assumption of the lead plaintiff role is that it is a "professional plaintiff,"

20  and therefore not an adequate class representative.

21      The PSLRA places "[r]estrictions on professional plaintiffs" as follows:

22
23  Except as the court may otherwise permit, consistent with the purposes of
   this section, a person may be a lead plaintiff, or an officer, director, or
   fiduciary of a lead plaintiff, in no more than 5 securities class actions

24  brought as plaintiff class actions pursuant to the Federal Rules of Civil
   Procedure during any 3-year period.

25
26  15 U.S.C. § 78u-4(a)(3)(B)(vi).  There is no dispute that Detroit P&F has appeared as a

27  lead plaintiff in more than five securities class actions in the last three years.  Indeed, by

28  its own admission, Detroit P&F is *currently* serving as lead plaintiff in six actions

ORDER – 7

1  pending in federal district courts across the country. Other contestants note that, if the

2  court considers other Detroit retirement funds that share officers and directors with

3  Detroit P&F, Detroit P&F is effectively serving as lead plaintiff in as many as eight

4  pending securities actions.

5        The PSLRA gives a court discretion to permit a party to appear as a lead plaintiff

6  despite its presumptive "professional plaintiff" status. The vast majority of courts have

7  used that discretion to permit institutional investors like Detroit P&F to appear as lead

8  plaintiff. *E.g.*, *In re Silicon Storage Tech., Inc. Secs. Litig.*, No. C 05-0295 PJH, 2005

9  U.S. Dist. LEXIS 45246, at *34 (N.D. Cal. May 3, 2005) (appointing institutional

10  investor despite five lead plaintiff appearances in three years); *In re Gemstar-TV Guide

11  *Int'l Secs. Litig.*, 209 F.R.D. 447, 454 (C.D. Cal. 2002) (citing cases). This exercise of

12  discretion is consistent with the legislative history of the PSLRA, in which Congress

13  noted that "[i]nstitutional investors seeking to serve as lead plaintiff may need to exceed

14  [the five-lawsuit] limitation and do not represent the type of professional plaintiff this

15  legislation seeks to restrict." H.R. Conf. Rep. No. 104-369 at 35 (1995), *as reprinted in*

16  1995 U.S.C.C.A.N. 730, 734.

17

18

19        The court declines to disqualify Detroit P&F as a professional plaintiff. The

20  court's review of Detroit P&F's purchases of WSB stock shows that it has been a

21  significant investor since WSB went public. There is no inference that Detroit P&F

22  purchased shares for the purpose of litigation. The court is mindful of the possibility that

23  serving as lead plaintiff in multiple securities actions could strain Detroit P&F's ability to

24  adequately represent class members, and acknowledges that one court has declined to

25  choose Detroit P&F for that reason. *Thompson v. Shaw Group Inc.*, No. 04-1685, 2004

26  U.S. Dist. LEXIS 25641, at *22 (E.D. La. Dec. 15, 2004) (finding " risk of overstretch

27  where Detroit P&[F] would be directing a total of eight concurrent lawsuits"). There is

28

ORDER – 8

no evidence before the court, however, that Detroit P&F's lead plaintiff commitments in multiple actions have adversely affected class members in its other litigations. Without such evidence, the court presumes, as have other courts, that institutional investors like Detroit P&F are well-suited to serve as lead plaintiff.

The court further finds that Detroit P&F's status as lead plaintiff in multiple actions does not rebut the presumption that it is an adequate class representative under Fed. R. Civ. P. 23(a)(4). At present, there is little evidence before the court suggesting that Detroit P&F is inadequate. For example, no one disputes that it has retained experienced class-action counsel. Instead, other contestants speculate that its commitments in other class actions will leave it "overstretched," just as the court found in *Thompson*. The court finds this speculation insufficient. One contestant has invoked 15 U.S.C. § 78u-4(a)(3)(B)(iv), which permits the court to order "discovery relating to whether a member . . . of the purported plaintiff class is the most adequate plaintiff." The court can order such discovery only where the contestant "first demonstrates a reasonable basis for a finding that the presumptively most adequate plaintiff is *incapable* of adequately representing the task." *Id.* (emphasis added). Again, other contestants' speculation that Detroit P&F is "overstretched" does not suffice. If Detroit P&F were incapable of representing class members, the court would expect other contestants to find evidence of incapability in the records of the many actions in which Detroit P&F is serving as lead plaintiff. Absent such a showing, the court declines to delay this action by ordering discovery into Detroit P&F's adequacy.

## IV.    CONCLUSION

For the reasons stated above, the court rules as follows. The court CONSOLIDATES the five above-captioned actions. Case No. C07-1747 shall be the

ORDER – 9

1  lead case, and all other actions shall be member cases.  All future pleadings in the

2  consolidated case shall be captioned substantially as follows:

3

4  IN RE: WSB FINANCIAL GROUP              MASTER FILE NO. C07-1747RAJ
   SECURITIES LITIGATION
5

6

7          The court GRANTS Detroit P&F's motion to be appointed lead plaintiff (Case No.

8  07-1747, Dkt. # 19), and DENIES the other four contestants' motions to be appointed

9  lead plaintiff (Case No. 07-1747, Dkt. ## 12, 14, 17; Case No. 07-1760, Dkt. # 11).

10  Because granting and denying the motions listed above disposes of all relief sought in all

11  other pending motions, the court directs the clerk to TERMINATE all other motions

12  pending in the above-captioned actions.   The court directs Detroit P&F to file a

13  consolidated complaint no later than March 28, 2008, and directs the parties to meet and

14  confer and to submit a proposed case management schedule no later than April 4, 2008.

15

16

17          DATED this 10th day of March, 2008.

18

19

20

21          The Honorable Richard A. Jones
            United States District Judge
22

23

24

25

26

27

28

ORDER – 10

# Exhibit C

# U.S. Party/Case Index

## Civil Name Search Results

**72 Total Party matches for selection IRON WORKERS LOCAL 25 PENSION FUND 03/24/2005
to 05/19/2008 for ALL COURTS**
**Search Complete**
**Mon May 19 15:00:40 2008**
**Selections 1 through 54 (Page 1)**

Download (2 pages $ 0.08)

Next 18

| | Name | Court | Case No. | Filed | NOS | Closed |
|---|---|---|---|---|---|---|
| 1 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv10228 | 01/18/2006 | 791 | 07/31/2006 |
| | Iron Workers Local 25 Pension Fund et al v. ACRO Metals, Incorporated | | | | | |
| 2 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv10282 | 01/20/2006 | 791 | 05/26/2006 |
| | Iron Workers Local 25 Pension Fund et al v. Pou, Incorporated et al | | | | | |
| 3 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2008cv10814 | 02/28/2008 | 791 | 04/25/2008 |
| | Iron Workers Local 25 Pension Fund et al v. Exterior Wall Specialties Corporation et al | | | | | |
| 4 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2008cv10840 | 02/29/2008 | 791 | |
| | Iron Workers Local 25 Pension Fund et al v. Re-bar, Incorporated et al | | | | | |
| 5 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2008cv10872 | 03/03/2008 | 791 | |
| | Iron Workers Local 25 Pension Fund et al v. Detroit Door and Hardware Company et al | | | | | |
| 6 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2007cv10881 | 02/28/2007 | 791 | 07/11/2007 |
| | Iron Workers Local 25 Pension Fund et al v. ACRO Metals, Incorporated et al | | | | | |
| 7 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2007cv10882 | 02/28/2007 | 791 | |
| | Iron Workers Local 25 Pension Fund et al v. Steel Enterprises, Incorporated et al | | | | | |
| 8 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2007cv11014 | 03/08/2007 | 791 | 02/12/2008 |
| | Kowalski et al v. Iron Workers Local 25 Pension Fund | | | | | |
| 9 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2008cv11068 | 03/12/2008 | 791 | |
| | Iron Workers Local 25 Pension Fund et al v. Woodruff Contracting, Incorporated et al | | | | | |
| 10 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2008cv11119 | 03/14/2008 | 791 | 04/04/2008 |

Iron Workers Local 25 Pension Fund et al v. Crawford Door Sales, Incorporated et al

| 11 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 4:2006cv11188 | 03/21/2006 | 791 | 06/14/2006 |

Iron Workers Local 25 Pension Fund et al v. Jerico Construction Incorporated et al

| 12 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv11276 | 03/28/2006 | 791 | 04/27/2006 |

Iron Workers Local 25 Pension Fund et al v. Crane Steel, L. L. C. et al

| 13 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2008cv11277 | 03/25/2008 | 791 | |

Iron Workers Local 25 Pension Fund et al v. Commercial Construction, Incorporated et al

| 14 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2007cv11525 | 04/04/2007 | 791 | 08/15/2007 |

Iron Workers Local 25 Pension Fund et al v. Hickory Steel, L. L. C. et al

| 15 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2007cv11769 | 04/23/2007 | 791 | 06/29/2007 |

Iron Workers Local 25 Pension Fund et al v. Municipal and Industrial Storage, Incorporated et al

| 16 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv11789 | 04/14/2006 | 791 | 09/07/2006 |

Iron Workers Local 25 Pension Fund et al v. DYNA Enterprise LLC et al

| 17 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2008cv11796 | 04/29/2008 | 791 | |

Iron Workers Local 25 Pension Fund et al v. Jerico Construction Incorporated et al

| 18 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2008cv11797 | 04/29/2008 | 791 | |

Iron Workers Local 25 Pension Fund et al v. Phoenix Steel Erectors, LLC, et al

| 19 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2007cv11845 | 04/27/2007 | 791 | 05/24/2007 |

Iron Workers Local 25 Pension Fund et al v. Exterior Wall Specialties Corporation et al

| 20 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv11975 | 04/28/2006 | 791 | 09/12/2006 |

Iron Workers Local 25 Pension Fund et al v. Alpine Contractors, Incorporated et al

| 21 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2008cv12021 | 05/08/2008 | 791 | |

Iron Workers Local 25 Pension Fund et al v. ABZ Steel Fabrication, LLC et al

| 22 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv12239 | 05/16/2006 | 791 | 08/23/2006 |

Iron Workers Local 25 Pension Fund et al v. Raptor Resteel, L. L. C. et al

| 23 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2007cv12677 | 06/25/2007 | 791 | 12/06/2007 |

Iron Workers Local 25 Pension Fund et al v. C and A Resteel Service, Incorporated et al

| 24 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2007cv12713 | 06/27/2007 | 791 | 01/08/2008 |

Iron Workers Local 25 Pension Fund et al v. DK Steel Erectors, Incorporated et al

| 25 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv71166 | 03/24/2005 | 791 | 06/23/2005 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. Crane Steel, L. L. C. et al

| 26 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv71336 | 04/06/2005 | 791 | 06/08/2005 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. Acker Steel Erectors, Incorporated et al

| 27 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv71337 | 04/06/2005 | 791 | 03/09/2006 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. CBN Steel Construction, Incorporated et al

| 28 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv71573 | 04/21/2005 | 791 | 05/06/2005 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. Fagerlie

| 29 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv71574 | 04/21/2005 | 791 | 09/12/2005 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. Whitmore Steel and Supply, Incorporated et al

| 30 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv71747 | 05/03/2005 | 791 | 02/28/2006 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. American Precast Erectors, Incorporated et al

| 31 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv71790 | 05/06/2005 | 791 | 02/23/2006 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. Jerico Construction, Incorporated et al

| 32 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv71791 | 05/06/2005 | 791 | 06/15/2005 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. Crawford Door Sales, Incorporated et al

| 33 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv71817 | 05/09/2005 | 791 | 11/23/2005 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. A. N. A. Erectors, Incorporated et al

| 34 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv71845 | 05/10/2005 | 791 | 07/28/2005 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. Cook

| 35 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv71909 | 05/13/2005 | 791 | 08/17/2005 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. Pou, Incorporated et al

| 36 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv72001 | 05/20/2005 | 791 | 10/11/2005 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. Steel House Construction Service, Incorporated et al

| 37 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv72107 | 05/27/2005 | 791 | 01/26/2006 |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. Kappa and Westlake Building and Concrete Construction, Incorporated et al

| 38 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv72713 | 07/11/2005 | 791 | |
|---|---|---|---|---|---|---|

Iron Workers Local 25 Pension Fund et al v. Structural Solutions, Incorporated et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 39 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv72852 | 07/21/2005 | 791 | 08/16/2005 |

Iron Workers Local 25 Pension Fund et al v. Sav's Ironworks, Incorporated et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 40 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv72981 | 08/01/2005 | 791 | 10/27/2005 |

Iron Workers Local 25 Pension Fund et al v. Dyna Enterprise, L. L. C. et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 41 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv73002 | 08/02/2005 | 791 | 10/25/2005 |

Iron Workers Local 25 Pension Fund et al v. Custom Canopy, Incorporated et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 42 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv73576 | 10/11/2005 | 791 | 07/19/2006 |

Iron Workers Local 25 Pension Fund et al v. Vulcan Iron Works, Incorporated et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 43 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv73767 | 10/03/2005 | 791 | 12/30/2005 |

Iron Workers Local 25 Pension Fund et al v. Steel Enterprises, Incorporated et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 44 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv73767 | 10/03/2005 | 791 | 12/30/2005 |

Iron Workers Local 25 Pension Fund et al v. Steel Enterprises, Incorporated et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 45 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv73866 | 10/07/2005 | 791 | 12/20/2005 |

Iron Workers Local 25 Pension Fund et al v. Pou, Incorporated et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 46 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2005cv73972 | 10/17/2005 | 791 | 02/15/2006 |

Iron Workers Local 25 Pension Fund et al v. AJ Steel Erectors, LLC et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 47 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2007cv12714 | 06/27/2007 | 791 | 02/04/2008 |

Iron Workers Local 25 Pension Fund et al v. Cook Construction Company et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 48 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv12892 | 06/29/2006 | 791 | 01/16/2007 |

Iron Workers Local 25 Pension Fund et al v. Duke and Duke Services, Incorporated et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 49 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv13134 | 07/10/2006 | 791 | 10/24/2006 |

Iron Workers Local 25 Pension Fund et al v. C and A Re-Steel Service, Incorporated et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 50 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv13856 | 08/29/2006 | 791 | 01/19/2007 |

Iron Workers Local 25 Pension Fund et al v. Lasky Rigging And Machinery Moving, Incorporated et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 51 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 5:2007cv13862 | 09/13/2007 | 791 | 03/13/2008 |

Iron Workers Local 25 Pension Fund et al v. Flint Riggers and Erectors, Incorporated et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 52 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv13864 | 08/30/2006 | 791 | 11/28/2006 |

Iron Workers Local 25 Pension Fund et al v. Cynatime, Incorporated et al

| | | | | | | |
|---|---|---|---|---|---|---|
| 53 | IRON WORKERS LOCAL 25 | miedce | 2:2006cv13958 | 09/07/2006 | 791 | 01/31/2007 |

Case 3:08-cv-00856-MMC   Document 94-2   Filed 05/19/2008   Page 35 of 91

PENSION FUND

Iron Workers Local 25 Pension Fund et al v. Jerico Construction, Incorporated et al

| 54 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv14109 | 09/19/2006 | 791 | 02/22/2007 |

Iron Workers Local 25 Pension Fund et al v. Detroit Riggers, Incorporated et al

 Next 18

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/19/2008 15:00:40 | | | |
| **PACER Login:** | km0125 | **Client Code:** | 759.01/imp/aal |
| **Description:** | Civil srch pg 1 | **Search Criteria:** | IRON WORKERS LOCAL 25 PENSION FUND 03/24/2005 to 05/19/2008 |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

**U.S. Party/Case Index - Home**
**Search:** All Court Types | Appellate | Bankruptcy | Civil | Criminal
**Reports:** Court Code List | Date Range | Courts not on Index | Statistical Reports
**User Options:**

# U.S. Party/Case Index

## Civil Name Search Results

**72 Total Party matches for selection IRON WORKERS LOCAL 25 PENSION FUND 03/24/2005 to 05/19/2008 for ALL COURTS**
**Search Complete**
**Mon May 19 15:00:40 2008**
**Selections 55 through 72 (Page 2)**

 Download (2 pages $ 0.00)

Previous 54

| | Name | Court | Case No. | Filed | NOS | Closed |
|---|---|---|---|---|---|---|
| 55 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv14145 | 09/20/2006 | 791 | 02/16/2007 |
| | Iron Workers Local 25 Pension Fund et al v. Bennett | | | | | |
| 56 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv14395 | 10/06/2006 | 791 | 04/18/2007 |
| | Iron Workers Local 25 Pension Fund et al v. Motor City Steel Construction, Incorporated et al | | | | | |
| 57 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv14434 | 10/11/2006 | 791 | 01/31/2007 |
| | Iron Workers Local 25 Pension Fund et al v. Fagerlie | | | | | |
| 58 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv14908 | 10/31/2006 | 791 | 02/16/2007 |
| | Iron Workers Local 25 Pension Fund et al v. Firek | | | | | |
| 59 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2007cv15178 | 12/06/2007 | 791 | 03/25/2008 |
| | Iron Workers Local 25 Pension Fund et al v. Quality Steel Fabricating and Erecting, Incorporated et al | | | | | |
| 60 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2007cv15294 | 12/12/2007 | 791 | 03/31/2008 |
| | Iron Workers Local 25 Pension Fund et al v. Murray Steel Corporation et al | | | | | |
| 61 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2007cv15295 | 12/12/2007 | 791 | 01/10/2008 |
| | Iron Workers Local 25 Pension Fund et al v. Detroit Door and Hardware Company et al | | | | | |
| 62 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv15439 | 12/08/2006 | 791 | 03/09/2007 |
| | Iron Workers Local 25 Pension Fund et al v. Municipal and Industrial Storage, Incorporated et al | | | | | |
| 63 | IRON WORKERS LOCAL 25 PENSION FUND | miedce | 2:2006cv15694 | 12/22/2006 | 791 | 11/13/2007 |

Iron Workers Local 25 Pension Fund et al v. ABZ Steel Fabrication, L. L. C. et al

64  IRON WORKERS LOCAL 25 PENSION FUND    miedce  4:2005cv40348  11/14/2005  791  07/26/2006

Iron Workers Local 25 Pension Fund et al v. Michigan Bridge and Iron, Incorporated et al

65  IRON WORKERS LOCAL 25 PENSION FUND    miedce  5:2005cv60282  12/08/2005  791  04/25/2006

Iron Workers Local 25 Pension Fund et al v. Vertex Steel, Incorporated et al

66  IRON WORKERS LOCAL 25 PENSION FUND    miedce  2:2005cv74001  10/19/2005  791  05/17/2007

Iron Workers Local 25 Pension Fund et al v. CMF Steel Erectors et al

67  IRON WORKERS LOCAL 25 PENSION FUND    miedce  2:2004cv74300  03/29/2005  791  11/21/2005

Iron Workers Local 25 Pension Fund et al v. Raptor Resteel, L. L. C. et al

68  IRON WORKERS LOCAL 25 PENSION FUND    miedce  2:2005cv74385  11/16/2005  791  03/01/2006

Iron Workers Local 25 Pension Fund et al v. Classic Convention Services Corporation et al

69  IRON WORKERS LOCAL 25 PENSION FUND    miedce  2:2005cv74675  12/08/2005  791  08/01/2006

Iron Workers Local 25 Pension Fund et al v. C and A Re-Steel Service, Incorported et al

70  IRON WORKERS LOCAL 25 PENSION FUND    miedce  2:2005cv74676  12/08/2005  791  12/23/2005

Iron Workers Local 25 Pension Fund et al v. City Steel, Incorporated et al

71  IRON WORKERS LOCAL 25 PENSION FUND    miedce  2:2005cv74738  12/14/2005  791  07/19/2006

Iron Workers Local 25 Pension Fund et al v. Municipal and Industrial Storage, Incorporated et al

72  IRON WORKERS LOCAL 25 PENSION FUND    miedce  2:2005cv74739  12/14/2005  791  01/30/2007

Iron Workers Local 25 Pension Fund et al v. Wayne Steel Erectors, Incorporated et al

Previous 54 

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/19/2008 15:00:53 | | | |
| PACER Login: | km0125 | Client Code: | 759.01/imp/aal |
| Description: | Civil srch pg 2 | Search Criteria: | IRON WORKERS LOCAL 25 PENSION FUND 03/24/2005 to 05/19/2008 |
| Billable Pages: | 1 | Cost: | 0.08 |

**U.S. Party/Case Index - Home**

# Exhibit D

ORIGINAL

FILED
CLERK, US. DISTRICT COURT

NOV 2 8 2001

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

X  Priority
X  Send
___ Clsd
X  Enter
NO  JS-5/JS-6
___ JS-2/JS-3

ENTERED
U. S. DISTRIC· COURT

NOV 2 9 2001

DISTRICT OF CALIFORNIA
DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GUESS?, INC.<br>SECURITIES LITIGATION | CV 01-00871 LGB (RNBx) |
| | ORDER GRANTING DEFENDANTS'<br>MOTION TO DISMISS FOR FAILURE<br>TO STATE A CLAIM |
| This Document Relates To:<br>ALL ACTIONS | |

I.   **INTRODUCTION**

Guess?, Inc. ("Guess"), a maker of fashion apparel,
experienced financial difficulties during the 2000 calendar year.
As a result, its stock value dropped and the current securities
litigation was instituted against defendants Guess, Maurice
Marciano, Paul Marciano, Armand Marciano and Brian Fleming. The
class action complaint alleges violations of the Exchange Act,
section 10(b), Securities Exchange Commission ("SEC") Rule 10b-5,
and the Exchange Act, section 20(a). Defendants' bring the
present motion to dismiss all claim for failure to state a claim
under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)").

✓ Docketed
✓ Copies (NTC Sent
___ JS - 5 / JS - 6
___ JS - 2 / JS - 3
___ CLSD

1  **II.   FACTUAL AND PROCEDURAL BACKGROUND**

2       The following facts are derived from the complaint, records

3  referenced in the complaint, or from public records properly

4  before the Court[1]:

5       Guess is primarily engaged in the business of designing,

6  marketing and distributing casual clothing, accessories, and

7  related consumer products. Compl. ¶ 1. It markets its clothing

8  lines through two primary distribution channels: (1) wholesale

9  distribution, through which Guess sells its product to large

10 upscale department stores; and (2) retail distribution, which

11 consists of sales directly to the public through full-price

12 retail and discount factory outlet stores owned and operated by

13 Guess. Id. For the fiscal year that ended on December 31, 1999

14 ("fiscal 1999"), Guess recorded roughly equal revenues from its

15 wholesale and retail distribution channels. Id.

16      Maurice Marciano is one of the founders of Guess. Id. ¶ 14a.

17 He served as Co-Chairman of the Board of Directors and Co-Chief

18 Executive Officer of Guess through the time covered by this

19 action. Id. He is also one of the largest shareholders of Guess.

20 Id. Paul Marciano shared Maurice Marciano's duties as Co-Chairman

21 of the Board of Directors and Co-Chief Executive Officer of

22 Guess. Id. ¶ 15a during this time period. Paul Marciano further

23 served as Guess's President and Chief Operating Officer from

24

25      [1]See, e.g., Fed. R. Evid. 201; Plevy v. Haggerty, 38 F.
26 Supp. 2d 816, 821, 835 (C.D. Cal. 1998) (SEC filings, stock
   prices and news articles may be considered under a motion to
27 dismiss).

28                                    2

1 September 1992 to December 2000. Id. He also enjoyed sizable

2 holdings of Guess stock. Id.

3 Another defendant, Armand Marciano, served as Guess's

4 Executive Vice President and Assistant Secretary during the time

5 period covered by this complaint. Id. ¶ 16a. He was also one of

6 the company's largest shareholders and served on the Guess Board

7 of Directors during this time. Id. The last individual defendant,

8 Brian Fleming, served as Guess's Executive Vice President and

9 Chief Financial Officer from July 20, 1998 to November 16, 2000.

10 Id. ¶ 17a.

11 On February 14, 2000, Guess announced that it had net

12 earnings for fiscal 1999 of $51.5 million on revenues of $599.7

13 million. It also announced that its inventories as of December

14 31, 1999 were valued at $106.6 million. Id. ¶ 54. At the same

15 time, Guess admitted that "certain inventory costs and related

16 costs of goods should have been recognized in the third quarter

17 [of fiscal 1999] rather than the fourth quarter." Id. As a result

18 of this accounting issue, Guess restated its 1999 third quarter

19 results and announced that adjustments in the fourth quarter

20 "have produced unusually high gross margin rates for the fourth

21 quarter, which should not be expected in future results." Id.

22 Guess also announced that it was "strengthening controls and

23 procedures surrounding its inventory cost accounting to assure

24 the accuracy of future quarterly inventory and gross margin

25 results, and the company has engaged outside consultants to

26 assist it in doing so." Id. ¶ 55.

27

28                                    3

1     In its SEC 10-K annual report, filed March 30, 2000, Guess

2   discussed its current business situation and made projections for

3   the future. At the end of fiscal 1999, Guess operated 92 full-

4   price and 54 factory outlet stores in the United States. Defs.'

5   Ex. 1 at 11. These factory outlet stores were used primarily to

6   sell outdated fashion items and other slow-moving merchandise at

7   severely discounted prices. Compl. ¶ 28. In its 10-K report,

8   Guess stated: "We plan that our retail division will be our

9   primary growth initiative over the next three to five years."

10   Defs.' Ex. 1 at 12. Supporting this growth was Guess's plan to

11   open a number of new stores, increase the average size of the new

12   stores, and increase sales productivity of all stores. Id.

13     At the same time, Guess discussed its opening of a "new,

14   automated distribution center in Louisville, Kentucky" to replace

15   its distribution center in Los Angeles, California. Id. at 14.

16   Its "new, 500,000 square-foot facility . . . is expected to . . .

17   allow [Guess] to reduce distribution operating costs per unit,

18   reduce [its] shipping costs and provide better service to [its]

19   customers." Id. This new center was expected to be fully

20   operational in the second quarter of fiscal year 2000. Id. Guess

21   stated that it uses "fully integrated and automated distribution

22   systems" in its distribution centers, providing "timely,

23   controlled, accurate and instantaneous updates to the

24   distribution. Id. at 19. During the fourth quarter of 1999,

25   enhanced ability to estimate reserves through improved processes

26   and more current and accurate data led Guess to revise its

27

28                                    4

1  estimate of certain reserves. Id. at 27. This resulted in a

2  reduction of cost of sales of $2.3 million and an increase of

3  gross margin of $2.3 million, or 2.4%. Id. Guess also represented

4  that it valued its inventory at the lower of cost or market.

5  Compl. ¶ 61.

6      In cautioning against its forward-looking statements, Guess

7  stated that "Certain statements . . . including those relating to

8  . . . our cost containment efforts . . . are forward-looking

9  statements. Such statements involve risks and uncertainties,

10  which may cause results to differ materially from those set forth

11  in these statements." Defs.' Ex. 1 at 29. The 10-K went on to

12  identify "[i]mportant factors that could cause actual results in

13  future periods to differ materially from our forward-looking

14  statements," such as:

15      1)    Possible cancellation of wholesale orders, which could

16            have a material adverse effect on Guess's financial

17            condition and results of operations;

18      2)    The success of Guess's programs to strengthen its

19            inventory cost accounting controls and procedures,

20            which could have a material adverse effect on its

21            financial condition and results of operation; and

22      3)    The success of technology to be used in Guess's new

23            distribution center, which could have a material effect

24            on its financial condition and results of operation.

25  Id. Nevertheless, Guess represented that the results were in

26  accordance with GAAP. Compl. ¶ 56.

27

28                                      5

1    At some point in March 2000, an inventory control committee

2  allegedly reported the existence of approximately $30 million in

3  inventory that was 1 ½ to 2 ½ seasons old. Id. ¶ 46. A month

4  later, on April 27, 2000, Guess filed an S-3 Registration

5  Statement. Defs.' Ex. 3 at 128. In the S-3, Guess related:

6

7         The efficient operation of our business is very

8         dependent on our information and accounting systems. .

9         . . Due to our recent rapid growth and increased

10        international sourcing, we have experienced some

11        difficulties with our current management information

12        and accounting systems. In addition, segments of our

13        current information and accounting systems are manually

14        intensive. We have in the past and may in the future

15        experience errors in entering and processing

16        information. While we are taking additional action to

17        reduce the risks associated with these situations,

18        including to purchase a new enterprise-wide information

19        system that could integrate all of our business

20        functions, we can give no assurances that these risk

21        will not have a material adverse effect on our results

22        of operations and financial condition.

23

24  Id. at 140. The S-3 then refers the reader to the "Management's

25  Discussion and Analysis of Financial Condition and Result of

26  Operations." Id. at 141.

27

28                                6

1    There, Guess reports that, on February 16, 2000, it filed an
2  amendment to its quarterly report on Form 10-Q for the three and
3  nine month periods ended September 25, 1999. Id. at 151. It did
4  so in order to restate Financial Statement and revise the
5  Management's Discussion because it had learned that certain
6  inventory costs and related cost of sales should have been
7  recognized in the third quarter. Id. Later, Guess reiterated its
8  belief that "during the fourth quarter of 1999, we enhanced our
9  ability to estimate reserves through improved processes and more
10  current and accurate data. As a result, we revised our estimate
11  of certain reserves. This resulted in a reduction of cost of
12  sales of $2.3 million and an increase of gross profit or [sic]
13  2.4%." Id. at 153.
14    In Guess's May 1, 2000 Press Release, the company discussed
15  its rising inventory levels. Compl. ¶ 58. "Inventories were
16  $135.5 million [for the first quarter of 2000] . . . . versus
17  $106.6 million at year-end and $70.9 million a year ago. . . .
18  [I]nventories were up 25.1% from year-end and 71.7% from a year
19  ago. The majority of these higher inventory levels are the result
20  of significantly increased product sales, substantially higher
21  wholesale backlog and our retail expansion program. . . . Our
22  wholesale backlog continues at high levels reflecting the
23  popularity of our brand and product." Id. The Form 10-Q, filed on
24  May 16, 2000 for the first quarter, confirmed the results
25  announced in the press release and stated the results were in
26  accordance with GAAP. Id. ¶ 59.
27
28                                    7

1    On May 4, 2000, an analyst, David P. Campbell of Merrill

2    Lynch, issued a report rating Guess stock "Long Term Accumulate."

3    Id. ¶ 62. Campbell noted that Guess inventories included only

4    "$10m of excess merchandise . . . The company plans to liquidate

5    the excess inventories through their outlet stores and off price

6    channels over the next two quarters." Id.

7    In June, however, Bloomberg News Service reported that the

8    stock dropped 2 3/8 or 15% after a Salomon Smith Barney broker

9    stated that the company inflated its backlog numbers by including

10   orders from its retail stores in its wholesale backlog. Id. ¶ 63.

11   On June 23, 2000, Maurice Marciano said the email was "completely

12   false because we do not include sales to our own stores in

13   wholesale backlog." Id. During the same time period, in June

14   2000, the inventory control committee allegedly reported that $20

15   million in inventory could only be sold, if at all, at severely

16   discounted prices. Id. ¶ 46. A few days after Marciano's

17   statement, on July 6, 2000, Guess announced that the "Company had

18   unfilled wholesale orders from department and specialty stores

19   customers of $162.4 million, a 62% increase from a year ago." Id.

20   ¶ 64. Paul Marciano commented, "[d]emand for our brand and

21   product remains strong." Id.

22   In its July 31, 2000 Press Release announcing its second

23   quarter earnings, Guess reported that its earnings increased

24   72.3% to 12.1 million from earnings the year before of $7.0

25   million. Id. ¶ 67. Paul Marciano commented: "We are very pleased

26   with our seventh consecutive quarter of strong revenue and

27

28                                    8

1 earnings growth." <u>Id.</u>

2    Maurice Marciano commented, in a concurrent statement with

3 the Press Release:

4

5    While we are still working through some excess

6    inventory by primarily utilizing wholesale off-price

7    and factory store channels, the amount of inventory

8    overage at the end of the second quarter is less than

9    $15 million. The year-over-year comparison for

10    inventory at the end of the second quarter is

11    exaggerated by several factors: inventories at July 1,

12    2000 include $14.2 million for Guess Canada, the

13    abnormally low inventory in the year-ago period, the

14    inventory necessary for new stores, and inventory

15    necessary to support our retail comparable sales gains.

16    The remaining increases in inventory is in line with

17    sales trends and is necessary to support our

18    substantially higher wholesale backlog. We expect to

19    have the inventory overage substantially cleared by

20    early in the fourth quarter.

21

22 <u>Id.</u> ¶ 68. Guess's August 14, 2000 SEC Form 10-Q contained the

23 quarterly financial statements and reported inventories of

24 $173,711,000, costs of goods sold of $100,080,000 and accounts

25 payable of $65,559,000. <u>Id.</u> ¶ 69. Again, inventory was

26 represented at the lower of cost or market. <u>Id.</u> Unfilled

27

28                                    9

1  wholesale backlog orders increased 61.4% to $162.4 million. Id.

2     Following these reports, several analysts, including Lee F.

3  Backus of the Buckingham Research Group rated Guess positively.

4  Id. ¶ 73. During this time, from August 31 to September 15, 2000,

5  Armand Marciano and Maurice Marciano sold 101,600 shares of Guess

6  common stock for over $2.1 million in proceeds. Id. ¶ 74. These

7  sales consisted of Armand Marciano's selling of 81,600 common

8  shares and Maurice Marciano's selling of 20,000 common shares.

9  Id. These amounts represented 1.3% of Armand's holdings and .12%

10 of Maurice Marciano's holdings. See Defs. Exs. 8-11. The average

11 selling price of these shares was slightly under $18.00, $15.00

12 off the high price during the relevant time period.

13    On September 25, 2000, Guess announced that it was lowering

14 its third-quarter earnings forecast, expecting $.35 to .38 per

15 share. Compl. ¶ 75. Securities analysts had projected earnings of

16 $.44 per share. Id. One security analyst, John P. Rouleau,

17 diagnosed the problem this way: "They were overly aggressive in

18 planning their sales and inventory levels for the spring, summer,

19 and fall seasons. . . . They've got too much stuff." Id. ¶ 76.

20    The November 9, 2000 Press Release acknowledged that third-

21 quarter profits fell 60% and that third-quarter net-income fell

22 to $5.64 million, or $.13 a share. Id. ¶ 77. Its Form 10-Q, filed

23 November 14, 2000, reported that the results were in accordance

24 with GAAP and that the inventories were valued at the lower of

25 cost or market, with an inventory of $164,214,000. Id. ¶ 78. the

26 Form 10-Q also reported that Guess's order backlog stood at

27

28                                    10

1 | $133.3 million. Id.

2 |     In November 2000, Guess announced that Paul Marciano would

3 | no longer be President of the Company and Fleming resigned as the

4 | company's Chief Financial Officer. Id. ¶ 81. These personnel

5 | moves were followed on January 26, 2001 with a Press Release. Id.

6 | ¶ 82.

7 |     The January release announced Guess's expectation of a

8 | diluted loss per share for the quarter ended December 31, 2000 in

9 | the range of $.27 to $.31. Id. This would include the recording

10 | of non-recurring charges of approximately $14 million, consisting

11 | of inventory write-down charges to address the valuation of aged

12 | or impaired inventory, asset impairment charges, store closing

13 | costs and other non-recurring expenses. Defs.' Ex. 5. Guess also

14 | determined that it was necessary to restate its earnings over the

15 | first three quarters of 2000. Id. These planned restatements

16 | suggested that earnings were overstated by $.02 in the first

17 | quarter, $.13 in the second quarter, and understated by $.06 in

18 | the fourth quarter. Id. This was needed because certain costs

19 | that should have been expensed were capitalized and the existence

20 | of unrecorded inventory accruals, triggered by the relocation

21 | from the Los Angeles distribution facility to Louisville. Id.

22 | This resulted in an overstatement of certain assets and

23 | understatements of vendor obligations for inventory purchases.

24 | Id. Carlos Alberini, President and Chief Operating Officer said,

25 | "We have been working diligently to improve controls in our

26 | financial and operational planning processes." Id.

27

28 |                        11

1    On March 8, 2001, Guess acknowledge a net loss for the
2 fourth quarter of 2000, including a $15.6 million pre-tax special
3 charge. Defs.' Ex. 7 at 238. This charge consisted of $5.7
4 million in inventory write-downs to address the valuation of aged
5 or impaired inventory; $4.5 million in restructuring charges,
6 including store closing costs, $4.1 million to write-down
7 impaired assets, including certain fixed assets and an investment
8 in an internet company; and $1.3 million in other charges. Id.
9 Evaluating the overall picture for the year, Maurice Marciano
10 commented, "The challenging retail environment in the Fall
11 contributed to lower sales and margin pressures. This, combined
12 with our excess inventory situation, had a significant negative
13 impact on our profitability for the period." Id. The reported
14 remarks assumed the restatement of the company's previously
15 reported results for the first three quarters of fiscal year
16 2000. Id.

17    In Guess's Form 10K for fiscal year 2000, it reported that
18 it recorded special charges of approximately $10.3 million to
19 reduce inventories to the lower of cost or market. Defs. Ex. 2 at
20 78. In the auditors' section of the report, it was reported that
21 $12.9 million in inventory reductions were taken to reduce
22 inventories to the lower of cost or market.

23    Following some preliminary stages of the litigation, the
24 current Consolidated Amended Class Action Complaint was filed in
25 this Court on July 9, 2001. The complaint alleges two causes of
26 action: 1) violation of section 10(b) of the Exchange Act, and
27

28                                   12

1  SEC Rule 10b-5, and 2) violation of section 20(a) of the Exchange

2  Act for actions taken between February 14, 2000 and January 26,

3  2001.

4  **III. LEGAL STANDARDS**

5      **A.    Federal Rule of Civil Procedure 12(b)(6)**

6      Federal Rule of Civil Procedure 12(b)(6) provides for

7  dismissal when a complaint fails to state a claim upon which

8  relief can be granted.  <u>See</u> Fed.R.Civ.P. 12(b)(6).  A complaint

9  fails to state a claim if it does not allege facts necessary to

10  support a cognizable legal claim.  <u>See</u> <u>Balistreri</u> <u>v.</u> <u>Pacifica</u>

11  <u>Police Dept.</u>, 901 F.2d 696, 699 (9th Cir. 1990); <u>Robertson</u> <u>v.</u>

12  <u>Dean</u> <u>Witter</u> <u>Reynolds, Inc.</u>, 749 F.2d 530, 533-34 (9th Cir. 1984).

13      In reviewing a Rule 12(b)(6) motion, the court must presume

14  the truth of the factual allegations in the complaint, and draw

15  all reasonable inferences in favor of the non-moving party. <u>See</u>

16  <u>Parks</u> <u>Sch.</u> <u>of</u> <u>Bus., Inc.</u> <u>v.</u> <u>Symington</u>, 51 F.3d 1480, 1484 (9th

17  Cir. 1995); <u>see</u> <u>also</u> <u>Usher</u> <u>v.</u> <u>City</u> <u>of</u> <u>Los</u> <u>Angeles</u>, 828 F.2d 556,

18  561 (9th Cir. 1987).  Dismissal under Rule 12(b)(6) is

19  appropriate "only if it is clear that no relief could be granted

20  under any set of facts that could be proved consistent with the

21  allegations."  <u>Hishon</u> <u>v.</u> <u>King</u> <u>&</u> <u>Spalding</u>, 467 U.S. 69, 73 (1984)

22  (citing <u>Conley</u> <u>v.</u> <u>Gibson</u>, 355 U.S. 41, 45-46 (1957))(dismissal

23  appropriate only where "plaintiff can prove no set of facts in

24  support of his claim which would entitle him to relief")); <u>see</u>

25  <u>also</u> <u>Ascon</u> <u>Properties, Inc.</u> <u>v.</u> <u>Mobil</u> <u>Oil</u> <u>Co.</u>, 866 F.2d 1149, 1152

26  (9th Cir. 1989). The issue is not whether the plaintiff will

27

28                          13

1  ultimately prevail, but whether the plaintiff is entitled to

2  offer evidence to support the plaintiff's claim.  See Usher, 828

3  F.2d at 561.

4      **B.    The Private Securities Litigation Reform Act**

5      Federal Rule of Civil Procedure 8(a) requires only that a

6  defendant be given fair notice of the factual allegations

7  supporting the complaint. See Fed. R. Civ. P. 8(a); Leatherman v.

8  Tarrant Cty. Narcotics & Intelligence Unit, 507 U.S. 163, 168

9  (1993). In 1995, Congress enacted the Private Securities

10 Litigation Reform Act. In re Silicon Graphics Inc. Sec. Litig.,

11 183 F.3d. 970, 973 (9th Cir. 1999). Its purpose was to deter

12 opportunistic private plaintiffs from filing abusive securities

13 fraud claims, in part, by raising the pleading standards for

14 private securities fraud plaintiffs. Id. Congress raised the

15 pleading bar in three principal ways.

16     First, it requires that "[i]n any private action arising

17 under this chapter in which the plaintiff may recover money

18 damages only on proof that the defendant acted with a particular

19 state of mind, the complaint shall, with respect to each act or

20 omission alleged . . . state with particularity facts giving rise

21 to a strong inference that the defendant acted with the required

22 state of mind." 15 U.S.C. § 78u-4(b)(2). This requires a

23 plaintiff plead, in great detail, facts that constitute strong

24 circumstantial evidence of deliberately reckless or conscious

25 misconduct. Silicon Graphics, 183 F.3d at 974.

26

27

28                              14

1   Second, a complaint must "specify each statement alleged to
2   have been false or misleading, [and] the reason or reasons why
3   the statement is misleading." Finally, "if an allegation
4   regarding [a] statement or omission is made on information and
5   belief, the complaint shall state with particularity all facts on
6   which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). If a
7   complaint does not meet the pleading requirements of the PSLRA,
8   the court, upon motion of the defendant, shall dismiss the
9   complaint. See 15 U.S.C. § 78u-4(b)(3)(A).

10  **IV.   ANALYSIS**

11   Neither party disputes that the PSLRA applies to this case.
12  Plaintiffs attack a variety of statements attributed to the
13  defendants in this case. Defendants advance several arguments in
14  response, but the Court focuses its attention on the factual
15  sufficiency of the allegations directed at establishing the
16  falsehood and at establishing scienter. In particular six core
17  assertions form the backbone of the allegations in the complaint,
18  arranged for ease of reference:

19

20  1) Various defendants were aware no later than February 2000 that
21  the Company's internal computer systems were inadequate to track
22  Guess's inventory. See Compl. ¶ 6.

23  **Basis (1):**      "top members of Guess' financial reporting
24                      organization participated in a 'financial
25                      roundtable group' which met on a weekly basis for
26                      the purpose of discussing and resolving financial
27

28                          15

1          reporting issues within the company." Id. ¶ 14d.

2          Fleming attended these meetings and "regularly

3          reported the results . . . to each of the other

4          Individual Defendants." Id.

5  **Basis (2):**    During the financial roundtable meetings Guess's

6          Director of Internal Audit reported that Guess's

7          internal computer systems were not accurately

8          tracking the company's inventory as it was

9          transported between the Los Angeles and Louisville

10          distribution centers. Id. ¶ 14e. As a result,

11          defendants knew that Guess was unable to reconcile

12          the inventory reports prepared by its distribution

13          centers, leading to overvaluation of the inventory

14          on the company's financial statements. Id.

15

16  2)    Various defendants were aware that the company was not

17      recording expenses associated with its inventory purchases.

18      See id. ¶ 14(f).

19  **Basis:**    In March 2000, the Director of Internal Audit reported

20          that the company's computer system failed to record

21          expenses when Guess personnel failed to enter certain

22          corresponding entries. Id. This failure was reportedly

23          wide-spread. Id.

24

25  3)    Various defendants knew that Guess's inventory was

26      overvalued because as much as $30 million consisted of

27

28                              16

1      inventory that was 1 ½ to 2 ½ seasons old-a lifetime in the

2      fashion world-and therefore had to be sold at severe

3      discounts. See id. ¶ 14g.

4 **Basis:** In March 2000, various defendants formed an "inventory

5      control committee" to track the company's inventory.

6      This group met on a weekly basis. Id. During these

7      meetings, defendants were informed about excess

8      inventory. Id.

9

10 4) Guess fired its entire internal audit staff in June 2000 and

11      this was never disclosed to the public in order to conceal

12      the alleged financial skullduggery at Guess. See id. ¶ 14b.

13

14 5) Guess inflated its wholesale backlog by including orders

15      from its retail stores, even as management denied the

16      practice. See id. ¶ 14i.

17 **Basis:** Guess's backlog increased as demand was significantly

18      declining and large wholesale customers, including

19      Macy's, were demanding to return substantial amounts of

20      product that could not be sold. See id. ¶¶ 45, 48.

21      Combined with a "weekly inventory report" defendants

22      knew that sales were slowing and that inventory needed

23      to be marked down. Id. ¶ 45. Maurice Marciano visited

24      the Louisville distribution center several times early

25      in 2000 and spoke with the company's vice-president of

26      operations almost every day throughout the year. Id. ¶

27

28        17

1        16c. Despite this the backlog numbers grew much larger

2        than any sales consummated 90 to 120 days later. See

3        id. ¶¶ 51, 52.

4

5   6)   The defendants concealed the negative information.

6   **Basis:**   Knowing all the information found above, none of it was

7        revealed, some public statements are alleged

8        inconsistent with this information, and some of the

9        defendants sold stock. See, e.g., id. ¶ 17h

10       (concealment); ¶ 74 (stock sales).

11

12       The defendants' primary attack on these pleadings is two-

13  fold. First, they maintain that the plaintiffs fail to allege the

14  underlying facts with the requisite specificity. Def. Mem. of P &

15  A ("Def. Mem.") at 17-20. Second, they argue that the pleadings

16  fail to create the "strong inference" of recklessness necessary

17  under the PSLRA and Silicon Graphics. Def. Mem. at 7-14; see also

18  id. at 14-22 (arguing statements not false).

19       **A.   Specificity of the Pleadings**

20       A quick scan of the supporting reasons for the allegations

21  shows that many rest on the existence of "weekly inventory

22  reports," "financial roundtable meetings," and the "inventory

23  control committee." These sources presumably supplied the

24  individual defendants and the company with information that did

25  more than just put them on notice there might be a problem, it

26  provided such detailed information that their conduct crossed the

27

28                                18

1  line into deliberately reckless or conscious misconduct. <u>See,</u>
2  <u>e.g.,</u> Compl. ¶ 6 ("From these weekly reports and discussions . .
3  . defendants knew that the Company's inventory was materially
4  overstated")

5      The similarity between these sources of information and
6  those in <u>Silicon Graphics</u> is striking. In <u>Silicon Graphics</u>, the
7  plaintiff's allegations pointed to three types of internal status
8  reports that alerted officers to "serious production and sales
9  problems." 183 F.3d at 984. The complaint then alleged that "the
10 officers conducted several meetings during which they entered
11 into a 'conspiracy of silence.'" <u>Id.</u> at 985. As the basis of
12 these allegations, the <u>Silicon Graphics</u> plaintiffs' based them
13 "upon the investigation of their counsel, which included a review
14 of SGI's filings, securities analysts reports and advisories
15 about the company, press releases issued by the company, media
16 reports about the company and discussions with consultants, and
17 believe that substantial evidentiary support will exist for the
18 allegations [ ] after a reasonable period of discovery." <u>Id.</u> at
19 985.

20     The Ninth Circuit rejected these allegations as insufficient
21 under the PSLRA. <u>Id.</u> at 985. The <u>Silicon Graphics</u> court stated
22 that "a plaintiff must provide, in great detail <u>all</u> the relevant
23 facts forming the basis of her belief." <u>Id.</u> (emphasis added). The
24 complaint in <u>Silicon Graphics</u> failed to include adequate
25 corroborating details to support a "strong inference" of
26 deliberate recklessness. <u>Id.</u> The Ninth Circuit pointed to the
27

28                            19

1 | plaintiff's failure to identify:

2

3      1) the source of information with respect to the reports;

4      2) how the plaintiff learned of the reports;

5      3) who drafted them;

6      4) which officers received them; and

7      5) an adequate description of the contents, "which would

8         include some specifics from those reports as well as such

9         facts as may indicate their reliability."

10 Id. To quote the Silicon Graphics court, "[Plaintiff] would have

11 us speculate as to the basis for the allegations about the

12 reports, the severity of the problems, and the knowledge of the

13 officers. We decline to do so." Id. These same shortcomings apply

14 to the current complaint.

15      Plaintiffs argue that they adequately identify the

16 speaker-the Director of Internal Audit-who reported the

17 information to the other individual defendants. Pls.' Opp'n at

18 19. It is unclear whether this argument is meant to encompass

19 both the information relayed at the financial roundtable

20 meetings, at the inventory control meetings, or in the various

21 reports. For the present purposes the Court will assume it to

22 apply to all the information alleged. Nevertheless, this alone

23 fails to satisfy the pleading requirements of the PSLRA.

24      The Court is provided no information as to who drafted these

25 reports, what date the key reports or statements were made, what

26 specifically the reports contained, or any other corroborating

27

28 |                              20

1  details. See Silicon Graphics, 183 F.3d at 985. This is

2  insufficient pleading. See id. Plaintiffs' reliance on In Re USA

3  Talks.com Sec. Litig., 2000 U.S. Dist. LEXIS 14823 *1, *8 (S.D.

4  Cal. 2000), is misplaced. There, the allegations generally

5  discussed the availability of daily red and yellow flag reports,

6  alerting management of severe technical problems with a fledgling

7  company that asserted its technology was working well. Id. at

8  *10. The district court found these allegations sufficient under

9  the PSLRA. Id. The significant differences between that case and

10  this one is found in the size of the companies and the relative

11  nature of the claims.

12     In USA Talks.com, the company only had four employees. Id.

13  at *11. The inferences of knowledge were thus much stronger than

14  they are in the present case, where the defendants were in charge

15  of a large corporation bringing in over $500 million dollars in

16  annual revenue. Additionally, the relevant information in the

17  cases was different. In USA Talks.com, knowledge of the

18  mechanical difficulties was enough to create scienter. Id. at *8.

19  Here, even granting the reports identified problems, there is no

20  indication that the reports had sufficient grasp of the scale

21  posed by these problems to create a "strong inference" of

22  "deliberate recklessness". The "facts" alleged in the complaint

23  only suggest the possible worst case scenario. See Compl. ¶ 15f

24  ("Guess had as much as $30 million") (emphasis added); ¶ 46

25  (three months after ¶ 15f, the number is $20 million). They give

26  no indication of how this number was calculated, what the range

27

28                                   21

1   of possible values was, or anything else. In evaluating the
2   adequacy of the pleadings and scienter, these details matter. See
3   Silicon Graphics, 185 F.3d at 985. As Guess had notified the
4   public of potential problems in its accounting systems, see
5   Defs.' Ex. 3 at 140, plaintiffs must plead specific facts showing
6   that the failure to actually reduce its financial projections
7   based on the ongoing investigation of a contingent problem, with
8   unknown potential ramifications-small or large-was so faulty that
9   it amounts to deliberate recklessness. The few "facts" in this
10  complaint fail to show, with adequate specification, when, where
11  or how the company identified $30 million in aged inventory; how,
12  when or where the company realized its wholesale sales were
13  slowing and why this was so obvious that it constituted
14  deliberate recklessness to still forecast strong sales; or how,
15  how much, when or where the company and executives lodged retail
16  sales on the wholesale backlog.

17      Nor does In re McKesson HBOC Inc. Sec. Litig., 126 F. Supp.
18  2d 1248 (N.D. Cal. 2000), support plaintiffs. Although the
19  district court in McKesson held that the failure to identify the
20  name of sources was not always a pleading failure, the facts
21  pled, including specific conversations corroborated by reports of
22  widespread fraudulent practices were sufficient to state a claim.
23  Id. at 1254-56, 1272, 1276 (describing fraud as "breathing" and
24  "so well substantiated"). Here, there is no indication that Guess
25  adopted any policy as egregious as the booking of entirely
26  contingent contracts as sales, followed by hiding the side
27
28                              22

1 | letters that established the contingencies. See id. at 1255. Nor

2 | is there sufficient corroboration for the Court to credit these

3 | vague allegations. This case presents the situation, recognized

4 | by the McKesson court, where "Congress meant to prohibit general

5 | allegations that corporate officers' statements were contradicted

6 | by unspecified 'negative internal reports' seen by completely

7 | unidentified sources." Id. at 1271. Alleging the involvement of

8 | the Director of Internal Audits in communications, without

9 | supplying an adequate basis for the allegations, is insufficient

10 | to rise above this prohibition.

11 | At the hearing, plaintiffs placed great stress on a recent

12 | case from the Northern District of California, In re Cylink

13 | Securities Litigation, 2001 U.S. Dist. Lexis 15734 (N.D. Cal.

14 | 2001). The Court finds the limited analogy between the cases is

15 | insufficient to alter its analysis. In Cylink, the allegations

16 | that survived the motion to dismiss identified five specific

17 | transactions where GAAP was violated through premature revenue

18 | recognition. Id. at *14-15. The "exchange provision [in one of

19 | the deals] made it clear that the customer did not have a fixed

20 | purchase commitment" and that deal alone overstated quarterly

21 | revenue by 12.5%. Id. at *15. Combined with other evidence

22 | provided in an SEC complaint alleging fraudulent revenue

23 | recognition practices and the size of the overstatements

24 | (overstating revenues from 46% to 97%), the Court concluded the

25 | facts alleged gave rise to a strong inference of scienter. Id. at

26 | *4, *15-16.

27

28 | 23

1    In contrast, the Cylink court had previously dismissed the
2  complaint because its earlier allegations were insufficient to
3  satisfy the PSLRA's pleading requirements. Id. at *6-7. In the
4  earlier complaint, the plaintiffs "first pointed to the existence
5  of internal controls . . . to imply that the magnitude of the
6  premature revenue recognized was beyond the capability of a few
7  "rogue" sales representatives and thus must have been known by
8  defendants." Id. at *7. Plaintiffs then alleged that the
9  magnitude of the problem indicated that defendants either knew or
10  disregarded the problem with deliberate recklessness. Id.
11  Although the current complaint is slightly more detailed than the
12  original complaint in Cylink, it fails to rise to the level of
13  specificity or to create the strong inferences of scienter, based
14  on the character and amount of the specific transactions at
15  issue, that the Cylink court found satisfied the PSLRA's
16  requirements.

17    Nor do the other cases cited by plaintiffs help their cause.
18  In each, more specific information was alleged that allowed the
19  court in each case to adequately evaluate the ultimate
20  allegations of fraud and to find corroboration in the specific
21  details related. See, e.g., In re 2theMart.com Sec. Litig., 114
22  F. Supp. 2d 955, 960 (finding a "clear disparity" between
23  statements and the known business reality, and "much more
24  precise" pleadings than Silicon Graphics). Defendants are correct
25  to compare the pleading in this case to the allegations in a
26  Northern District of California case, In re Autodesk, Inc. Sec.
27
28                            24

1 <u>Lit.</u>, 132 F. Supp. 2d 833, 839 (N.D. Cal. 2000) (granting motion

2 to dismiss for similar reasons).

3      Additionally, based on the current allegations, taken as a

4 whole, Plaintiffs have failed to plead facts sufficient to

5 support a strong inference of scienter. <u>See, e.g.</u>, <u>Autodesk</u>, 132

6 F. Supp. 2d at 843-44 ("Defendants are correct in their argument

7 that plaintiffs must do more than allege that these key officers

8 had the requisite knowledge by virtue of their 'hands on'

9 position"). The insider stock sales provide no support for a

10 conclusion of scienter. <u>See</u> <u>Silicon Graphics</u>, 183 F.3d at 987.

11 Between the significant drop-off from the stock's high during the

12 class period (high: $33.00, apx. average at sale: $22) and the

13 minuscule percentages involved by only two of the four

14 defendants, the Court finds this information is not probative of

15 scienter. <u>See</u> <u>Ronconi v. Larkin</u>, 253 F.3d 432, 435 (9th Cir.

16 2001) ("when insiders miss the boat this dramatically, their

17 sales do not support an inference that they are preying on ribbon

18 clerks who do not know what the insiders know"); <u>Silicon</u>

19 <u>Graphics</u>, 185 F.3d at 987 (7.7% and 6.9% stock sales provide no

20 indication of scienter). The violations of GAAP are just as

21 consistent with the existence of an accounting problem of unknown

22 scope as they are with intentions to hide the performance of the

23 company.[2] Plaintiffs have provided insufficient factual

24

25      [2]The Court reads the defendants' acknowledgment of
accounting problems, Defs.' Ex. 3, recognition of an inventory
26 overage of $15 million, and plaintiffs' allegation of a $20
million overage in June as consistent with a technology and
27 operating upgrade gone awry in the midst of rapid expansion.

28                                   25

1   allegations to support the inference that the failure to
2   recognize the eventual costs of these problems was attributable
3   to fraud, rather than a lack of caution, a lack of solid
4   information, a belief that it was part of the company's grand
5   expansion plans, or a momentary surplus of hubris. And, finally,
6   the layoffs of the internal audit department may be attributable
7   to the creation of the inventory and accounting problems, as well
8   as a failure to provide sufficient answers to management.
9   Frankly, on the allegations in the complaint, the Court cannot
10  find sufficient factual support to believe fraud is any more
11  likely than mismanagement or growing pains as the cause of any
12  misrepresentations-and thus the motion to dismiss will be
13  granted, with leave to amend within twenty (20) days of this
14  order.

15          **B.    Amending the Pleadings**

16          In approaching the amended complaint, the Court agrees with
17  the Autodesk court in its conclusion that the pleading for a
18  securities claim such as this should be more straightforward. See
19  Autodesk, 132 F. Supp. 2d at 842. The Autodesk court adopted a
20  sensible requirement to provide a framework for complaints such
21  as the present one. The Court finds that court's solution to the
22  requirements of the PSLRA persuasive.

23          Accordingly, if plaintiffs choose to amend the complaint,
24  the Court requires the following:

25  ————————

26  Allegations concerning the scope of the problem and how they were
    reported may overcome this problem created by the current status
27  of the complaint.

28                                  26

1        Separately, for each alleged false or misleading statement,

2   plaintiffs shall

3

4       1. State the false or misleading statement;

5       2. State whether the statement was written or oral;

6       a. If the statement was written, identify the document in

7   which it appeared -- that is, provide the title and author of the

8   document, the date it was prepared, and, if not a

9   publicly-available document, name of the person or persons who

10  reviewed it;

11      b. If the statement was oral, state when and under what

12  circumstances the statement was made, and by whom; if an

13  allegation regarding an oral statement is not made on personal

14  knowledge, state with particularity all facts upon which

15  plaintiffs formed the belief that one or more of the defendants

16  made the statement at the time and place at which it is alleged

17  to have been made.

18      3. State why the statement was false or misleading at the time

19  it was made, and state with particularity all facts upon which

20  plaintiffs formed the belief that the statement was false or

21  misleading;

22      a. If plaintiffs allege that the falsity of the statement is

23  shown by conflicting information in internal reports, identify

24  the report (title, author, date prepared, recipient(s)) and

25  indicate the portion of the report that contradicts the false or

26  misleading statement;

27

28                              27

1    b. If plaintiffs allege that the falsity of the statement is
2 shown by contemporaneous information inconsistent with a
3 particular statement, state with particularity what the
4 contemporaneous information was, what the source of the
5 information was, who had the information, and how plaintiffs
6 learned of the information.

7    4. State particular facts giving rise to a strong inference of
8 a degree of recklessness that strongly suggests actual intent to
9 deceive;

10    a. If plaintiffs allege that defendants received or possessed
11 documents or information that was at odds with the alleged false
12 or misleading statement, state all the relevant facts supporting
13 this belief;

14    b. If plaintiffs allege that the information was contained in
15 documents, state the title, date, and contents of such documents
16 (with particularity), the identity of the person or persons who
17 drafted such documents, the identity of the person or persons who
18 reviewed such documents, how plaintiffs learned of the existence
19 of the documents, and how plaintiffs know that defendants
20 received these documents;

21    c. If plaintiffs allege that the information was in a form
22 other than written, state the source or sources of their
23 information (how they learned of this information allegedly
24 possessed by defendants) and how they know that the defendants
25 possessed this information; and

26    5. With regard to allegations concerning the liability of the
27
28                                  28

1  individual defendants for "group-published" information,

2  plaintiffs must indicate the statements that they contend fall

3  under the doctrine.

4  <u>Autodesk</u>, 132 F. Supp. 2d at 846; <u>see also</u> <u>In re Secure Computing</u>

5  <u>Corp. Sec. Litig.</u>, 2001 U.S. Dist. LEXIS 13563 *1, *11

6  (commenting on a well-drawn pleading where facts were repeated

7  for various statements).

8  **IV.    CONCLUSION**

9      Because the complaint in this case fells to meet the

10  specificity and scienter pleading requirements under the PSLRA,

11  the Court GRANTS the defendants' motion to dismiss with leave to

12  amend within twenty (20) days of this order.

13

14  IT IS SO ORDERED.

15

16  Dated:    *Nov. 22, 2001*

17

18                                    LOURDES G. BAIRD
                                      United States District Judge
19

20

21

22

23

24

25

26

27

28                        29

Exhibit E

# U.S. District Court
# United States District Court for the Southern District of New York (Foley Square)
# CIVIL DOCKET FOR CASE #: 1:05-cv-05630-VM

Miller v. Lazard, Ltd. et al
Assigned to: Judge Victor Marrero
Member case: (View Member Case)
Cause: 15:78m(a) Securities Exchange Act

Date Filed: 06/16/2005
Date Terminated: 02/21/2007
Jury Demand: Plaintiff
Nature of Suit: 850
Securities/Commodities
Jurisdiction: Federal Question

**Lead Plaintiff**

**Diana B. Lien**

**Lead Plaintiff**

**Charles F Lin**

**Lead Plaintiff**

**Edward Schonberg**

**Plaintiff**

**Arlette Miller**
*Individually and on behalf of All*
*others similarly situated*

represented by **David Avi Rosenfeld**
Coughlin, Stoia, Geller, Rudman
& Robbins, LLP(LIs)
58 South Service Road
Suite 200
Melville, NY 11747
631-367-7100
Fax: 631-367-1173
Email: drosenfeld@csgrr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Evan J Smith**
Brodsky & Smith, L.L.C.
240 Mineola Blvd.
Mineola, NY 11501
516-741-4977
Email: esmith@brodsky-
smith.com
*ATTORNEY TO BE NOTICED*

Case 3:08-cv-00856-MMC     Document 94-2     Filed 05/19/2008     Page 70 of 91     Page 20 of 20

| | | |
|---|---|---|
| | | brought by Plaintiffs against Bruce Wasserstein, Steven J. Golub, Michael J.Castellano, and Scott D. Hoffman alleging a cause of action under Section 15 of the Securities Act are DISMISSED. All claims brought by Plaintiffs against Bruce Wasserstein, Steven J. Golub, Michael J.Castellano, and Scott D. Hoffman alleging a cause of action under Section 20 of the Exchange Act are DISMISSED. The motion of Lazard Ltd. and Lazard Freres to impose sanctions and deny leave to replead is DENIED. Plaintiffs are granted leave to file, by no later than 20 days from the date of this order, an amended complaint repleading any of the claims dismissed herein. All motions entered in the docket sheets for related and consolidated cases, 05cv5785, 05cv5879, 05cv6111, 05cv6398, and 05cv6419, should similarly be removed from the Court's docket. (Signed by Judge Victor Marrero on 2/7/07) (kco) (Entered: 02/08/2007) |
| 02/20/2007 | 63 | ORDER that in accordance with the Court's Decision and Order of February 7, 2007 the Clerk of the Court is directed to dismiss the Consolidated Amended Complaint in this action and to close this caase and remove it from the Court's list of pending cases as a separate action, subject to its being reopened in the event within the time provided for in the 2007 Order the plaintiffs file an amended complaint consistent with the Court's decision therein. SO ORDERED. (Signed by Judge Victor Marrero on 2/20/2007) (jmi) (Entered: 02/21/2007) |
| 02/20/2007 | | Transmission to Judgments and Orders Clerk. Transmitted re: 63 Order,,, to the Judgments and Orders Clerk. (jmi) (Entered: 02/21/2007) |
| 02/21/2007 | 64 | CLERK'S JUDGMENT That for the reasons stated in the Court's Order dated February 20, 2007, the Consolidated Amended Complaint in this action is dismissed, subject to its being reopened in the event within the time provided for in the 2007 Order the plaintiffs file an amended complaint consistent with the Courts decision therein; accordingly, the case is closed. (Signed by Judge J. Michael McMahon on 2/21/07) (Attachments: # 1 notice of right to appeal)Filed In Associated Cases: 1:05-cv-05630-VM, 1:05-cv-05879-VM, 1:05-cv-06111-VM, 1:05-cv-06398-VM, 1:05-cv-06419-VM(ml) (Entered: 02/21/2007) |

Exhibit F

CLOSED, CONSOLIDATED, LEAD

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:03-cv-11852-PBS

Marcano v. Vertex Pharmaceuticals Incorporated et al
Assigned to: Judge Patti B. Saris
Cause: 28:1332 Diversity-Contract Dispute

Date Filed: 09/27/2003
Date Terminated: 02/23/2005
Jury Demand: Plaintiff
Nature of Suit: 160 Stockholders Suits
Jurisdiction: Federal Question

**Consolidated Plaintiff**

| | | |
|---|---|---|
| **City of Dearborn Heights General Governmental Employees Retirement System** | represented by | **Bing Ryan** Lerach Coughlin Stoia Geller Rudman & Robbins LLP 100 Pine Street Suite 2600 San Francisco, CA 94111 415-288-4545 Fax: 415-288-4534 *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Lesley E. Weaver** Lerach Coughlin Stoia Geller Rudman & Robbins LLP 100 Pine Street Suite 2600r San Francisco, CA 94111 415-288-4545 Fax: 415-288-4534 Email: Lesleyw@lerachlaw.com *LEAD ATTORNEY* *ATTORNEY TO BE NOTICED* |
| | | **Maria V. Morris** Lerach Coughlin Stoia Geller Rudman & Robbins LLP 100 Pine Street Suite 2600 |

| 10/19/2004 | 80 | Assented to MOTION for Leave to File *Reply to Plaintiffs' Opposition to Motion to Dismiss Plaintiffs' Amended Complaint* by Andrew S. Marks. (Attachments: # 1)(Brooks, Douglas) (Entered: 10/19/2004) |
| 11/08/2004 | 81 | NOTICE of Change in Firm Name and Address by the law firm of Rabin, Murray, and Frank, LLP. (Patch, Christine) (Entered: 11/15/2004) |
| 11/12/2004 | | ELECTRONIC Clerk's Notes for proceedings held before Judge Patti B. Saris: Motion Hearing held on 11/12/2004 re 68 MOTION to Dismiss the Plaintiffs' Consolidated Amended Complaint filed by Vertex Pharmaceuticals Incorporated, Joshua S. Boger, Vicki L. Sato, John J. Alam, M.D., Mark Murcko, 66 MOTION to Dismiss the Consolidated Amended Complaint filed by Andrew S. Marks. Court hears argument of counsel. Court takes motion under advisement. (Court Reporter Valerie O'Hara.) (Alba, Robert) (Entered: 11/12/2004) |
| 12/20/2004 | 82 | TRANSCRIPT of Motions Hearing held on November 12, 2004 before Judge Saris. Court Reporter: Valerie A. O'Hara. The original transcripts are maintained in the case file in the Clerk's Office. Copies may be obtained by contacting the court reporter at 617/737-2346 or the Clerk's Office. (Scalfani, Deborah) (Entered: 12/20/2004) |
| 01/20/2005 | 83 | NOTICE of Change of Address by Marc A. Topaz (Patch, Christine) (Entered: 01/28/2005) |
| 02/18/2005 | 84 | Judge Patti B. Saris : ORDER entered. MEMORANDUM AND ORDER, granting 68 MOTION to Dismiss *the Plaintiffs' Consolidated Amended Complaint* filed by Vertex Pharmaceuticals Incorporated,, Joshua S. Boger,, Vicki L. Sato,, John J. Alam, M.D.,, Mark Murcko, denying 72 MOTION for Leave to File *PLAINTIFFS' MOTION TO SUPPLEMENT COMPLAINT IN FURTHER OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS* filed by City of Dearborn Heights General Governmental Employees Retirement System,, Terry Sivesind,, (Patch, Christine) (Entered: 02/22/2005) |
| 02/23/2005 | 85 | Judge Patti B. Saris : ORDER entered. JUDGMENT in favor of Defendants Vertex Pharmaceuticals, Inc., Joshua Boger, Vicki L. Sato, John J. Alam, Mark Murcko, and Andrew Marks against Plaintiffs(Patch, Christine) (Entered: 02/24/2005) |
| 02/28/2005 | | Documents terminated from Court's statistical report: 80 Assented |

to MOTION for Leave to File *Reply to Plaintiffs' Opposition to Motion to Dismiss Plaintiffs' Amended Complaint* filed by Andrew S. Marks,, 48 MOTION to Dismiss *The Operative Complaint* filed by Andrew S. Marks,, 66 MOTION to Dismiss *the Consolidated Amended Complaint* filed by Andrew S. Marks. (issue decided by prior court action.) (Alba, Robert) (Entered: 02/28/2005)

Exhibit G

RECEIVED

NOV 1 8 2005

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CALPINE SECURITIES LITIGATION | Master File No: C-02-1200 SBA (WDB) |
| | )  Plaintiff's Counsel ~~~ ~~~~ ~ ~rve this |
| | )  order upon all ~~~~ ~~~~~~~ ~ ~~~~tion. |
| | ) |
| This Document relates To: ALL CONSOLIDATED ACTIONS | )  STIPULATION OF DISMISSAL AND [PROPOSED] ORDER |

532

WHEREAS, the Policemen and Firemen Retirement System of the City of Detroit ("Detroit") and Julius Ser are Plaintiffs in a lawsuit against Calpine and the Individual Defendants that is pending in the United States District Court for the Northern District of California captioned In re: Calpine Corporation Securities Litigation, Master File No. C-02-1200 SBA (WDB) (hereinafter "the Lawsuit").

WHEREAS, the Third Consolidated Amended Class Action Complaint ("TCAC") in the Lawsuit asserts a single claim against Calpine and the Individual Defendants under Section 11 of the Securities Act of 1933. The TCAC claims that Calpine and the Individual Defendants violated Section 11 by making false and misleading statements in a December 1, 2000 Registration Statement, February 2001 Supplemental Prospectus and October 2001 Supplemental Prospectus for the February 2001 and October 2001 offerings of Calpine 8.5% senior notes due February 15, 2011 (the "Notes"). Defendants have denied that they violated Section 11.

WHEREAS, an earlier complaint in the Lawsuit, the Second Consolidated Amended Complaint ("SCAC"), included two factually distinct claims brought by Julius Ser against Calpine and the Individual Defendants under Section 11 of the Securities Act of 1933. One of the Section 11

Kohn, Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
215-238-1700

1

DEC - 8 2005

Entered on Civil Docket

1   claims was included in the TCAC. The other Section 11 claim was not included in the TCAC and

2   was dismissed by the district court in an order dated February 4, 2004.

3        WHEREAS, the TCAC alleged that a class should be certified. At a June 10, 2005 hearing,

4   and in an August 10, 2005 written order, the district court denied Detroit's motion for Class

5   Certification. On August 24, 2005, Detroit filed a Petition for Permission to Appeal the Order

6   denying class certification (the "Petition for Permission to Appeal") under Fed. R. Civ. P. 23(f) with

7   the United States Court of Appeals for the Ninth Circuit. Defendants filed a timely response,

8   opposing the Petition.

9        WHEREAS, on October 3, 2005, Detroit and the Defendants engaged in a confidential

10  mediation before the Honorable Daniel Weinstein (Ret.).

11       WHEREAS, the Parties have agreed to resolve and settle all claims without trial or further

12  adjudication of any issues of fact or law.

13       WHEREAS, neither Detroit nor Ser is releasing the claims, if such exist, of any would be

14  member of the class denied by the Court by Order dated August 10, 2005.

15       WHEREFORE, Plaintiff Detroit and defendants Calpine Corporation, Peter Cartwright, Ann

16  B. Curtis and Charles B. Clark, by their undersigned counsel, hereby stipulate and agree to dismissal

17  of the above-captioned action with prejudice as to the single claim asserted by Detroit under Section

18  11 of the Securities Act of 1933 raised in the Third Consolidated Amended Complaint, filed October

19  17, 2003, and without prejudice as to any claim of any would be member of the class denied by the

20  Court by Order dated August 10, 2005, pursuant to Federal Rule of Civil Procedure 41(a). Each party

21  shall bear its own costs.

22       WHEREFORE, Plaintiff Ser and defendants Calpine Corporation, Peter Cartwright, Ann B.

23  Curtis and Charles B. Clark, by their undersigned counsel, hereby stipulate and agree to dismissal of

24

25

Kohn, Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
215-238-1700

2

1  the above-captioned action with prejudice as to all of the claims asserted by Ser under Section 11 of

2  the Securities Act of 1933 raised in the Second Consolidated Amended Complaint, filed January 27,

3  2003, and in the Third Consolidated Amended Complaint filed October 17, 2003, and without

4  prejudice as to any claim of any would be member of the class denied by the Court by Order dated

5  August 10, 2005, pursuant to Federal Rule of Civil Procedure 41(a).  Each party shall bear its own

6  costs.

7

8  JOSEPH C. KOHN                      GARY S. GRAIFMAN
   DENIS F. SHEILS                     KANTROWITZ GOLDHAMER &
9  WILLIAM E. HOESE                    GRAIFMAN, P.C.
   KOHN, SWIFT & GRAF, P.C.
10

11 By:                                 By:
   Denis F. Sheils                        Gary S. Graifman
12 One South Broad Street, Suite 2100     747 Chestnut Ridge Road
   Philadelphia, PA 19107                 Chestnut Ridge, NY  10977
13 (215) 238-1700                         (845) 356-2570

14 Attorneys for Plaintiff             Attorneys for Plaintiff
   THE POLICEMEN AND FIREMEN          JULIUS SER
15 RETIREMENT SYSTEM FOR THE          Dated:
   CITY OF DETROIT
16 Dated:

17 PAUL H. DAWES                       MELVIN R. GOLDMAN
   JAY L. POMERANTZ                    JORDAN ETH
18 PATRICK E. GIBBS                    D. ANTHONY RODRIGUEZ
   CHRISTOPHER E. CAMPBELL             STUART C. PLUNKETT
19 LATHAM & WATKINS                    MORRISON & FOERSTER LLP

20 By:                                 By:
   Jay Pomerantz                          D. Anthony Rodriguez
21 135 Commonwealth Drive                 425 Market Street
   Menlo Park, California  94025          San Francisco, California  94105-2482
22 (650) 328-4600                         (415) 268-7000

23 Attorneys for Individual Defendants  Attorneys for Defendant
   PETER CARTWRIGHT, ANN B.            CALPINE CORPORATION

24
                                    3
25

10098_1

Kohn, Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107
215-238-1700

1   the above-captioned action with prejudice as to all of the claims asserted by Ser under Section 11 of

2   the Securities Act of 1933 raised in the Second Consolidated Amended Complaint, filed January 27,

3   2003, and in the Third Consolidated Amended Complaint filed October 17, 2003, and without

4   prejudice as to any claim of any would be member of the class denied by the Court by Order dated

5   August 10, 2005, pursuant to Federal Rule of Civil Procedure 41(a).  Each party shall bear its own

6   costs.

7       JOSEPH C. KOHN                              GARY S. GRAIFMAN
        DENIS F. SHEILS                             KANTROWITZ GOLDHAMER &
8       WILLIAM E. HOESE                            GRAIFMAN, P.C.
        KOHN, SWIFT & GRAF, P.C.
9

10  By: _____        By: _____
        Denis F. Sheils                            Gary S. Graifman
11      One South Broad Street, Suite 2100         747 Chestnut Ridge Road
        Philadelphia, PA 19107                     Chestnut Ridge, NY  10977
12      (215) 238-1700                             (845) 356-2570

13      Attorneys for Plaintiff                    Attorneys for Plaintiff
        THE POLICEMEN AND FIREMEN                  JULIUS SER
14      RETIREMENT SYSTEM FOR THE                  Dated:
        CITY OF DETROIT
15      Dated:

16      PAUL H. DAWES                               MELVIN R. GOLDMAN
        JAY L. POMERANTZ                            JORDAN ETH
17      PATRICK E. GIBBS                            D. ANTHONY RODRIGUEZ
        CHRISTOPHER E. CAMPBELL                     STUART C. PLUNKETT
18      LATHAM & WATKINS                            MORRISON & FOERSTER LLP

19  By: _____        By: _____
        Jay Pomerantz                              D. Anthony Rodriguez
20      135 Commonwealth Drive                     425 Market Street
        Menlo Park, California 94025               San Francisco, California  94105-2482
21      (650) 328-4600                             (415) 268-7000

22      Attorneys for Individual Defendants        Attorneys for Defendant
        PETER CARTWRIGHT, ANN B.                   CALPINE CORPORATION
23      CURTIS, and CHARLES B. CLARK, JR.          Dated:
        Dated:
24
                                    3
25

10098_1

1   the above-captioned action with prejudice as to all of the claims asserted by Ser under Section 11 of

2   the Securities Act of 1933 raised in the Second Consolidated Amended Complaint, filed January 27,

3   2003, and in the Third Consolidated Amended Complaint filed October 17, 2003, and without

4   prejudice as to any claim of any would be member of the class denied by the Court by Order dated

5   August 10, 2005, pursuant to Federal Rule of Civil Procedure 41(a).  Each party shall bear its own

6   costs.

7     JOSEPH C. KOHN             GARY S. GRAIFMAN
       DENIS F. SHEILS             KANTROWITZ GOLDHAMER &

8     WILLIAM E. HOESE           GRAIFMAN, P.C.
       KOHN, SWIFT & GRAF, P.C.

9

10   By: _____      By: _____

11       Denis F. Sheils               Gary S. Graifman
       One South Broad Street, Suite 2100     747 Chestnut Ridge Road

12       Philadelphia, PA 19107          Chestnut Ridge, NY  10977
       (215) 238-1700               (845) 356-2570

13       Attorneys for Plaintiff         Attorneys for Plaintiff
       THE POLICEMEN AND FIREMEN     JULIUS SER

14     RETIREMENT SYSTEM FOR THE     Dated:
       CITY OF DETROIT

15       Dated:

16     PAUL H. DAWES            MELVIN R. GOLDMAN
       JAY L. POMERANTZ          JORDAN ETH

17     PATRICK E. GIBBS           D. ANTHONY RODRIGUEZ
       CHRISTOPHER E. CAMPBELL      STUART C. PLUNKETT

18     LATHAM & WATKINS         MORRISON & FOERSTER LLP

19   By: _____      By: *Anthony Rodriguez* /k

20       Jay Pomerantz              D. Anthony Rodriguez
       135 Commonwealth Drive       425 Market Street

21       Menlo Park, California  94025     San Francisco, California  94105-2482
       (650) 328-4600             (415) 268-7000

22     Attorneys for Individual Defendants    Attorneys for Defendant
       PETER CARTWRIGHT, ANN B.      CALPINE CORPORATION

23     CURTIS, and CHARLES B. CLARK, JR.   Dated:  November 18, 2005
       Dated:

24

25

Kohn, Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA  19107
215-238-1700

3

10098_1

1   CURTIS, and CHARLES B. CLARK, JR.        Dated:
    Dated:

2                              **ORDER**

3       The parties having stipulated, and good cause appearing, it is ordered that the above-described

4   claim under Section 11 of the Securities Act of 1933 raised in the Third Consolidated Amended

5   Complaint filed October 17, 2003 is DISMISSED, with prejudice, as to Plaintiffs Julius Ser and The

    Policemen and Firemen Retirement System of the City of Detroit.  The Section 11 claim that was

6
    raised in the Second Consolidated Amended Complaint filed January 27, 2003, but was not realleged

7   in the Third Consolidated Amended Complaint was previously DISMISSED, with prejudice, in an

8   order dated February 4, 2004.

9       **IT IS SO ORDERED.**

10

11  Dated:    12-5-05

12                              HON. SAUNDRA BROWN ARMSTRONG
                                UNITED STATES DISTRICT JUDGE
13

14

15

16

17

18

19

20

21

22

23

24                                  4

25

10098_1

Kohn, Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
215-238-1700

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


Weisz et al,

             Plaintiff,

   v.

Calpine Corporation et al,

             Defendant.

_____ /

Case Number: CV02-01200 SBA

**CERTIFICATE OF SERVICE**


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on December 6, 2005, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Denis F. Sheils
Kohn Swift & Graf P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107


Dated: December 6, 2005

                      Richard W. Wieking, Clerk
                      By: LISA R CLARK, Deputy Clerk

Exhibit H

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN CORTESE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>RADIAN GROUP INC., et al.,<br><br>Defendants. | Civil Action No. 07-03375<br><br>CLASS ACTION<br><br>REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF IRON WORKERS LOCAL NO. 25 PENSION FUND AND CITY OF ANN ARBOR EMPLOYEES' RETIREMENT SYSTEM FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFFS AND FOR APPROVAL OF SELECTION OF LEAD AND LIAISON COUNSEL AND IN RESPONSE TO THE OPPOSITION OF THE COMPETING MOVANT |
| WILLIAM MASLAR, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>RADIAN GROUP INC., et al.,<br><br>Defendants. | |

Institutional Investors Iron Workers Local No. 25 Pension Fund ("Iron Workers") and City of Ann Arbor Employees' Retirement System ("City of Ann Arbor") respectfully submit this reply memorandum of law in further support of their motion for consolidation, appointment as Lead Plaintiffs and for approval of their selection of Lead and Liaison Counsel and in response to the opposition of the competing movant.

## I.     PRELIMINARY STATEMENT

With losses of $664,747, Iron Workers and City of Ann Arbor unquestionably have the largest financial interest in this litigation. Since they also satisfy the requirements of Federal Rule of Civil Procedure 23, Iron Workers and City of Ann Arbor are afforded the presumption of Lead Plaintiff. To rebut this presumption, Tulare County Employees' Retirement Association ("Tulare County"), the only other movant, must offer "proof" showing that Iron Workers and City of Ann Arbor cannot adequately represent the interests of the Class or are subject to unique defenses. Tulare County has not done so.

Instead, Tulare County argues that the motion of Iron Workers and City of Ann Arbor should be denied because Iron Workers is serving as Lead Plaintiff in two pending securities class actions and seeking appointment in three other cases,[1] including this one, and is therefore overextended. The Private Securities Litigation Reform Act (the "PSLRA"), however, specifically states the threshold at which courts should be concerned about investors becoming overextended in multiple securities class actions: "Except as the court may otherwise permit," investors should not serve as lead plaintiff *more than* 5 times in a 3 year period. 15 U.S.C. §78u-4(a)(3)(B)(vi). And even then, most courts have concluded that this 5-in-3 restriction does not apply to institutional investors. *See*

---

[1]      Subsequent to the filing of Tulare County's opposition brief, Iron Workers' motion in *A1 Credit Company v. RAIT Financial Trust*, 07-3148 (E.D. Pa.), was denied in favor of a movant with a larger financial interest. Therefore, its motion is no longer pending.

*e.g. In re Vicuron Pharms., Inc. Sec. Litig.,* 225 F.R.D. 508, 512 (E.D. Pa. 2004) ("The [Conference Committee] Report made it quite clear that the limitation against professional plaintiffs was not designed to be applied mechanically to institutional investors").

Significantly, Tulare County has not cited to a single court that has found a movant to be overextended where it is serving as Lead Plaintiff in 5 or less cases, as is the case here with Iron Workers. On the contrary, courts faced with this argument have outright rejected it. *See In re OSI Pharms, Inc. Sec. Litig.,* 04-cv-5505(JS)(ETB), slip op. at *16 (E.D.N.Y. Sept. 21, 2005) (attached hereto as Exhibit A) (rejecting argument that presumptive lead plaintiff was overextended where he had not served as lead plaintiff more than 5 times in a 3 year period); *see also In re Fannie Mae Sec. Litig.,* 355 F. Supp. 2d 261 (D.D.C. Jan. 13, 2005) (same).

Here, Iron Workers is serving as lead plaintiff in only two actions, with a motion for lead plaintiff pending in this action and in one other action. Another motion that Iron Workers recently filed was denied since it did not represent the largest financial interest in that case. Thus, if appointed in this case and in the other case where its motion is pending, Iron Workers will be simultaneously serving as Lead Plaintiff in only four actions, below the statutory limit of five.

Tulare County also tries to discredit Iron Workers by claiming that Iron Workers cannot serve as Lead Plaintiff because of its size and its other ongoing obligations. These arguments are nothing more than speculation by Tulare County and fell short of the "proof" that the PSLRA requires in order to rebut the presumption afforded to the presumptive Lead Plaintiff.

Lastly, Tulare County contends that City of Ann Arbor cannot recover losses for shares sold prior to the disclosure of the fraud at the end of the Class Period. Ann Arbor, however, similar to Tulare County, calculated its financial interest using a First-In-First-Out ("FIFO") analysis. Under this analysis, the shares of stock most recently sold by Ann Arbor were first offset against the shares of stock that City of Ann Arbor was holding at the start of the Class Period. Since there were more

shares held at that time (2,700) than were ultimately sold (2,197), the Class Period sales by City of Ann Arbor are not relevant for purposes of calculating City of Ann Arbor's financial interest. Indeed, this FIFO analysis is the same analysis advocated by Tulare County in calculating its own financial interest in this litigation. *See* Exhibit B of the Declaration of Brent W. Landau in Support of the Motion of the Tulare County Employees' Retirement Association for Appointment as Lead Plaintiff, Appointment of Lead Counsel, and Consolidation of Related Actions, filed October 15, 2007 ("Landau Declaration") (heading of loss chart states "Class Period FIFO"). City of Ann Arbor's claimed financial interest is therefore correct. Regardless, even under the analysis now being advocated by Tulare County, the financial interest of Iron Workers and City of Ann Arbor still greatly exceeds that of Tulare County.

For these reasons, and as set forth herein and in its prior submissions, the motion of Iron Workers and City of Ann Arbor should be granted in full.

## II.    ARGUMENT

### A.    Iron Workers and City of Ann Arbor are the Presumptive Lead Plaintiffs

#### 1.    Tulare County Has Not Offered Any "Proof" to Rebut Iron Workers and City of Ann Arbor's Presumption

As the movants with the largest financial interest and who are otherwise adequate and typical, Iron Workers and City of Ann Arbor are the presumptive Lead Plaintiffs in this action. Tulare County has not offered any type of proof to rebut that presumption. *See* 15 U.S.C. §78u-4(a)(3)(B)(iii)(II) (stating that "proof" is required to rebut the presumption afforded to the presumptive lead plaintiff). As such, Iron Workers and City of Ann Arbor's motion should be granted.

##### a.    Iron Workers is Not Overextended

In opposing the motion of Iron Workers and City of Ann Arbor, Tulare County argues that "[a]lthough Iron Workers does not appear to have exceeded the PSLRA's statutory limit, it is clear

b.    **Iron Workers and City of Ann Arbor are Committed to Successfully Prosecuting this Action**

Tulare County also speculates about whether Iron Workers will be able to "focus its efforts on protecting the interests of the Class members here" since it is "preoccupied with protecting the interests of [its] plan participants." Tulare County Opp. at 6. As a fiduciary to its beneficiaries, Iron Workers is certainly "preoccupied with protecting the interests of [its] plan participants," and as a Lead Plaintiff, Iron Workers understands that it will be acting as a fiduciary to the class and will be preoccupied with protecting the interests of the class. That is precisely the responsibility of a fiduciary, as Tulare County undoubtedly knows.

Indeed, the interests of its plan participants are exactly the reason that Iron Workers is seeking appointment as Lead Plaintiff here. Having lost more than $544,000 as the result of securities fraud, Iron Workers is now doing everything within its power to recover those funds and is highly motivated to do so. It has retained one of the leading securities class action law firms and has filed a motion seeking appointment as Lead Plaintiff with City of Ann Arbor. It is committed to vigorously representing the interests of the entire class here and will commit the necessary resources to maximize the recovery for the class. Any suggestion to the contrary by Tulare County is simply being made without any legitimate basis and falls short of the "proof" needed to rebut the presumption of Lead Plaintiff afforded to Iron Workers and City of Ann Arbor.[3]

---

[3]    The lone case cited by Tulare County to support its argument is inapposite. In *In re Network Associates, Inc. Sec. Litig.*, 76 F. Supp. 2d 1017, 1029 (N.D. Cal. 1999), the court denied the appointment of a lead plaintiff movant whose "two sister banks. . . [were] under investigation for criminal fraud violations of the laws in Belgium," among other reasons. *Id.* The court specifically stated that it was "unwilling to install an enterprise under such a cloud in a position of trust and confidence." *Id.* Here, there are no concerns about the trustworthiness of Iron Workers to represent the interests of the class and it has already demonstrated its commitment to this litigation by fully complying with the requirements of the PSLRA in seeking its appointment as Lead Plaintiff.

DATED:  November 13, 2007

LAW OFFICES BERNARD M. GROSS, P.C.
DEBORAH R. GROSS
ROBERT P. FRUTKIN


_/s/ Deborah R. Gross-DG639_
DEBORAH R. GROSS, I.D. NO. 44542

Wanamaker Building, Suite 450
100 Penn Square East
Philadelphia, PA 19107
Telephone:  215/561-3600
215/561-3000 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA, JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that on November 13, 2007, I caused a true

and correct copy of the attached:

Reply Memorandum Of Law In Further Support Of The Motion Of Iron Workers
Local No. 25 Pension Fund And City Of Ann Arbor Employees' Retirement
System For Consolidation, Appointment As Lead Plaintiffs And For Approval Of
Selection Of Lead And Liaison Counsel And In Response To The Opposition Of
The Competing Movant

to be served: (i) electronically on all counsel registered for electronic service for this

case; and (ii) by first-class mail to all additional counsel on the attached service list.


_____ /s/ *David A. Rosenfeld*
David A. Rosenfeld

RADIAN

Service List - 10/30/2007  (07-0167)

Page 1 of  1

**Counsel For Defendant(s)**

David  Smith
Schnader, Harrison, Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, PA  19103
   215/751-2000
   215/751-2205 (Fax)


**Counsel For Plaintiff(s)**

Brent W. Landau
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
One South Broad Street, Suite 1850
Philadelphia, PA  19107
   215/825-4010

Samuel H. Rudman
David A. Rosenfeld
Mario  Alba, Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
   631/367-7100
   631/367-1173 (Fax)

Deborah R. Gross
Robert P. Frutkin
Law Offices Bernard M. Gross, P.C.
100 Penn Square East, Suite 450
Wanamaker Bldg.
Philadelphia, PA  19107
   215/561-3600
   215/561-3000 (Fax)

Richard A. Maniskas
D. Seamus Kaskela
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA  19087
   610/667-7706
   610/667-7056 (Fax)