**KIRBY McINERNEY** LLP
**IRA M. PRESS** (*admitted pro hac vice*)
**PETER S. LINDEN** (*admitted pro hac vice*)
**RANDALL K. BERGER** (*pro hac vice* pending)
**825 Third Avenue, 16th Floor**
**New York, New York 10022**
**Telephone:  (212) 371-6600**
**Facsimile: (212) 751-2540**
**Email: ipress@kmllp.com**

**Lead Counsel for Lead Plaintiff**

**GLANCY BINKOW & GOLDBERG LLP**
**LIONEL Z. GLANCY #134180**
**PETER A. BINKOW #173848**
**MICHAEL GOLDBERG #188669**
**1801 Avenue of the Stars, Suite 311**
**Los Angeles, CA 90067**
**Telephone: (310) 201-9150**
**Facsimile:  (310) 201-9160**
**Email: info@glancylaw.com**

**Liaison Counsel for Lead Plaintiff**

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: SIRF TECHNOLOGY HOLDINGS, INC. SECURITIES LITIGATION | ) ) ) ) **Master File No. C 08 00856** |
| This Document Relates To: | ) ) **CLASS ACTION** ) ) **AMENDED COMPLAINT** |
| ALL ACTIONS | ) **FOR VIOLATION OF THE** ) **SECURITIES LAWS** ) |

1

**SUMMARY OF THE ACTION**

2      Lead Plaintiff, on behalf of itself and all others similarly situated, upon personal

3 knowledge as to Lead Plaintiff and Lead Plaintiff's acts, and as to all other matters upon information

4 and belief based upon, *inter alia*, the investigation of Lead Plaintiff's counsel, states as follows:

5      1.      This is a securities class action on behalf of all persons who purchased or otherwise

6 acquired the publicly traded securities of SiRF Technology Holdings, Inc. ("SiRF" or the

7 "Company") between June 21, 2007 and March 25, 2008, inclusive (the "Class Period"). The action

8 asserts claims against SiRF and certain of its officers and/or directors for violations of §§ 10(b) and

9 20(a) of the Securities Exchange Act of 1934 ("1934 Act") (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule

10 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

11      2.      SiRF, through its subsidiaries, engages in the development and marketing of

12 semiconductor and software products that enable location-awareness throughout the world, using the

13 satellite-based global positioning system ("GPS") and other location technologies.   SiRF is

14 headquartered in San Jose, California.

15      3.      On June 21, 2007, SiRF announced that it had agreed to acquire competitor Centrality

16 Communications, Inc. ("Centrality") for $283 million in stock and cash.  Although Centrality also

17 sold GPS semiconductor products, on a conference call with analysts SiRF emphasized that its

18 customers and Centrality's customers were not "overlapping," but "complementary". This addressed

19 any concern that the effect of the transaction might be to cause existing SiRF customers to switch

20 from SiRF products to Centrality products.   SiRF's stock price moved higher on the news.   The

21 transaction closed on August 6, 2007.

22      4.      Later in the Class Period, on October 30, 2007, defendants issued a press release and

23 held a conference call with analysts announcing "exceptional" third quarter financial performance,

24 bullishly describing the outcome of the Centrality acquisition, and forecasting fourth quarter earnings

25 of $0.31 to $0.33. Defendants said that integration of Centrality had gone "extremely well," and that

26 SiRF was "**now** well positioned to benefit" from the acquisition.  In response to a direct question on

27 the conference call, defendants said that sales of Centrality products would not depress SiRF's gross

28

margins.  Rather, defendants said, SiRF will "maintain our gross margins.  We have done so for the last five years, we expect it to continue. ... In the 54%-55% range."

5.      On this news, SiRF's stock price jumped 28% and remained at elevated levels throughout Q4 and the Class Period.  As a result of defendants' October 2007 statements, in November 2007, defendant Diosdado Banatao, SiRF's Chairman, was able to sell a significant chunk of his SiRF holdings for over $9.6 million, at prices between $24.18-$24.29 per share.

6.      On February 4, 2008, after the market closed, defendants disclosed a very different picture of SiRF's profit margins and business prospects.  Net income for the Company fell from a whopping $9.1 million in the fourth quarter of 2006 to a measly $0.7 million in the fourth quarter of 2007.  SiRF did not earn $0.31 to $0.33, but only $0.01 per share in the fourth quarter of 2007.  Contrary to SiRF's statements in October, Company gross margins in Q4 2007 were not 54-55%, but only 48.1%.  Again, this was a sharp difference from 54.8% margins recorded by SiRF in Q4 2006.  On the conference call, SiRF guided the market downward, saying that gross margins going forward would be no higher than 50%.

7.      When asked on the February 4, 2008 conference call about the dramatic change in SiRF's gross margins, defendant Canning stated: **"*We had always expected* that gross margins would start to shift down as ramping of certain products occurred"**.[1]

8.      In response, on February 5, 2008, SiRF's stock collapsed by 54%, closing at $7.36 per share on volume of 63 million shares, which was 24 times the average three-month volume.

9.      On March 25, 2008, SiRF further disclosed that it anticipated a revenue shortfall for Q1 2008, and that it planned a corporate restructuring, and company layoffs.  Analysts attributed this news to SiRF's failure to manage an orderly transition with Centrality, and an ineffective integration.  According to one analyst, even management's reduced guidance on gross margins – 50% – was too optimistic, because the mix of SiRF and Centrality products resulting from the acquisition would favor lower-margin Centrality products.  As a result of defendants' March 25, 2008 disclosures, SiRF

---

[1]  Unless otherwise noted all bolding or other emphasis herein has been added.

1  stock plunged an additional 28.5%, to close at $4.93.

2      10.    Defendants knew but concealed from the investing public during the Class Period the

3  following facts evidencing declining gross margins and less than smooth integration of the Centrality

4  business:

5      (a)    Demand for SiRF's GPS product was flagging as major customers "second

6  sourced" their GPS needs with SiRF's competitors and thereby reduced Company sales of its high

7  margin discrete semiconductor chip sets;

8      (b)    The acquisition of Centrality would and did have an adverse impact on SiRF

9  as sales of the Centrality products cannibalized sales of the SiRF product line;

10      (c)    Insofar as the System-on-Chip ("SoC") products Centrality offered carried

11  lower gross margins than SiRF's "discrete" semiconductor line, sales of SoC's which increased at

12  the expense of sales of sales of discrete semiconductors would reduce Company margins and destroy

13  profitability;

14      (d)    The Centrality acquisition was not complementary, but would in fact

15  significantly lower SiRF's gross margins;

16      (e)    SiRF's discrete semiconductor products had become "commodities," leaving

17  SiRF with no pricing power and placing further downward pressure on gross margins;

18      (f)    Shifting standards in the wireless GPS area were causing SiRF customers to

19  move to cellular-enabled products with which SiRF could not adequately compete; and

20      (g)    Defendants therefore had no basis for their statements in June, July and

21  October 2007 extolling SiRF's and Centrality's "complementary" customer bases, an integration that

22  had progressed "extremely well," a forecast of EPS of $0.31-$0.33 in Q4 2007, and affirmation that

23  SiRF's 5-year record of delivering 54% to 55% in gross margins would continue.  Gross margins in

24  Q4 and going forward would in fact be down significantly due to lower-margin SoC products (which

25  cannibalized SiRF sales of discrete products), because SiRF's higher-margin semiconductor products

26  had become commodities (and were being second sourced to competitors), and because SiRF's

27  wireless business was suffering because cellular telephone standards had shifted in favor of

28

1  competitors.

2      11.    Defendants' statements, and their failure to disclose adverse facts known to them,

3  artificially inflated the price of SiRF's publicly traded securities and allowed defendant Banatao to

4  reap $9.6 million in trading proceeds. Plaintiff and other members of the Class purchased SiRF

5  securities at prices inflated by defendants' false and misleading statements and thereby suffered

6  injury.

7                          **JURISDICTION AND VENUE**

8      12.    The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the

9  Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 (17 C.F.R. §

10  240.10b-5) promulgated thereunder by the SEC. Jurisdiction is conferred by §27 of the Exchange

11  Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

12      13.    Venue is proper in this District pursuant to §27 of the Exchange Act. Many of the acts

13  and transactions giving rise to the violations of law complained of herein, including the preparation

14  and dissemination to the investing public of false and misleading information, occurred in this

15  District. SiRF's principal executive offices are located at 217 Devcon Drive, San Jose, California,

16  where the day-to-day operations of the Company are directed and managed.

17      14.    In connection with the acts, conduct and other wrongs complained of, the defendants,

18  directly or indirectly, used the means and instrumentalities of interstate commerce, the United States

19  mails, and the facilities of the national securities markets.

20                                **PARTIES**

21      15.    Lead Plaintiff, the Police & Fire Retirement System of the City of Detroit, purchased

22  SiRF common stock during the Class Period as detailed in the certification previously filed with this

23  Court and was damaged thereby.

24      16.    Defendant SiRF develops and markets semiconductor and software products that

25  enable location-awareness throughout the world, utilizing GPS and other location technologies. SiRF

26  offers a range of GPS chip set and software products.

27      17.    Defendant Michael L. Canning ("Canning") was, at all relevant times, President and

28

1 Chief Executive Officer ("CEO") of the Company.   During the Class Period, Canning was
2 responsible for the Company's public statements, and personally participated on the analyst
3 conference calls alleged herein.  On April 18, 2008, Canning resigned his positions at SiRF.

4      18.    Defendant Diosdado P. Banatao ("Banatao") was, at all relevant times, Chairman of
5 the Board of SiRF.  Banatao was also a co-founder of the Company.  During the Class Period, while
6 SiRF's stock was artificially inflated by defendants' false statements, Banatao sold 400,000 shares
7 of his SiRF stock for proceeds of $9.6 million.  Banatao had power and authority to control the
8 contents of SiRF's public statements.  Banatao became interim CEO of SiRF upon Canning's
9 resignation in April 2008.

10     19.    Defendant Geoffrey Ribar ("Ribar") is, and at all relevant times was, Chief Financial
11 Officer ("CFO") and Senior Vice President of Finance of the Company. During the Class Period,
12 Ribar was responsible for the Company's public statements, and personally participated on the
13 analyst conference calls alleged herein..

14     20.    Defendant Kanwar Chadha ("Chadha") is a co-founder of the Company.  At all
15 relevant times Chadha was Vice President of Marketing and a director of the Company.  During the
16 Class Period, Chadha was responsible for the Company's public statements.

17     21.    Defendants Channing, Banatao, Ribar and Chadha (the "Individual Defendants"),
18 because of their positions with the Company, had power and authority to control the contents of
19 SiRF's quarterly reports, press releases and presentations to securities analysts, money and portfolio
20 managers and institutional investors, i.e., the market.  They were provided with copies of the
21 Company's reports and press releases alleged herein to be misleading prior to or shortly after their
22 issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.
23 Because of their positions with the Company, and their access to material non-public information
24 available to them but not to the public, the Individual Defendants knew that the adverse facts
25 specified herein had not been disclosed to and were being concealed from the public and that the
26 positive representations being made were then materially false and misleading.

27

28 AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    -5-

1

## BACKGROUND

2      22.    SiRF develops and markets semiconductor and software products that enable location-

3  awareness throughout the world utilizing GPS and other location technologies.  Specifically, the

4  Company's products use GPS to provide longitude, latitude and time information to GPS-enabled

5  devices manufactured and sold by SiRF's customers.  SiRF's business segments are: Automotive

6  (which included SiRF's "bread and butter" – the Portable Navigation Device ("PND") market);

7  Wireless (*i.e.*, GPS for cellular telephones); and Consumer (devices such as recreational GPS

8  handhelds).  At relevant times, the Automotive segment comprised approximately 65% of Company

9  revenues, Wireless accounted for 20%, and Consumer for 15%.  SiRF's customers include such

10  companies as Garmin, TomTom and Motorola.

11      23.    Historically, the SiRF product line has been GPS "chip sets" for use in the various

12  applications existing within its business segments.  Each of the Company's chip set product lines

13  consists of two integrated circuits, a radio frequency integrated circuit and a digital signal processing

14  circuit, and standard embedded GPS software.  The semiconductor circuits chips included in a SiRF

15  chip set are "discrete," meaning that the chips perform specific functions and must be packaged

16  together to provide GPS functionality in end-user devices.  At relevant times, the Company's flagship

17  product has been the "SiRFstarIII" chip set.  SiRF does not own semiconductor plants, but is

18  "fabless," meaning that the Company enters contracts with third-party foundries for manufacture of

19  its semiconductors products.

20      24.    On June 21, 2007, SiRF announced an agreement to acquire one of its largest

21  competitors, Centrality Communications Inc., for 8.1 million shares of SiRF stock and $110 million

22  in cash.  The transaction closed on August 6, 2007.  At relevant times, Centrality's core product has

23  been the GPS "System-on-Chip," or "SoC".  Centrality's most popular SoC's are its "Atlas" and

24  "Titan" products.  With an SoC, functions found separately in discrete semiconductor chips like

25  SiRF's can be combined into a single semiconductor chip.  In a given application, therefore, an SoC

26  could replace the SiRFstar III chip set, and provide additional functionality as well.  SoC products

27  have lower gross margins, however, than the discrete chips comprising SiRF's product line.

28   AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    -6-

Accordingly, at the time of SiRF's acquisition of Centrality, Centrality's gross profit margins were much lower than SiRF's. In FY 2006, Centrality's gross margins were only 40%, whereas SiRF's were 55.6%. Likewise, in Q1 2007, Centrality's and SiRF's respective gross margins were 39.8% and 54.6%.

**DEFENDANTS ISSUE FALSE AND MISLEADING STATEMENTS**

25.    On June 21, 2007, SiRF issued a press release and held a conference call bullishly describing its definitive agreement to acquire Centrality. Defendant Canning was quoted saying "Centrality's team has a proven track record of delivering innovative solutions to market and we believe that **the combined entity can provide a very attractive product portfolio to address the price performance and functionality needs of our customers.**" On the conference call, defendant Chadha said that the customer bases of the two companies were "complementary" rather than "overlapping".

> [ANALYST]: [M]aybe you could talk about just **are there any overlapping customers here** or you know what types of customers do you think this will help increase your penetration into?

> [CHADHA]: This is Kanwar. I think **we have actually a pretty complementary base**. The way to look at it is every socket we can add more value to now, and if we look at our customer base today, **there are a number of customers who are using Centrality's system-on-a-chip platform, and there are many other customers who are using SiRF GPS with other SOC platforms**. So, we see significant synergy as we – as a merged company to add more value to those sockets.

These statements by Canning and Chadha dispelled concerns that customers who, prior to the Centrality acquisition, were purchasing SiRF's high-margin discrete semiconductor chip sets, might afterwards begin purchasing Centrality's low margin SoC semiconductors. On news of the Centrality acquisition and the company's complementary customer bases, SiRF's stock price rose 3% on heavy volume.

26.    On the same conference call, Rob Baxter, Centrality's CEO, said

> [W]e are looking forward to **combining our Atlas and Titan products with – and expanding that range along with SiRF Technology offerings**. And it really is a **win-win-win**, firstly for our customers and most of all for our customers to see an accelerated product roadmap, **a differentiated product** roadmap with leadership in its field. Of course, shareholders will benefit from that as well of both companies. And thirdly, of course, our employees.

1   Stating that the Centrality products could be added alongside SiRF's discrete semiconductor offerings

2   in a "win-win" scenario told the market that the acquisition was not expected to cannibalize SiRF's

3   sales.

4          27.    In response to a question about the impact of the Centrality acquisition on customer

5   Samsung, defendant Chadha emphasized that Centrality's SoC ("fully integrated") GPS solution and

6   SiRF's ("modular") fit the needs of different customers.

7              [ANALYST]: [Y]ou have a close relationship with [Samsung] – they're your
               manufacturer and I believe in a lot of applications its their application process that is
8              being used, how do you see this acquisition impacting that relationship and – and
               have you talked to them about Centrality?

9              [CHADHA]: I think we see the markets having different price performance
10             modularity needs. **There are going to be certain segments where a fully integrated
               solution makes sense, there are other segments where more modular solutions
11             make sense**. So, our strategy is to address all of them.

12         28.    The foregoing statements issued by defendants on June 21, 2007 were materially false

13  and misleading at the time that they were made because they misrepresented and/or failed to disclose

14  the facts set forth in ¶¶ 47, 55 and 65, *inter alia*, and, in particular, that Centrality's customer base

15  and products were not "complementary" to SiRF's, because:

16             (a)    Centrality and SiRF had overlapping customer bases, so sales of Centrality

17             products would cannibalize sales of SiRF product lines; and

18             (b)    Centrality's SoC products carried lower gross margins than SiRF's "discrete"

19             semiconductor products, thereby lowering SiRF's profit margins.

20         29.    On July 31, 2007, SiRF announced second quarter earnings and held a conference call

21  with analysts. On the call, defendant Canning stated:

22             We believe that **the combination of [Centrality's] products and our products is
               going to provide extensive strength in the PND market**. And frankly, we think it
23             will be a very successful product portfolio from that standpoint.

24                            *    *    *

25             What we have said is that we are capable of being competitive in this market on price
               **without having substantial problems with our gross margins** and that continues
26             to be the case.

27         30.    On this conference call, SiRF repeated a theme from its June 2007 call announcing

28

the Centrality acquisition, *i.e.*, that Centrality sales would not reduce sales of SiRF's product line because the customer bases of the two companies were complementary, not overlapping.  Defendant Canning said "The Centrality line and the SiRF line right now are very complementary, there is very little overlap, a few software items that overlap a little bit but really not much."

31.    The foregoing statements issued by the defendants on July 31, 2007 were materially false and misleading at the time that they were made because they misrepresented and/or failed to disclose the facts set forth ¶¶ 44-51, 62-65, *inter alia*, and, in particular, that defendants knew Centrality's and SiRF's customer bases and products were not "complementary," and that this would have a material impact on gross margins, because:

(a)    Centrality and SiRF had overlapping customer bases, so sales of Centrality products would cannibalize sales of SiRF product lines; and

(b)    Centrality's SoC products carried lower gross margins than SiRF's "discrete" semiconductor products, thereby lowering SiRF's profit margins; and

(c)    Demand for SiRF's GPS product was flagging as major customers "second sourced" their GPS needs with SiRF's competitors and thereby reduced Company sales of its high margin discrete semiconductor chip sets; and

(d)    Cannibalization of sales of SiRF products by Centrality's low margin sales would in fact significantly lower SiRF's gross margins; and

(e)    SiRF's discrete semiconductor products had become "commodities," leaving SiRF with no pricing power and placing further downward pressure on gross margins; and

(f)    Integration of Centrality had proceeded poorly.

32.    On October 30, 2007, SiRF issued a press release touting the positive effect of the Company's Centrality acquisition on SiRF's revenue stream.

SiRF reports record revenue and strong Non-GAAP operating profits

"We believe our Q3 performance has been exceptional.  We have once again posted record revenues on record shipment volumes with excellent profitability and strong bookings momentum. **Our acquisition of Centrality and broadening of our**

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                                    -9-

**product portfolio with the System-on-Chip (SoC) products has been enthusiastically welcomed by customers, and the SoC products are also breaking revenue and shipment volume records**," said Dr. Michael Canning, President and CEO.

\* \* \*

Q3 2007 Highlights and Business Outlook:

**We have successfully closed the merger with Centrality Communications and are integrating our products, platforms and personnel. The resulting combination has exceeded our expectations and has been very well received by customers**, vendors and employees alike. We are seeing significant design win momentum at major PND customers for our SoC platforms. **We are now working on synergistic extensions of our combined fundamental technology**.

Growth in our Automotive business, and particularly in Portable Navigation Devices (PNDs), continues to be very strong and to mirror overall market growth. ... In addition, many of our customers, including ASUS, Garmin, HP Magellan, Mio, Siemens VDO and TomTom, launched **new platforms using SiRFstarIII or SiRF SoC based products** this quarter.

**Interest in and demand for our products continues to accelerate in our Wireless business**. ... **Multiple handsets based on the SiRFstarIII platforms** have also been announced or moved into volume production by customers ....

In the consumer and mobile computing market, **SiRFstarIII architecture is gaining more momentum**.

33. Immediately following the release of its Q3 2007 results, SiRF hosted a conference call for analysts, investors and media representatives, during which defendants stated the following:

[CANNING]: The **integration [of Centrality] and process has progressed extremely well**, and we are now well positioned to benefit from the combined creativity and GPS-enabled location technology and DSP engineering of the two companies.

\* \* \*

Demand for our products is robust across all market segments and we expect to see Q4 revenues in the range of $99 to $102 million with at least 10% of this revenue coming from SoC products. This will bring revenue for the year into the range of $328 million to $331 million. Assuming a tax rate of 5% to 10%, **we are modeling EPS for Q4 in the range $0.31 to $0.33.**

\* \* \*

[ANALYST]: **So let's say a full quarter of Centrality in Q4. Will that then depress margin** or would the higher revenue level, do you expect gross margin to go up sequentially a little bit?

[CANNING]: **We expect to maintain our gross margins. We have done for**

1    **the last five years, we expect it to continue**.

2        [RIBAR]: **In the 54% to 55% range**.

3                            *    *    *

4        [ANALYST]:  Well then as a follow-up.  Did you feel like you've really taken
a big brunt of the ASP decline in Q3 so we'll see more modest declines going forward
5    or will we see more of the same?

6        [CANNING]: Well there's always competition in the marketplace, and that's
something we have expected and forecast for sometime.  So it's not surprising that
7    competitors are there.  It's not surprising that if they want to try to win business from
us, they try to offer lower prices.  But **we plan to be just as competitive going
8    forward as we have been in the past**.  And we expect to win more sockets than we
lose and to **improve the value of the sockets that we win**.

9        [RIBAR]: So I think that the other point is clearly, right, **we've been able to
10   sustain our market share, sustain our margin, sustain our business model** in this
pricing environment.  So I think we've done an outstanding job over an extended
11   period of time of maintaining our business.

12   34.    Like SiRF's June 21, 2007 statements, its October 30, 2007 statements that customers

13   were launching new platforms in either SiRFstar III **or** SoC (implying that SoC gains were not at the

14   expense of SiRFstar III sales) and describing the combination of SiRF and Centrality as "synergistic,"

15   served to assuage investor concerns about cannibalization.  Similarly, Canning's references on

16   October 30, 2007 to "very strong" customer interest in the Centrality's Atlas and other SoC products,

17   alongside statements about gains by SiRFstar III with customers in the wireless handset and

18   consumer segments, and assurances that the integration of Centrality "has progressed extremely

19   well," told the market that these customer bases were indeed complementary.

20   35.    Later in the call, defendant Ribar was again queried about gross margins.  Ribar

21   confirmed the 54-55% figure.  When asked directly whether the Centrality business might affect

22   SiRF's gross margins, defendant Canning responded that the margins would remain stable.

23       [ANALYST]: On the gross margin, just a clarification.  Geoff, I think you
mentioned 55 to 56 going forward.  Is that the target you're expecting in Q4 and into
24   2008?

25       [RIBAR]: So Adam, **I said 54% to 55% for Q4.**  We're not guiding '08.

26       [ANALYST]: Okay.  And then **as you move into Centrality and becomes
I guess 10% of your mix in Q4 and maybe a bigger percent next year, can you
27   just talk about the dynamics of how that, you know, can move gross margin up**

28   AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    -11-

1    **or down**?

2        [CANNING]: Well, I think it's very clear that in this business, because of the
3    enormous opportunities in the market that we see, there's of course competition, and
     the traditional way of managing margins is to create more value through products that
4    are differentiated from those competitors.

5    And the SoC products are part of that strategy as are some of the software products
     that we introduce. **So we will be able to maintain our margins quite nicely by
6    introducing more interesting products over time.**  And that's fundamentally the
     strategy that we've been following for sometime.

7        36.    Addressing the Wireless segment, defendant Canning told analysts that SiRF and

8    Qualcomm had essentially split the market for GPS-enabled mobile phone handsets: "I think **between**

9    **Qualcomm and SiRF, we have covered pretty much the field of GPS-enabled wireless**

10   **solutions.**" Canning's statement implied that Qualcomm and SiRF were on equal footing with GPS-

11   enabled handsets when in fact, as a former SiRF employee (CW1) stated, *see infra*, SiRF was unable

12   to compete with Qualcomm in the handset arena because Qualcomm owned the intellectual property

13   for the CDMA standard that had become dominant, and gave away GPS for free in those handsets.

14       37.    An analyst asked whether SiRF competitor MediaTek presented a competitive threat

15   to SiRF's high margins and defendant Chadha responded that MediaTek was really no different than

16   any other competitor.

17       [ANALYST]: How do you folks, to put it bluntly, you know, fool proof
     competitive entry from [the] sort of guy like a MediaTek that has been very successful
18   coming in, good technology at very low prices?

19       [Chadha]: [Y]ou know, [the] market is going to be competitive and **there are
     going to be a number of players.  You know, MediaTek being one of them**, but
20   there are other players in the marketplace.

21   In fact, however, three months earlier SiRF had published an internal study which singled out

22   MediaTek as a particularly strong competitive threat because there were no performance or

23   functionality differences between SiRF and MediaTek products which could justify SiRF charging

24   twice as much as MediaTek.  *See infra*.

25       38.    Defendant Canning closed the conference call stating that "As expected, the Centrality

26   acquisition has created **positive synergies** internally and externally."

27       39.    The foregoing statements issued by the defendant on October 30, 2007 were materially

28   AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    -12-

false and misleading at the time that they were made because they misrepresented and/or failed to disclose the facts set forth in §§ 44-51, 62-65, *inter alia*, and, in particular that defendants knew that the integration with Centrality was not proceeding smoothly, that Centrality's and SiRF's customer bases and products were not complementary and that SiRF did not expect to maintain its gross margins in the fourth quarter of fiscal 2007, because:

        (a)    the acquisition of Centrality was having an adverse impact on SiRF as sales of Centrality products cannibalized sales of SiRF product lines; and

        (b)    Centrality's SoC products carried lower gross margins that SiRF's "discrete" semiconductor products, thereby lowering SiRF's profit margins; and

        (c)    Demand for SiRF's GPS product was flagging as major customers "second sourced" their GPS needs with SiRF's competitors and thereby reduced Company sales of its high margin discrete semiconductor chip sets; and

        (d)    the Centrality acquisition was not complementary, but would in fact significantly lower SiRF's gross margins; and

        (e)    SiRF's discrete semiconductor products had become "commodities," leaving SiRF with no pricing power and placing further downward pressure on gross margins; and

        (f)    Defendants had no basis for their statements on the Q3 conference call that EPS would be in the $0.31-$0.33 range, or that the gross margins of 54% to 55% obtained in Q3 would remain stable for Q4.  Gross margins in Q4 would be down significantly due to lower-margin SoC products (which cannibalized SiRF sales of discrete products), because SiRF's higher-margin semiconductor products had become commodities (and were being second sourced to competitors), and because SiRF's wireless business was suffering because cellular telephone standards had shifted in favor of competitors; and

        (g)    the lower margin Centrality products were already 10% of SiRF's sales in Q3, and were expected to comprise a larger share in Q4.

40.    SiRF's Q3 earnings release and Q3 conference call on October 30, 2007 had an extremely positive effect on market prices for SiRF stock.  This was not surprising, since the Company touted SiRF's prospects for its discrete SiRFstar III platform in all three of SiRF's business segments – Automotive, Wireless and Consumer – and unequivocally stated that its gross margins were solid.  On October 31, 2007, SiRF stock shot up $6.51, or 28%, from $23.30 to $29.81 per share, on volume of 11.9 million shares.  This compared to average volume of 2.8 million shares traded per day in the month of October 2007.  The one-day jump on October 31, 2007 was SiRF's largest move since the company went public in April 2004.

41.    Analysts raved about SiRF's apparent success in the quarter.  Bloomberg News reported that SiRF's 29¢ profit, excluding research, acquisition and stock-compensation costs, had beaten the 22¢ estimate of analysts in the Bloomberg survey.  Goldman Sachs wrote that "handset designs at key customers including Motorola and RIM) [were] beginning to ramp, in addition to the well-known strength at PND customers such as TomTom."  Dougherty & Company wrote that "the Centrality acquisition has given SiRF superior positioning relative to other PND chipset providers (boosting share and ASP per PND)."

42.    Based upon the Company's statements in the Company's October 30, 2007 press release and conference call, Credit Suisse raised its price target for SiRF from $24 to $30 per share, Jeffries & Company raised from $28 to $32, Deutsche Bank raised to $35.  Analysts Oppenheimer & Co., Lehman Brothers, and RBC Capital Markets also wrote reports bullish on SiRF's earnings prospects.  In total, at least eight analysts following SiRF's stock upgraded it and/or wrote positively about the information that SiRF reported to the market on October 30, 2007.

## DEFENDANTS KNEW THAT THEIR PRIOR STATEMENTS ABOUT MARGINS, EARNINGS AND INTEGRATION WERE FALSE

43.    Defendants, but not investors, knew at the beginning of the Class Period that sales of lower-margin SoC products would eat into SiRF's discrete business and cause profit margins and earnings to come in lower than SiRF had told the market.  Numerous confidential witnesses interviewed in the course of plaintiff's investigation – all former employees of SiRF, identified herein

1  as "CW __" – confirmed defendants' knowledge.

2  **Second Sourcing**

3       44.    According to CW1, a former SiRF Senior Marketing Manager, as of July 2007, SiRF's

4  key customers in the crucial PND (Personal Navigation Device) product line "were seriously starting

5  to second source" their demand for SiRF products.  Second sourcing meant that SiRF's customers

6  had found alternatives to SiRF to obtain GPS chips to use in their end-user devices.  CW1 said that

7  customer TomTom was second sourcing, and that customer Garmin likewise was "designing SiRF

8  chips out of their product".  TomTom was one of only three SiRF customers that accounted 10% or

9  more of sales as of Company October 30, 2007.  The impact of this second sourcing was to reduce

10  Company sales of high margin discrete semiconductor chip sets, and therefore increase the slice of

11  sales in SiRF's accounting channels that was comprised of low margin SoC sales.

12       45.    CW1 said that SiRF management was not concerned at first by customer second

13  sourcing, because the mix was expected to be 70% SiRF and 30% second sources.  Those ratios,

14  however, soon dropped to 50-50, and later 20-80.  This meant that second sources, *i.e.*, SiRF's

15  competitors, were filling 80% of the orders that had once belonged 100% to SiRF.  This critical

16  situation was known by defendants to be materially inconsistent with defendants' Class Period

17  statements about SiRF's ability to sustain its market share (¶ 33), as well as specific statements about

18  market acceptance of SiRF's PND products (¶¶ 32, 33).

19       46.    As head of a Product Marketing Group at SiRF, CW1 was familiar with the source mix

20  ratios, and their effect on the Company's sales numbers.  CW1 reported to Dennis Sheehan, Senior

21  Director of Product Marketing, who reported directly to defendant Kanwar Chadha.  CW1 attended

22  the staff meetings held by both Sheehan and Chadha.  Among the topics of discussion at staff

23  meetings was the source mix and effect on SiRF revenues.  CW1 was employed at SiRF from July

24  2000 through February of 2008.  CW1 told plaintiffs' counsel that demand for SiRF's products was

25  being drained away by customer second sourcing, which left more low margin sales of Centrality's

26  product line.

27  **Cannibalization**

28

47.    CW1 advised plaintiffs' counsel that the acquisition of Centrality led directly to cannibalization of SiRF sales by the Centrality product line.  The customer bases of the companies were not in fact "complementary," as defendants had told the market in June, July and October. According to CW1, it was inevitable that sales of Centrality products would eat into demand for the SiRF chips, given that SiRF's discrete chips required combination with other chips whereas Centrality's SoC to provided a complete GPS solution on a single piece of silicon.  CW1 said that PND's (SiRF's bread and butter application) required functionality (such as display drivers, and serial input/output ports) that were included in the Centrality SoC's but lacking in discrete GPS chips offered by SiRF.

48.    Defendant Canning failed to mention cannibalization when he stated on October 30, 2007 that "Customer interest in our Atlas type and SoC platforms [both Centrality products] has been very strong, especially in the tier one PND market, and we expect them to be significant contributors to our revenue growth in 2008".  This omission rendered those statements misleading, as well as Class Period statements about the "complementary" nature of the Centrality acquisition.  Nor was the cannibalization that occurred and squeezed SiRF's margins "positive synergy" from the transaction that Canning had described.  Cannabalization demonstrates that the customer bases of SiRF and Centrality were not in fact complementary as defendants Chadha and Canning emphasized in June and October 2007.

**Commoditization**

49.    CW2, a former SiRF Program Manager, Strategic Accounts, said that by late July 2007 "it was obvious that SiRF discrete GPS chips were becoming a commodity".  Evidence of that was a July 20, 2007 study circulated internally by SiRF titled "Fighting Guide: MediaTek".  This study, authored by Greg Turetzky, Director of Marketing, and a respected original founder of the Company, compared the flagship SiRFstar III chipset to corresponding chipsets offered by competitor MediaTek.  According to CW2, "Fighting guide: MediaTek" concluded that there were no performance or functionality differences whatsoever between the SiRF and the MediaTek products. This raised extreme concerns among CW2 and other sales people because they were aware from

1  publicly available information that MediaTek was selling its products for half what SiRF charged.

2  Turetzky sent an e-mail to SiRF management, including each defendant, and other SiRF employees,

3  directing them to read the "Fighting Guide: MediaTek" study.

4      50.    This evidence that SiRF's discrete chips had been relegated to commodities –

5  meaning that the Company had no pricing power – came three months **before** SiRF used healthy 54-

6  55% gross margins as a basis to forecast $0.31-$0.33 per share earnings.  A commodity product does

7  not earn gross margins at this level.  The knowledge also rendered misleading defendants' Class

8  Period statements that SiRF planned to respond to price cuts in the market by being "just as

9  competitive going forward as [it had] been in the past" and that it expected to win more "sockets"

10  (placement in end-user devices sold by SiRF customers) than it lost and "to improve the value of the

11  sockets that we win".  SiRF was aware as early as July that it could not expect to maintain prices on

12  its flagship discrete GPS semiconductor product line.

13  **Lack of Integration**

14      51.    CW1 made statements to plaintiffs' counsel that contradicted Canning's glowing

15  commentary about Centrality's integration within SiRF, as of October 30, 2007 (*i.e.*, integration had

16  progressed "extremely well").  CW1 said that integration was actually extremely poor.  According

17  to CW1, within marketing, there were rampant "turf wars," no "unified message" and "no

18  leadership".  The company effectively ended up with two distinct marketing groups.  Software

19  produced in India had created "major problems" due to lack of quality, and the code had to be

20  reworked by U.S. software engineers.  SiRF was forced to write off significant investments, including

21  a SoC version of the SiRFstar III called "SoC Star IIIA," and a GPS solution based on BlueTooth 1.0.

22  **Problems In The Wireless Segment**

23      52.    CW2 said it was clear in the early part of December 2007 that SiRF's lead wireless

24  customer, Motorola, was not keeping its commitments in terms of purchases of SiRF units.  CW2's

25  responsibilities at SiRF gave him direct knowledge of the Motorola account, and direct contact with

26  Motorola employees.  These employees told CW2 that Motorola's problems were so serious that they

27  triggered a round of layoffs at Motorola.  According to CW2, the impact of Motorola on SiRF was,

28

1  in turn, very significant, and directly caused layoffs of 40 SiRF personnel in March 2008. Tim

2  McCarthy, SiRF Director and CW2's direct supervisor, told CW2 that McCarthy had personally told

3  defendant Chadha about the dramatic falloff in Motorola purchases. CW2 stated that he had heard

4  Chadha admit in a subsequent all-employees meeting that there were problems in the Motorola

5  account.

6        53.    This stands in stark contrast to the Company's earlier statement that "interest in

7  demand for [SiRF's] products continues to accelerate in our Wireless business." Indeed, the

8  Motorola account eventually is blamed for the weak Q4 2007 by analyst Jeffries & Company, *see*

9  *infra*. CW2, who told plaintiff's counsel about "Fighting Guide: MediaTek," and serious problems

10  with the Motorola account, joined SiRF in June 2005 and left in March 2008. In early December,

11  SiRF was under a duty to disclose to investors that its earlier statement regarding accelerating

12  demand in Wireless was no longer accurate.

13        54.    Also in the Wireless segment, CW1 said that SiRF was unable to compete with

14  handset manufacturer Qualcomm in CDMA (code division multiple access) handsets. Unbeknownst

15  to investors, who heard Canning say that between SiRF and Qualcomm, the field was "covered,"

16  Qualcomm was offering GPS capability **at no extra cost** inside the wireless chips that it sold handset

17  manufacturers. SiRF could not feasibly charge handset manufacturers for inclusion of its GPS

18  products in CDMA handsets (that generally contained Qualcomm chips already), when Qualcomm

19  offered that functionality for free. This was especially problematic because during the Class Period

20  the wireless industry was in the midst of shifting over to CDMA standards, and Qualcomm owns the

21  intellectual property underlying CDMA technology. So SiRF was unable to compete on GPS

22  products with respect to handsets that were becoming an increasingly larger portion of all handsets

23  sold.

24  **Defendants Received Information Through Rigorous Financial Reporting**

25        55.    CW3, a former SiRF V.P. Hardware Engineering, confirmed that SiRF's gross margins

26  were extremely important to Company management. CW3 reported directly to defendant Canning

27  and said that gross margins were examined very closely during Canning's weekly staff meetings.

28  

1    According to CW3, Canning, Banatao, Ribar and Chadha were fully aware prior to the acquisition

2    that gross margins on the SoC products were lower than the margins on SiRF's line. CW3 said it was

3    imperative for SiRF management to look at Centrality's gross margins to determine how the

4    acquisition would affect SiRF's business model, and to insure the health of the business. CW3 was

5    employed by SiRF from July 2006 through September 2007.

6        56.    Financial information was delivered to SiRF's senior management in detailed

7    spreadsheet reports, on a monthly and quarterly basis. According to CW4, a former SiRF Finance

8    Manager, the Excel spreadsheets used by SiRF for internal financial reporting showed income

9    statement, balance sheet, and sales against forecast information. An Excel spreadsheet also showed

10    detailed gross margins by product line, for all of SiRF's businesses. SiRF's accounting staff (under

11    the direction of CFO Ribar) prepared these reports and bundled them together into a "Comprehensive

12    Review Package" for senior management. According to CW4, defendants Canning, Ribar and

13    Chadha all received the Comprehensive Review Package. CW4 was at SiRF from September 2006

14    through October 2007.

15        57.    CW5, a former Vice President confirmed that SiRF had in place a "rigorous

16    accounting system" for internal financial reporting. CW5 also confirmed that at the time of the

17    Centrality acquisition the gross margins on SoC's sold by Centrality were known by management to

18    be lower than SiRF's margins. CW5 was employed at the Company from April 2003 until December

19    2007.

20        58.    In January 2008, SiRF's stock drifted downward as the market began to doubt the

21    market for SiRF's products. Defendants did not however disclose how much of SiRF's growth was

22    disappearing, and the stock continued to be artificially inflated. On February 4, 2008, SiRF's stock

23    closed at $16.27 per share.

24             **DEFENDANT BANATAO REAPS INSIDER TRADING PROFITS**

25        59.    On November 29-30, 2007, defendant Banatao sold 400,000 shares of his SiRF stock

26    for proceeds of $9,694,000. This was 12.5% of Banatao's holdings and constituted by far his largest

27    sale of SiRF holdings in the prior two years. Notwithstanding his duty to refrain from trading SiRF

28    AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS        -19-

1  stock under the circumstances, or to disclose the information alleged herein, Banatao sold shares of

2  SiRF stock at prices that had been artificially inflated by defendants' materially false representations

3  detailed above.

**SiRF ANNOUNCES A CATASTROPHIC EARNINGS SHORTFALL
AND SAYS THAT LOWER GROSS MARGINS WERE "ALWAYS EXPECTED"**

60.    On February 4, 2008, after the market close, SiRF issued a press release announcing

that despite increased revenues, it had missed Q4 earnings estimates on far lower gross margins than

the Company identified in October 2007 (a mere three months earlier, and already a month into the

quarter).

Net revenue in the fourth quarter of 2007 was $100.4 million, an increase of
35.3 percent from $74.2 million reported in the fourth quarter of 2006. Net revenue
in fiscal 2007 was $329.4 million, an increase of 33.0 percent from $247.7 million
reported in fiscal 2006. **Gross margin in the fourth quarter of 2007 was 48.1
percent**, as compared to 54.7 percent in the fourth quarter of 2006. Gross margin in
fiscal 2007 was 50.9 percent, as compared to 54.8 percent in fiscal 2006.

**Net income for the fourth quarter of 2007 was $0.7 million, or $0.01 per
diluted share**, based on 64.3 million diluted weighted average shares outstanding. This
compares with net income of $9.1 million, or $0.16 per diluted share, based on
56.1 million diluted weighted average shares outstanding in the fourth quarter of
2006.

Net loss for fiscal 2007 was $(10.4) million, or $(0.19) per diluted share, based
on 55.5 million diluted weighted average shares outstanding. This compares with net
income of $2.4 million, or $0.04 per diluted share, based on 56.0 million diluted
weighted average shares outstanding in fiscal 2006.

61.    On the conference call, Defendant Canning admitted that defendants had "always

expected" a decline in the gross margins, notwithstanding their October 30, 2007 statements to the

contrary.

**We had always expected that gross margins would start to shift down** as ramping
of certain products occurred and as competitive influences came into the market. So
for the moment, I think, it's probably best to assume that we'll be around 50% gross
margin.

62.    When pressed by an analyst, Defendant Ribar disclosed that the low-margin SoC

business had in fact eaten into sales of SiRF's profitable discrete semiconductor GPS platform.

[ANALYST]: I remember your previous guide you noted that Centrality
would probably make up around 10% of your total revenues this quarter and I'm
assuming this was the case.  So is it fair to assume that the contribution from

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    -20-

1    Centrality next quarter will be minimal, if that?  If I just kind of do the math and look at your guidance?

2

3    [RIBAR]: **No, the SoC business last quarter we had said was about 10% of our business, so it was clearly higher this quarter.**

4    The SoC business was "clearly higher" in Q4 2007 than SiRF had said in October 2007, because sales

5    of Centrality's product line had cannibalized sales of SiRF's discrete semiconductor products.

6    Furthermore, in this February conference call, the Company denied having suggested that Centrality's

7    (low margin revenue) would comprise only 10% of their business in Q4 2007.  A review of the

8    October 2007 transcript, however, reveals that the analyst was correct that the Company did suggest

9    Centrality would comprise approximately 10% of Company revenues in Q4 (*see* ¶ 35, *supra*).  If the

10   Company had in fact always assumed that Centrality revenue would be "clearly higher" than "10%

11   of our business" in Q4 2007, as Ribar implies on February 4, 2008, then the Company had in fact

12   materially mislead analysts and the investing public in its response to the direct analyst question on

13   this issue on the October 30, 2007 conference call.

14       63.    SiRF's dramatic EPS shortfall for fourth quarter 2007 ($0.01 versus forecasted $0.31-

15   0.33) was caused by (i) cannibalization of sales SiRF's high-margin products by sales of Centrality's

16   low margin products, (ii) second sourcing of SiRF's products by discrete semiconductor customers,

17   (iii) commoditization of those products by competitors, *i.e.*, MediaTek, and (iv) competitive problems

18   in the wireless segment.  All of these facts were known by defendants during the Class Period.

19       64.    SiRF's February disclosures also constituted a complete reversal of its October 30,

20   2007 statement that "We expect to maintain our gross margins.  We have done for the last five years,

21   we expect it to continue" ... "[i]n the 54% to 55% range".  Not only were Q4 2007 margins actually

22   much lower in the fourth quarter, but Canning admitted that management had *always expected* those

23   lower gross margins.

24       65.    Gross margins were lower in Q4 2007 because margins on SoC products were lower,

25   and because SoC sales had egregiously cannabalized the more profitable SiRFstar III business.  That

26   SoC products had lower margins, and would eat into sales of SiRF's discrete platform, could not have

27   come as a surprise.  CW3 said that Centrality's margins were crucial to the Company's decision to

28   AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                    -21-

1   undertake the acquisition in June 2007, and CW5 confirmed that management had examined those

2   margins carefully.  By October 2007, the Company had lived with lower margins on those products

3   for the three months (since the August 2007 acquisition).  SiRF's employees, its rigorous accounting

4   system, and "Fighting Guide: MediaTek," all told SiRF that demand had plunged for its high margin

5   discrete semiconductor products.  SiRF nevertheless issued Class Period statements that margins

6   would remain stable, that the combination with Centrality had exceeded Company expectations, and

7   that all three of its business segments were benefitting from customer wins under the discrete

8   SiRFstar III platform.  Nor did SiRF correct these statements during the course of the Class Period,

9   as Company prospects deteriorated from impact of low-margin SoC sales.

10      66.   On February 5, 2008, *Forbes.com* wrote, in an article entitled "SiRF Shares

11  Wiped-Out":

12          Shares of SiRF Technologies drowned on Tuesday.

13          The firm closed trading down 54.8%, or $8.91, to $7.36 after announcing
        fourth-quarter earnings below analyst estimates.

14

15          SiRF Technologies, makes parts for GPS devices. The firm saw its shares fall
        after it reported an 89% decrease in fourth-quarter profits to $0.7 million from $9.1

16      million the year before. The company also gave a miserable outlook for the
        first-quarter, predicting a loss of 4 cents per share on revenue of $71 million to $77
        million. Analysts polled by Thomson Financial expected, on average, profit of 24

17      cents per share on revenue of $92.4 million.

18          SiRF is the leading supplier of global positioning system chips, supplying
        industry-leading brands like TomTom and Garmin. Despite demand for the GPS units,

19      pricing has gone down significantly over the last year putting strain on SiRF to lower
        prices as well.

20
            "The guidance was the big bugaboo," said Jefferies analyst Adam Benjamin.

21      "We've been concerned about Portable Navigation Devices pricing pressure, but
        thought the wireless would offset that. Handsets are a billion-unit market; as that takes

22      off that could dwarf the PND market."

23          Benjamin downgraded the stock to "hold" from "buy" and lowered his price
        target to $9 from $32.

24
            "I think over time you will see GPS in all handsets," added Benjamin, "but the

25      question is 'who is going to benefit from that?'"

26          SiRF purchased Centrality Communications, another GPS chip-maker, June
        of last year, giving it the potential to be a bigger player in the wireless market. Mobile

27      phone currently incorporate GPS technology, but it is not widely used. The industry

28

is making a shift over to 3G, or W-CDMA standards, opening up the market for next-gen mobile devices.

67.     Analysts at Canaccord Adams wrote on February 5, 2008 that if SiRF's difficulties continued it "could become a potential takeout candidate." Deutsche Bank wrote "poor quarter, poor outlook," and cut its price target in half (from $18 to $9) because in part "We think **the Centrality SoC products are cannibalizing stand-alone products** which saw no organic growth and even steeper price declines. These trends look set to continue in coming quarters." In its report "Giant Disappointment," Jefferies & Company also credited **lost share of business from TomTom (*i.e.*, second sourcing)**, and order softness from **Motorola**, as likely reasons for the weak Q4. At least eight analysts cut their ratings on SiRF stock as a result of the February 4, 2008 disclosures. Virtually every report cited the reversal in Company margins as a basis for downgrading the stock.

68.     As a result of SiRF's February 4, 2008 disclosures, the stock immediately collapsed by 54%. By the close of trading on February 5, SiRF had dropped $8.91 per share to $7.36 per share, on volume of 63 million shares, 30 times average three-month volume.

69.     As late as March 25, 2008, the Company was still having difficulty with integration of Centrality. On that date, SiRF issued a press release lowering its expectations for revenue in the first quarter 2008, from $71-77 million to $60-62 million. SiRF reported that it had experienced greater than expected softness in product demand in the personal navigation device market. In response, SiRF also announced it would undertake a Company-wide restructuring and lay off 7% of its work force.

70.     An analyst at Pacific Crest Securities said in a March 25, 2008 report that "SiRF mis-estimated the demand from legacy customers of Centrality ... **the transition is not proceeding as orderly as they had hoped**." This stands in sharp contrast with Canning's October 2007, statement that integration had progressed "extremely well". A March 25, 2008 RBC Capital Markets Equity Research report found the "**inability to integrate the Centrality acquisition effectively**" to be a factor that could hold back the stock. A March 25, 2008 Stanford Group analyst report said "Management claims that gross margins should be near the 50% expected but we are forecasting a

1  drop because **we believe the Centrality/SirfStar mix will favor the lower margin Centrality**

2  **products.**" Thus, even in March 2008, contrary to defendants earlier statements, SiRF was still

3  grappling with integration of Centrality and its impact on profit margins.

4       71.    In response to SiRF's March 25, 2008 disclosures, SiRF stock fell further, from $6.89

5  to $4.93 per share, a 28% drop on volume of over 13 million shares.

6                 **LOSS CAUSATION/ECONOMIC LOSS**

7       72.    On February 4, 2008, SiRF announced dramatically lower Q4 2007 margins and

8  earnings. Analysts attributed the drop to cannibalization of SiRF sales by the lower margin Centrality

9  products, and SiRF essentially admitted the same. These disclosures were contrary to earlier

10  statements about strong demand, stable margins, a successful integration of Centrality, and an

11  accelerating wireless market. The disclosures also triggered a swift and material decline in SiRF's

12  share price.

13       73.    On March 25, 2008, when SiRF again missed earnings and announced layoffs,

14  analysts attributed the problems to poor integration of Centrality's business. These additional

15  disclosures in March caused a further material drop of over 28% in the price of SiRF's stock.

16       74.    These market reactions to corrective disclosures are evidence of the extent to which

17  SiRF's stock price had been inflated artificially by defendants' false and misleading statements

18  during the Class Period. By issuing false and misleading statements, withholding the true facts, and

19  failing to correct mistaken information in the market until the end of the Class Period, defendants

20  caused economic loss to Lead Plaintiff and the other members of the Class.

21                 **EFFICIENT MARKET**

22       75.    At all relevant times, the market for SiRF's stock was an efficient market that

23  promptly digested current information with respect to the Company from all publicly available

24  sources and reflected such information in SiRF's stock price.

25       76.    The common stock of SiRF met the requirements for listing, and was listed and

26  actively traded, on the NASDAQ, a highly developed and efficient market. During the class period,

27  SiRF stock was heavily traded, with average daily volume exceeding 1 million shares. SiRF filed

28    AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS           -24-

periodic public reports with the SEC, and was followed by analysts from brokerages including Goldman Sachs & Co., Oppenheimer & Co. Lehman Brothers, Deutsche Bank, Jeffries & Company, and Credit Suisse. The reports of these analysts were redistributed to their customers and the public at large, and SiRF regularly issued press releases, which were carried by national news wires. Thus, the analyst reports and SiRF's press releases entered the public marketplace. As a result, the market for SiRF's stock promptly digested current information with respect to SiRF from all publicly-available sources, and reflected such information in SiRF's stock price. Lead Plaintiff and other members of the Class relied on the integrity of the market price of SiRF's publicly traded stock.

77.    As would be expected when a security is traded in an efficient market, material news concerning SiRF's operations, financial results, and prospects had an immediate effect on the market price of SiRF stock.

78.    At the times Lead Plaintiff purchased or otherwise acquired the Company's stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

## CLASS ACTION ALLEGATIONS

79.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired SiRF publicly traded securities during the Class Period (the "Class"). Excluded from the Class are defendants.

80.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. SiRF has over 60 million shares of stock outstanding, owned by hundreds if not thousands of persons.

81.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by defendants;

(b)    whether defendants omitted and/or misrepresented material facts;

AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                                    -25-

1    (c)    whether defendants' statements omitted material facts necessary to make the

2    statements made, in light of the circumstances under which they were made, not misleading;

3    (d)    whether defendants knew or deliberately disregarded that their statements were

4    false and misleading;

5    (e)    whether the prices of SiRF's publicly traded securities were artificially inflated;

6    and

7    (f)    the extent of damage sustained by Class members and the appropriate measure

8    of damages.

9    82.    Plaintiffs claims are typical of those of the Class because plaintiff and the Class

10   sustained damages from defendants' wrongful conduct.

11   83.    Plaintiff will adequately protect the interests of the Class and has retained counsel who

12   are experienced in class action securities litigation. Plaintiff has no interests which conflict with those

13   of the Class.

14   84.    A class action is superior to other available methods for the fair and efficient

15   adjudication of this controversy.

16                                      **COUNT I**

17                  **For Violation of § 10(b) of the 1934 Act and Rule 10b-5**
                                   **Against All Defendants**

18

19   85.    Plaintiff incorporates ¶¶ 1-84 by reference.

20   86.    During the Class Period, defendants disseminated or approved the false statements

21   specified above, which they knew or deliberately disregarded were misleading in that they contained

22   misrepresentations and failed to disclose material facts necessary in order to make the statements

23   made, in light of the circumstances under which they were made, not misleading.

24   87.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

25   (a)    employed devices, schemes and artifices to defraud;

26   (b)    made untrue statements of material facts or omitted to state material facts

27   necessary in order to make the statements made, in light of the circumstances under which they were

28

1   made, not misleading; or

2           (c)     engaged in acts, practices and a course of business that operated as a fraud or

3   deceit upon plaintiff and others similarly situated in connection with their purchases of SiRF publicly

4   traded securities during the Class Period.

5           88.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of

6   the market, they paid artificially inflated prices for Sirf publicly traded securities. Plaintiff and the

7   Class would not have purchased SiRF publicly traded securities at the prices they paid, or at all, if

8   they had been aware that the market prices had been artificially and falsely inflated by defendants'

9   misleading statements.

10                                      **COUNT II**

11                          **For Violation of § 20(a) of the 1934 Act**
                                    **Against All Defendants**
12

13          89.     Plaintiff incorporates ¶¶ 1- 84 by reference.

14          90.     The Individual Defendants acted as controlling persons of SiRF within the meaning

15  of §20(a) of the 1934 Act.  By reason of their positions with the Company, and their ownership of

16  SiRF stock, the Individual Defendants had the power and authority to cause SiRF to engage in the

17  wrongful conduct complained of herein.  SiRF controlled the Individual Defendants and all of its

18  employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

19

20                                  **PRAYER FOR RELIEF**

21          WHEREFORE, plaintiff prays for judgment as follows:

22          A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

23          B.      Awarding plaintiff and the members of the Class damages, including interest;

24          C.      Awarding plaintiff reasonable costs and attorneys' fees; and

25

26

27

28  AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS                          -27-

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

DATED: July 28, 2008

Respectfully submitted,

GLANCY BINKOW & GOLDBERG LLP

*By: /s/ Michael Goldberg*
        MICHAEL GOLDBERG #188669

LIONEL Z. GLANCY #134180
PETER A. BINKOW #173848
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Liaison Counsel for Lead Plaintiff*

KIRBY McINERNEY LLP
IRA M. PRESS (*admitted pro hac vice*)
PETER S. LINDEN (*admitted pro hac vice*)
RANDALL K. BERGER (*pro hac vice* pending)
825 Third Avenue, 16th Floor
New York, New York  10022
Telephone:  (212) 371-6600
Facsimile: (212) 751-2540

*Lead Counsel for Lead Plaintiff*

JAMES P. ALLEN
ALLEN BROTHERS, PLLC
400 Monroe Street, Suite 220
Detroit, MI 48226
Telephone: (313) 962-7777
Facsimile:  (313) 962-0581

*Additional Counsel for Lead Plaintiff*

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the Named parties, there is no such interest to report.